**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **TEVA PHARMACEUTICAL** | : | |
| **INDUSTRIES, LTD., et al.,** | : | **CIVIL ACTION** |
| | : | |
| **Plaintiffs,** | : | |
| | : | |
| **v.** | : | **No. 16-4870** |
| | : | |
| **UNITEDHEALTHCARE SERVICES, INC.,** | : | |
| | : | |
| **Defendant.** | : | |

**Goldberg, J.**                                                                                          **April 20, 2018**

## MEMORANDUM

      This case arises out of a set of antitrust actions, brought pursuant to <u>FTC v. Actavis, Inc.</u>, 570 U.S. 136 (2013), which involve reverse settlement payments between the brand name manufacturer of the drug Provigil® and various generic drug manufacturers. Following my denial of class certification for the end-payor plaintiffs in the case of <u>Vista Healthplan v. Cephalon, Inc., et al.</u>, Civil Action No. 06-1833, the putative class plaintiffs and a separate group of third-party payers—of which Defendant United Healthcare Services, Inc. ("UHS") was a part—allegedly reached a settlement agreement with brand manufacturer Cephalon, Inc. and two generic manufacturers Teva Pharmaceutical Industries/Teva Pharmaceuticals USA, Inc. and Barr Pharmaceuticals, Inc. (collectively, the "Cephalon Parties"). UHS has renounced the settlement, claiming that the terms set out in the Memorandum of Understanding ("MOU") do not constitute a binding contract and are unenforceable. UHS also asserts that even if the MOU is valid, its lawyers were not authorized to enter into such an agreement. The Cephalon Parties have sued to enforce the MOU.

The Cephalon Parties have moved for partial summary judgment on the sole issue of whether the contract is binding and enforceable as written (the question of the lawyers' authority involves factual issues not appropriate for disposition under Federal Rule of Civil Procedure 56). For the reasons set forth below, I find that the MOU sets forth the essential terms of a settlement and constitutes a binding, enforceable, and unambiguous contract.

## I.     FACTUAL BACKGROUND

In connection with their briefing on the Motion for Partial Summary Judgment, the parties submitted lengthy recitations of the underlying facts accompanied by numerous supporting exhibits.  I provide a synopsis of these facts only for the purpose of lending context to the dispute giving rise to this litigation.  This summary is not necessary to determine, as I do below, that the four corners of the MOU at issue create a legally binding and enforceable contract, are unambiguous, and clearly define the parties' mutual obligations.

### A.     Background - Provigil® Litigation

Beginning in 2006, a series of antitrust suits were brought alleging that delayed entry of generic versions of the branded drug Provigil® resulted in various entities and individuals overpaying for the drug.  These lawsuits were consolidated into multiple subcategories, including:  cases filed by direct purchasers of Provigil from Cephalon for re-distribution, King Drug Company of Florence, Inc., et al. v. Cephalon, Inc., et al., Civil Action No. 06-1797; cases brought by end-payors that purchased Provigil indirectly, Vista Healthplan, Inc. et al. v. Cephalon, Inc., et al., Civil Action No. 06-1833; a case filed by the Federal Trade Commission ("FTC"), Federal Trade Commission v. Cephalon, Inc., Civil Action No. 08-2141, and a case brought by a separate generic drug company, Apotex v. Cephalon, Inc., et al., Civil Action No. 06-2768.

Cephalon, Inc. reached a settlement with the FTC in May 2015, resulting in a Stipulated Order for Permanent Injunction and Equitable Monetary Relief, which I entered on June 17, 2015. That settlement required Cephalon, Inc. to deposit $1.2 billion, less amounts already paid out in related case settlements, into an FTC-administered account. I also ordered that the FTC Settlement Fund be held in trust to satisfy the amount of any settlement or judgment regarding other Provigil claims. Subsequently, the Cephalon Parties reached settlements with other plaintiffs, all of which have been or will be paid from the FTC Settlement Fund.

B.      **The End-Payor Litigation and Coordination of Settlement Talks**

As noted above, a class action was brought by the end-payors of Provigil ("end-payor plaintiffs") in Vista HealthPlan, Inc. et al. v. Cephalon Inc., et al. Civ. A. No. 06-1833. The lead lawyers for that proposed putative class included, among others, Jeffrey Kodroff and John Macoretta of Spector Roseman Kodroff & Willis, P.C. (Decl. of Abby Dennis ("Dennis Decl."), Ex. 1, at UHS-EDPa-0000420.) I denied class certification on June 1, 2015.

Following the denial of the class certification motion, Mr. Macoretta, on behalf of the former putative class members, began settlement discussions with Jay Lefkowitz of Kirkland and Ellis LLP, counsel for the Cephalon Parties. (Dennis Decl., Ex. 7.) Soon thereafter, another attorney, Richard Cohen of the Lowey firm, also contacted Mr. Lefkowitz, stating that he represented "a group of large third party payers including Aetna, Humana, the Blue Cross Association, and others" that intended to either intervene in the existing action or file a new action. (Dennis Decl., Ex. 8.) UHS was among this group of third-party payers. (Id.)

At that time, UHS, as an individual entity, was represented by Robert Rhoad of Crowell & Moring LLP, and Mark Sandmann and Pamela Slate, both of Hill, Hill, Carter, Franco, Cole &

Black, P.C. (collectively, "UHS outside counsel"). (Dennis Decl., Ex. 10.) UHS's in-house counsel was Elizabeth Schmiesing. (Id.)

Given the myriad of attorneys involved in the settlement talks, a summary of the various parties/groups and attorneys/law firms is helpful:

| Party or Parties | Lead Attorney(s) | Law Firm |
|---|---|---|
| Cephalon Parties | Jay Lefkowitz<br>Greg Skidmore | Kirkland & Ellis |
| Putative End Payor Class Members | John Macoretta<br>Jeffrey Kodroff | Spector Roseman Kodroff & Willis, P.C. |
| Third-Party Payers (later known as "SHPs") | Richard Cohen | Lowey firm |
| UHS (outside counsel) | Robert Rhoad<br><br>Mark Sandmann<br>Pamela Slate | Crowell & Moring, LLP<br><br>Hill, Hill, Carter, Franco, Cole & Black, P.C. |
| UHS (in-house counsel) | Elizabeth Schmiesing | |

Mr. Lefkowitz stated that he, acting on behalf of the Cephalon Parties, had no direct communications with any of UHS's attorneys between June 1, 2015, when class certification was denied, and December 7, 2015, when the MOU was signed. (Dennis Decl., Ex. 9, Dep. of Jay Lefkowitz ("Lefkowitz Dep."), 16:19–17:7, 20:19–21:7, 113:23–114:14; Id. Ex. 11, Dep. of Greg Skidmore ("Skidmore Dep."), 88:20–89:23, 174:14–175:11.) UHS's outside counsel, however, participated in the settlement efforts of the third-party payer group coordinated by Mr. Cohen. In July 2015, UHS outside counsel Mr. Sandmann e-mailed UHS's in-house counsel Ms. Schmiesing indicating that UHS was "working with" Mr. Cohen and talking to the "class." (Decl. of Bradley Weidenhammer ("Weidenhammer Decl."), Ex. 2, at UHS-EDPa-0002963–64.) According to this e-mail,

> The intent is to have a discussion and make a unified demand on Cephalon for payment out of the disgorgement fund. Cephalon has indicated (n[o]t surprisingly) that they need "global peace", meaning something with us, the independently represented plans

and a "class" to act as the "clean-up" for any potential remaining parties. We plan to present a united front to Cephalon (our respective firms and the class). The next step (mentioned above), and which will occur next week, is to get all the groups together and begin discussing what we would like to collectively present as our demand.

(Id.) When asked about her understanding of this e-mail, Ms. Schmiesing testified:

A.    What I understand by this last sentence is that all of the groups, including, you know, the groups represented by other law firms, were going to get together and make a collective demand.
Q.    Right.
A.    Not that there would be a demand presented on behalf of United, per se.
Q.    But United was—you understood that United was one of the members of the group that would be making a demand to the Cephalon defendants to settle Provigil, right?
A.    Yes.

(Weidenhammer Decl., Ex. 3, Dep. of Elizabeth Schmiesing ("Schmiesing Dep.") 78:10–79:14.)

On July 10, 2015, Mr. Cohen informed Mr. Lefkowitz that "we have brought into our fold the lawyers representing most of the rest of major health insurers. So we will be able to come to the table with United Healthcare, Massachusetts Minnesota and North Carolina Blue Cross, Assurant and several others." (Dennis Decl., Ex. 12.) Ten days later, Mr. Cohen wrote again, stating "we've made peace with the Macoretta class action group, so we expect to be able to negotiate for virtually all endpayers." (Dennis Decl., Ex. 13.)

During this time, Mr. Cohen and Mssrs. Lefkowitz and Skidmore negotiated a tolling agreement. This agreement was first executed by Mr. Cohen on July 8, 2015, on behalf of the approximately twenty health plans his firm represented, with additional lawyers signing on behalf of different clients at later dates. (Dennis Decl., Exs. 14–16.) Mr. Sandmann and Mr. Rhoad, on behalf of UHS, signed the tolling agreement on July 22, 2015. (Id.) These health

plans, through lead counsel Mr. Cohen, eventually became known as the Settling Health Plans ("SHPs").

C.    **The October 22, 2015 Phone Call**

All parties agree that, on October 22, 2015, Mr. Lefkowitz and Mr. Cohen participated in a phone call in which they agreed to a $125 million settlement number in exchange for a global release of Provigil-related claims against the Cephalon Parties. (Lefkowitz Dep. 85:18–86:11.) Mr. Cohen described it as a "routine settlement negotiation" which was the final step after "many, many steps leading up to it." (Dennis Decl., Ex. 18, Dep. of Richard Cohen ("Cohen Dep."), 111:4–113:4.)

Mr. Cohen indicated that he engaged in multiple communications to keep his negotiating partners from the other SHPs apprised of the progress in the settlement negotiations:

> Nobody—nobody was—never was a number discussed with Jay without everybody—all the counsel who had signed the tolling agreements for A, B, and C being consulted and approving.
>
> And we—we had robust discussions, disagreements, and ultimately consensus on each number that we communicated to Jay and on the final number to which we agreed.

(Cohen Dep. 104:6–17.) Mr. Sandmann remarked that he did not participate in the settlement negotiations that led to the October 22, 2015 phone conference, but agreed that Cohen did report to UHS the communications with the Cephalon Parties. (Dennis Decl, Ex. 21, Dep. of Mark Sandmann ("Sandmann Dep."), 104:4–105:8.)

D.    **Discussions Between the October 22, 2015 Phone Call and the December 7, 2015 Signing of the MOU**

Subsequent to the October 22, 2015 phone call, Mr. Lefkowitz circulated a draft MOU among counsel for the various plaintiffs. (Dennis Decl., Ex. 23.) Thereafter, Mr. Cohen, for the SHPs, and Mr. Macoretta, for the putative class, developed a plan wherein $77 million of the

$125 million settlement would be initially allocated to the SHPs as a "quick pay," $48 million would be initially allocated to the putative class, and there would be a "true up" or "clawback" formula pursuant to an "Allocation Agreement" that the class lawyers and the Lowey firm intended to sign with counsel for all of the other health insurance companies on the MOU.[1] (Dennis Decl., Ex., 29, Dep. of John Macoretta ("Macoretta Dep."), 150:4–152:6.)   Mr. Lefkowitz, speaking for the Cephalon Parties, indicated that he wanted to know the allocation before the Cephalon Parties would sign off on the MOU because it impacted their "evaluation of things like how likely the class settlement is to be approved."  (Dennis Decl., Ex. 28.)  A draft

---

[1]  Mr. Macoretta explained the "true up" and "clawback" as follows:

> A.      The SHPs are health plans, just like every other health plan in the class. The concept is health plans in the class and health plans separate, the SHPs, will all get—will all get the same pro rata share of their damages from the settlement.
>
> Because the SHPS get 77 million up front, we don't—and we don't know who is going to make claims in the class, we can't tell exactly how much of the combined TPP [third-party payor] pot should really go to the SHPs versus the class plaintiffs.
>
> We are going to start by giving the SHPs 77.  But after we see all the class TPP claims and we look at them and look at the SHP claims, we have to balance that to see if the 77 was the correct amount.  That is the true-up.
> . . .
> Q.      Is it also correct that it could work in the opposite direction; that if all of the absent class members or a high percentage perhaps all, submitted verified claims, that there would be a need to clawback some of the 77 million to ensure that those class members got the same percentage that the so-classed SHPs got?
> . . .
> A.      Yes, but there could be money flowing back from the SHPs to the class TPPs, not only if a lot of class TPPs filed their claims, but if the SHP claims turned out to be less than everybody originally thought they were.

(Macoretta Dep.151:11–156:11.)

Allocation Agreement was provided to UHS, but it was never finalized or executed. (Dennis Decl., Ex. 30; Macoretta Dep. 150:6–21.)

### E. The Memorandum of Understanding

In early December 2015, counsel for the putative class members, the SHPs, and the Cephalon Parties signed a Memorandum of Understanding ("MOU"), which, according to its language, "memorializes the principal terms of a settlement agreement reached on October 22, 2015 by and between" the putative class plaintiffs, the SHPs, and the Cephalon Parties. (Pls.' Mot. Summ. J., Ex. A ("MOU"), 1.) UHS is a "Schedule C" party to the MOU, and outside counsel, Rhoad, Sandmann, and Slate all signed the MOU on UHS's behalf.

In the introduction, the MOU states:

> This memorandum of understanding ("MOU") memorializes the principal terms of a settlement agreement reached on October 22, 2015 by and between the following persons and entities (collectively, "the Parties") and to be incorporated into a written settlement agreement that will be presented to the Court for approval with respect to the End Payor Plaintiffs and End-Payor Settlement Class ("End-Payor Class Settlement Agreement"), and a separate written settlement agreement with the Settling Health Plans listed on the attached A–D ("SHP Settlement Agreement"), which agreements together will result in a comprehensive settlement between the Cephalon Defendants and Plaintiffs.

(MOU at Introduction.)

The MOU then provides that "Plaintiffs will release all claims against the Cephalon [Parties] and covenant not to sue the Cephalon [Parties] on any claims relating in any way to the claims asserted in the lawsuit filed by the End-Payor Plaintiffs and related actions." (Id. ¶ 1.) In exchange for these releases, the Cephalon Parties were to request from the FTC Settlement Fund certain amounts for each group of plaintiffs. With respect to the SHPs, the Cephalon Parties agreed to request disbursement from the Settlement Fund in the amount of $77 million into "an

account designated by Plaintiffs' Counsel." (Id. ¶ 2.) With respect to the End-Payor putative class, the Cephalon Parties agreed to request a disbursement in the amount of $48 million, to be paid into a "qualified settlement escrow account established by Plaintiffs' Counsel." (Id. ¶ 3.) According to the MOU, these terms were to be "incorporated into" two separate settlement agreements—the End-Payor Class Settlement Agreement and the SHP Settlement Agreement— and the collective payments under those agreements would be entitled the "Settlement Payment," and would not exceed $125 million. (Id. ¶ 4.) The MOU then states that "[t]he settlement is binding and enforceable, and, unless otherwise agreed to in writing, the terms, including the Settlement Payment, will not change regardless of any rulings issued by the Court on pending motions . . . ." (Id. ¶ 5.)

### F. UHS's Refusal to Consider Itself Bound

Approximately, six months after execution of the MOU, UHS informed the Cephalon parties that it did not consider itself bound by the settlement. UHS fired its outside counsel (Rhoad, Sandmann, and Slate), and new counsel for UHS sent the Cephalon Parties a letter stating as follows:

> We understand that there have been settlement discussions between you and counsel seeking to represent the class of indirect purchasers (at Lowey Dannenberg Cohen & Hart), as well with other counsel purporting to represent a group of large indirect purchasers (Crowell & Moring). As UnitedHealth has informed you, none of those lawyers ever received authorization to make any offer of settlement, or to agree to any offer of settlement, by or on behalf of UnitedHealth. Thus, any memorandum of understanding or other agreement you may have with those lawyers does not affect UnitedHealth.

(Compl., Ex. C, at p. 1.)

### G. **Procedural History**

On July 28, 2016, UHS commenced an individual antitrust action against the Cephalon Parties, and several other Defendants, in the United States District Court for the District of Minnesota, captioned United Healthcare Services, Inc. v. Cephalon, Inc., et al., Civil Action No. 16-0263. The claims raised in that action were substantially similar to those raised in the Vista HealthPlan action, but for the fact that they were brought under a Minnesota antitrust statute. That case was subsequently transferred to this Court on February 6, 2017.

On September 9, 2016, the Cephalon Parties initiated this action against UHS alleging that UHS breached the MOU by failing to abide by its terms. On December 18, 2017, and following discovery, the Cephalon Parties filed a dispositive motion solely on the issue of whether the MOU is binding and/or ambiguous. UHS responded on January 26, 2018, and the Cephalon Parties filed their reply brief on February 16, 2018.

## II.     STANDARD OF REVIEW

The Cephalon Parties move for summary judgment under Federal Rule of Civil Procedure 56. This rule states, in pertinent part:

> A party may move for summary judgment, identifying each claim or defense—or the part of each claim or defense—on which summary judgment is sought. The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. The court should state on the record the reasons for granting or denying the motion.

Fed. R. Civ. P. 56(a). "Through summary adjudication, the court may dispose of those claims that do not present a 'genuine dispute as to any material fact' and for which a jury trial would be an empty and unnecessary formality." Capitol Presort Servs., LLC v. XL Health Corp., 175 F. Supp. 3d 430, 433 (M.D. Pa. 2016).

## III.    DISCUSSION

The crux of the Cephalon Parties' Motion for Partial Summary Judgment is that the MOU's principal settlement terms are unambiguous, binding, and enforceable.  UHS counters with two main arguments.  First, it contends that the MOU is not a binding contract, but rather is a provisional "an agreement to agree."  Second, UHS asserts that even assuming the MOU is contractual, it contains multiple ambiguous material terms which cannot be interpreted without reference to extrinsic evidence.  I consider each argument individually.

### A.    Whether the MOU is an Enforceable Contract

The parties offer divergent versions about the intent behind the MOU.  The Cephalon Parties urge that the MOU clearly memorializes the parties' unambiguous intent to settle the case:  the end-payor putative class plaintiffs and the SHPs (including UHS) would release all claims against the Cephalon Parties related to those raised in the Vista Healthplan action, while the Cephalon Parties would pay all plaintiffs a collective amount of $125 million, $77 million of which was to go to the SHPS.  UHS, on the other hand, avers that the MOU was not a contract, but rather was simply part of negotiations intended to lead to a never-finalized, future settlement contract.

Under Pennsylvania law,[2] an enforceable agreement requires three components:  a mutual intention to be bound, definite terms, and consideration on both sides.  Channel Home Ctrs. v. Grossman, 795 F.2d 298–99 (3d Cir. 1986).  Here, neither side contests the element of consideration.  Rather, they dispute (1) whether the parties manifested a mutual intent to be bound and (2) whether the MOU was sufficiently definite to show that the parties agreed upon the material and necessary details of the bargain.

---

[2]  The parties agree that Pennsylvania law governs the contractual portion of this dispute.

1.     Intent to Be Bound

The first element in the test for enforceability of a contract is whether both parties have manifested an intention to be bound.  Am. Eagle Outfitters v. Lyle & Scott Ltd., 584 F.3d 575, 582 (3d Cir. 2009) (citations omitted).  "In assessing intent, the object of inquiry is not the inner, subjective intent of the parties, but rather the intent a reasonable person would apprehend in considering the parties' behavior."  Id. (citing Ingrassia Constr. Co., Inc. v. Walsh, 486 A.2d 478, 483 (Pa. 1984).  "Accordingly, 'a true and actual meeting of the minds is not necessary to form a contract.'"  Id. (citing Ingrassia, 486 A.2d at 483).

Pennsylvania law has "long recognized the principle that documents, having the surface appearance of contracts may be in fact evidence of mere negotiating by parties with a view toward executing a binding contract in the future."  Goldman v. McShain, 247 A.2d 455, 458 (Pa. 1968).  As such, "evidence of preliminary negotiations or an agreement to enter into a binding contract in the future does not alone constitute a contract."  Am. Eagle, 584 F.3d at 582 (quoting Channel Home Ctrs., 795 F.2d at 298; ATACS Corp. v. Trans World Commc'ns, Inc., 155 F.3d 659, 666–67 (3d Cir. 1998)) (further quotations omitted).

Nevertheless, "parties may bind themselves contractually although they intend, at some later date, to draft a more formal document."  Am. Eagle, 584 F.3d at 582 (quoting Goldman v. McShain, 247 A.2d 455, 459 (Pa. 1968)).  "Mutual manifestations of assent that are in themselves sufficient to make a contract will not be prevented from so operating by the mere fact that the parties also manifest an intention to prepare and adopt a written memorial thereof . . . ."  Id. at 582 (quoting Restatement (First) of Contracts § 26 (1932)).

The strongest objective manifestation of intent is the language of the contract.  Mellon Bank N.A. v. Aetna Bus. Credit, 619 F.2d 1001, 1009 (E.D. Pa. 1980).  Pennsylvania courts

apply the "plain meaning rule" of interpretation of contracts, which assumes that the intent of the parties to an instrument is "embodied in the writing itself, and when the words are clear and unambiguous the intent is to be discovered only from the express language of the agreement." Cnty. of Dauphin v. Fid. & Deposit Co. of Md., 770 F. Supp. 248, 251 (M.D. Pa.) (quotation omitted), aff'd, 937 F.2d 596 (3d Cir. 1991). Where the words of the contract clearly manifest the parties' intent, a court need not "resort to extrinsic aids or evidence." Am. Eagle, 584 F.3d at 587 (citation and internal quotation marks omitted).

Here, the plain language of the MOU directly addresses the question of enforceability by setting forth objective manifestations of the parties' intent. The introduction states that "[t]his memorandum of understanding ("MOU") memorializes the principal terms of a settlement agreement reached on October 22, 2015." (MOU at Introduction.) Notably, it contains no reference to further negotiations on material terms.

Paragraph five of the MOU goes on to emphasize that "[t]he settlement is binding and enforceable, and, unless otherwise agreed to in writing, the terms, including the Settlement Payment, will not change" regardless of any rulings issued by any court. (Id. ¶ 5.) Although the MOU provides for the parties to enter into other, future written contracts that describe precise allocation of the settlement proceeds, the MOU itself—which sets forth the essential terms of the October 22, 2015 oral settlement—manifests a stand-alone document that is intended to obligate both parties. To read the MOU as provisional and non-binding would render the Introduction's "binding and enforceable" language meaningless.

It is also notable that, just above counsel's signatures, the MOU states that the parties "Accepted and Agreed" to the MOU's terms. Rather, than signifying a simple understanding or agreement to agree in the future, such language denotes contractual assent. See FCOF UB Secs.

LLC v. MorEquity, Inc., 663 F. Supp. 2d 224, 229 (S.D.N.Y. 2009) ("[T]he Initial Commitment was "Accepted and Agreed" by both parties . . . indicating that the parties may have intended to be bound."). Based on this plain language, I find that the parties intended the MOU to be a binding agreement.

Despite the unambiguous language of the MOU, UHS raises a multitude of arguments in support of its theory that the MOU was simply one step of many in the settlement negotiations between the parties and, therefore, does not itself reflect the parties' mutual assent to be bound. None of UHS's arguments, however, raise any basis for interpreting the contract other than by its plain meaning.

First, UHS notes that the MOU is entitled "Memorandum of Understanding" as opposed to a "contract" or "agreement." UHS posits that the normal meaning of the term "memorandum of understanding," as defined in Black's Law Dictionary, is the same for "letter of intent," which is defined as:

> A written statement detailing the preliminary understanding of parties who plan to enter into a contract or some other agreement; a noncommittal writing preliminary to a contract. A letter of intent is not meant to be binding and does not hinder the parties from bargaining with a third party. Business people typically mean not to be bound by a letter of intent, and courts ordinarily do not enforce one; but courts occasionally find that a commitment has been made . . . . Also termed *memorandum of intent; memorandum of understanding; term sheets; commitment letter.*

Black's Law Dictionary (10th ed. 2014), at 924.

A document's label does not dictate whether it constitutes an enforceable contract. See California Sun Tanning USA, Inc. v. Electric Beach, Inc., 369 F. App'x 340, 347 (3d Cir. 2010) (finding that party's e-mails evidenced parties' mutual assent and intention to be bound by the material terms of the contemplated settlement despite parties' stated intention to later enter into

an asset purchase agreement which would encompass mutual releases of claims by parties); <u>Am. Eagle</u>, 584 F.3d at 582 (finding informal document memorializing content of settlement discussions and points of agreement constituted a binding agreement and not just a stepping stone on the way to further negotiations); <u>DeHainaut v. Cal. Univ. of Pa.</u>, 490 F. App'x 420, 422 (3d Cir. 2012) (finding that a "Memo of Agreement" constituted a binding settlement contract). Accordingly, the mere use of the term "Memorandum of Understanding" is neither dispositive nor indicative of the intention of the parties to be bound.[3]

Second, UHS challenges the Cephalon Parties' interpretation of paragraph five of the MOU, which states that:

> The settlement is binding and enforceable, and, unless otherwise agreed to in writing, the terms, including the Settlement Payment, will not change regardless of any rulings issued by the Court on pending motions, and regardless of any ruling by the United States Court of Appeals for the Third Circuit on the End-Payor Plaintiffs' pending petition for leave to appeal under Federal Rule of Civil Procedure 23(f).

(MOU ¶ 5.) UHS notes that the above language does not say that "this MOU" is binding and enforceable and, as such, it is "unclear exactly what 'the settlement' references." (Def.'s Opp'n Summ. J. 28.) UHS urges that the "settlement" could be read to refer to the "End Payor Class Settlement Agreement," or to the "SHP Settlement Agreement," both of which are discussed in the document.

---

[3] <u>See also</u> <u>Harmony Dairy Co. v. Local Union 205 of Int'l Bhd. of Teamsters</u>, No. 72-803, 1972 WL 1038 (W.D. Pa. Oct. 18, 1972) (finding a memorandum of understanding to be a binding contract); <u>Zippysack LLC v. Ontel Prods. Corp.</u>, 182 F. Supp. 3d 867, 872 (N.D. Ill. 2016) ("That the parties styled the settlement a 'memorandum of understanding' has no effect on its finality. They may have intended to work out additional terms at a later date, but they undoubtedly intended to be bound by the document."); <u>Glyka v. New England Cord Blood Bank, Inc.</u>, No. 07-10950, 2009 WL 1816955, at *4 (D. Mass. June 29, 2009) (finding that a memorandum of understanding that encompasses material terms of the parties' contractual agreement is binding).

This interpretation is strained at best.[4]  The introduction of the MOU states that "[t]his memorandum of understanding . . . memorializes the principal terms of a settlement agreement reached on October 22, 2015 . . ."  (MOU at Intro.)  The fact that the provision is written in the present tense undermines any notion that "settlement" refers to the yet-to-be-executed End Payor Class and SHP Settlement Agreements defined in the MOU.  Paragraph six of the MOU bolsters this interpretation and states, "[t]he End-Payor Plaintiffs and the Cephalon Defendants have jointly informed the Court of the settlement."  This language suggests that the term "settlement" refers to one that already exists.  Reading paragraphs five and six in context with the remainder of the MOU belies UHS's assertion that the MOU does not manifest the parties' clear intent.  See Regents of Mercersburg Coll. v. Republic Franklin Ins. Co., 458 F.3d 159, 172 (3d Cir. 2006) ("Courts should not . . . distort the meaning of the language or strain to find an ambiguity.") (citations omitted).

Third, UHS argues that paragraph five contains an additional ambiguity as to what is meant by the "settlement agreement" because paragraph eight provides:  "The SHP Settlement Agreement will be final when executed."  Because the SHP Settlement Agreement has never been executed, UHS claims that "the settlement" is not final and cannot be binding and enforceable.

UHS, however, reads paragraphs five and eight out of context.  Paragraph eight discusses only the "*End-Payor* Class Settlement Agreement" and the "*SHP* Settlement Agreement."  The introduction to the MOU defines these terms separately from the overall "comprehensive settlement" of paragraph five, which clearly included UHS:

---

[4]     Indeed, UHS admits that the Cephalon Parties' interpretation is the more "natural" interpretation.  (See Def.'s Opp'n Summ. J. 28 (conceding, contrary to its argument, that the word "settlement" is "most naturally read to refer to the October 22, 2015 'settlement agreement' referred to in the first sentence of the MOU.").

This memorandum of understanding ("MOU") memorializes the principal terms of a settlement agreement reached on October 22, 2015 by and between the following persons and entities (collectively, "the Parties") and to be incorporated into a written settlement agreement that will be presented to the Court for approval with respect to the End Payor Plaintiffs and End-Payor Settlement Class ("End-Payor Class Settlement Agreement"), and a separate written settlement agreement with the Settling Health Plans listed on the attached A–D ("SHP Settlement Agreement"), which agreements together will result in a comprehensive settlement between the Cephalon Defendants and Plaintiffs.

(MOU at Intro.)

Paragraph five simply evidences an intent by the parties to make the MOU's overall terms part of two additional, separate Settlement Agreements, which would be subsequently executed. Nothing in the MOU suggests that the binding nature of the document is contingent on the future finalization of the End Payor Class Settlement Agreement and/or SHP Settlement Agreement. See ATACS Corp., 155 F.3d at 667 ("The fact that the parties never finalized an implementing subcontract is usually not fatal to enforcing the teaming agreement on its own—if the parties intended the teaming agreement itself to constitute a binding agreement that enumerated definite terms of behavior governing the parties during, or even after, the bidding process."); Channel Hom Ctrs., 795 F.2d at 298–300 (3d Cir. 1986) (concluding that a "letter of intent" between parties to a transaction created a "mutually binding obligation" even though the parties never reached a final agreement on the terms of the bargain).

Fourth, UHS urges that the MOU is "dominated by future tense constructions that 'say' the parties 'will' do certain things" rather than saying "the parties 'shall' do these things." For example, UHS notes that paragraph one of the MOU provides that the releases "will be substantially similar to the release and covenant not to sue in the Settlement Agreement between Cephalon Defendants and the Direct Purchaser Class," which contemplates future negotiation as

to what is "substantially similar." (MOU ¶ 1.) Paragraph two also states that Cephalon "will" request a disbursement of funds from the FTC only after the "execution by all parties of both the final SHP Settlement Agreement and the End-Payor Class Settlement Agreement." (Id. ¶ 2.) Thus, according to UHS, the consideration Cephalon is to provide under the MOU—the disbursement of funds from the FTC—is dependent on the future finalization of a formal settlement agreement.

This argument is meritless for several reasons. First, I note that references to "releases" typically are consistent with settlements and not ongoing negotiations. Second, UHS provides no legal support for the argument that the word "will" is somehow less binding than the word "shall."[5] As noted by Plaintiffs, the word "will" is "the ordinary verb of promise." (Pl.'s Reply 10 (quoting Bryan A. Garner, "Shall We Abandon Shall?" (Aug. 2012, http://www.abajournal.com/ magazine/article/ shall_we_abandon_shall/).) Third, the provisions of the MOU which actually memorialize the settlement and make it binding are written in the present and mandatory tense. (See MOU at Intro ("This memorandum of understanding ('MOU') memorializes the principal terms of a settlement agreement . . . .); MOU ¶ 5 ("The settlement is binding and enforceable . . .").) Finally, to the extent the MOU talks in future tense, it is well established in contract law that "an agreement with open terms may nevertheless constitute an enforceable contract." ATACS Corp., 155 F.3d at 666 (3d Cir. 1998); see also Compu Forms Control, Inc. v. Altus Grp., Inc., 574 A.2d 618, 624 (Pa. Super. Ct. 1990) ("[I]f the parties agree

_____

[5] Defendants cite Norton v. Southern Utah Wilderness Alliance, 542 U.S. 55, 67–69 (2004) for the proposition that use of the word "will" rather than "shall" fails to create a binding commitment. No fair reading of Norton suggests that it sets such a broad rule. Rather, Norton found that, in the context of the land use plans before it, a statement that a party "will" take a certain action was not a binding commitment "absent clear indication of binding commitment in the terms of the plan." Id. at 69.

on essential terms and intend them to be mutually binding, a contract is formed even though the parties intend to adopt a formal document later which will include additional terms.").

UHS's last argument is that the extrinsic evidence confirms that the MOU was not understood to be binding. UHS reasons that "[t]he contemporaneous documents show that UHS's lawyers at Hill Hill and Crowell understood the MOU to be a 'proposed settlement' or 'proposed agreement,' which is how they consistently described it in their written communications with UHS at the time."

Given the unequivocal language of the contract, however, reference to extrinsic evidence is both unnecessary and improper. As set forth above, "[i]n assessing intent, the object of inquiry is not the inner, subjective intent of the parties, but rather the intent a reasonable person would apprehend in considering the parties' behavior."[6] Am. Eagle, 584 F.3d at 582 (citing Ingrassia Constr. Co., Inc. v. Walsh, 486 A.2d 478, 483 (Pa. 1984)). "Accordingly, 'a true and actual meeting of the minds is not necessary to form a contract.'" Id. (citing Ingrassia, 486 A.2d at 483). As observed in the Restatement (Second) of Contracts:

---

[6]     UHS argues that because the MOU does not contain an integration clause, it is not an integrated document and, as such, does not preclude reference to extrinsic evidence to determine intent to enter a contract. It goes on to contend that in cases where the issue of contract formation has been disputed, courts do not limit themselves solely to whatever writing one party might claim constitutes the contract, but rather looks at both that writing and the surrounding facts and circumstances. Thus, UHS concludes that where the facts are in dispute, the question of whether a contract was formed is for the trier of fact to describe.

Pennsylvania contract law, however, "begins with the 'firmly settled' point that 'the intent of the parties to a written contract is contained in the writing itself.'" Bohler-Uddeholm America, Inc. v. Ellwood Group, Inc., 247 F.3d 79, 92–93 (3d Cir. 2001) (citing Krizovensky v. Krizovensky, 624 A.2d 638, 642 (Pa. Super. Ct. 1993)). "'Where the intention of the parties is clear, there is no need to resort to extrinsic aids or evidence,'" instead, the meaning of a clear and unequivocal written contract "'must be determined by its contents alone.'" Id. (further quotations omitted). "[W]here language is clear and unambiguous, the focus of interpretation is upon the terms of the agreement as *manifestly expressed*, rather than as, perhaps, silently intended." Id. (emphasis in original) (citations omitted). "Clear contractual terms that are capable of one reasonable interpretation must be given effect without reference to matters outside the contract." Id. (citing Krizovensky, 624 A.2d at 642).

> The parties to most contracts give actual as well as apparent assent, but it is clear that a mental reservation of a party to a bargain does not impair the obligation he purports to undertake. The phrase used here, therefore, is "manifestation of mutual assent."

Restatement (Second) of Contracts § 17 cmt. c (1981). "[L]est the ambiguity inquiry degenerate into an impermissible analysis of the parties' subject intent, such an inquiry appropriately is confined to determining 'the parties' linguistic reference.'" Duquesne Light Co. v. Westinghouse Elec. Corp., 66 F.3d 605, 614 (3d Cir. 1995) (quotations omitted).[7]

In clear, plain language, the MOU: references principal terms of a settlement agreement reached on a specific date; notes that the settlement is "binding and enforceable;" states that the terms "will not change;" and concludes that the parties accept and agree to the terms. In short, the MOU unequivocally evidences the parties' intention to enter into a binding settlement agreement wherein all signing parties, which included UHS, released their claims against the Cephalon Parties in exchange for some share of a $125 million payment by the Cephalon Parties. While UHS contends that the MOU was simply an unworkable statement of the parties' intention to enter into future agreements, "[a] meeting of the minds can occur in the absence of each and every obligation of the parties having been particularized." United Incentives, Inc. v. Sea Gull Lighting Prods., Inc., No. 91-0226, 1992 WL 41322, at *4 (E.D. Pa. Mar. 2, 1992). "Once it is determined that the parties intended to form a binding agreement, certainty of terms is important only as a basis for determining the existence of a breach and for giving an appropriate remedy." Browne v. Maxfield, 663 F. Supp. 1193, 1198 (E.D. Pa. 1987) (quoting Restatement (Second) of

---

[7] In any event, the record suggests that the SHPs understood the MOU to be binding. In the course of drafting the SHPs Settlement Agreement contemplated by the MOU, the parties included the following language: "WHEREAS, the parties have entered into a *binding Memorandum of Understanding* that contemplates the entry of this Settlement Agreement which *will remain in force and effect* only until this Settlement Agreement becomes effective, at which point the Memorandum of Understanding will be superseded by the Settlement Agreement." (Weidenhammer Decl., Ex. 10 (emphasis added).)

Contracts § 33). I view UHS's efforts to create a genuine issue of material fact on this issue, and thereby avoid summary judgment, as post-hoc efforts to undermine the clear language of the MOU.

2. <u>Whether the Terms of the MOU Are Sufficiently Definite to Show that the Parties Agreed Upon the Material and Necessary Details of the Bargain</u>

Further inquiry is necessary. Even if the parties have objectively manifested their intention to contract, "in order for there to be an enforceable contract, the nature and extent of its obligation must be certain; the parties themselves must agree upon the material and necessary details of the bargain." <u>Am. Eagle</u>, 584 F.3d at 585 (quoting <u>Lombardo v. Gasparini Excavating Co.</u>, 123 A.2d 663, 666 (Pa. 1956)). In other words, a court must look to see if "the terms are sufficiently definite to be enforced." <u>Id.</u> (quoting <u>Channel Home Ctrs. v. Grossman</u>, 795 F.2d 291, 298–99 (3d Cir. 1986)). Whether terms are sufficiently definite is a question of law. <u>Id.</u> "'The burden of proving the existence of a contract lies with the party relying on its existence.'" <u>Guzzi v. Morano</u>, No. 10–1112, 2013 WL 4042511, at *10 (E.D. Pa. Aug. 8, 2013) (quoting <u>Edmondson v. Zetusky</u>, 674 A.2d 760, 764 (Pa. Commw. Ct. 1996)).

If there are "ambiguities and undetermined matters which render a settlement agreement impossible to understand and enforce, such an agreement must be set aside." <u>Calif. Sun Tanning</u>, 369 F. App'x at 347. The definiteness requirement, however, does not mean that the presence of any interpretive ambiguity renders an agreement unenforceable. <u>Shell's Disposal & Recycling, Inc. v. City of Lancaster</u>, 504 F. App'x 194, 202 (3d Cir. 2012). Rather, if the ambiguity "goes to the details of the performance, not to the 'nature and extent of [the parties'] obligation[s]'" that ambiguity does not render the contract unenforceable. <u>Id.</u> at 202. In short, "[i]f all of the material terms of a bargain are agreed upon, the settlement agreement will be enforced." <u>Calif. Sun Tanning</u>, 369 F. App'x at 347.

As set forth above, the MOU clearly delineates the principal settlement terms: the SHPs and class members would release all claims against the Cephalon Parties in exchange for a $125 million payment. The MOU further indicates that the division of this payment among the settling plaintiffs would provide $48 million to the class members and $77 million to the SHPs, the former of which was subject to approval of the class settlement. At no point would Cephalon be required to pay more than $125 million. These terms are definite and unambiguous.

UHS nevertheless contends that even if the parties had all intended the MOU to be binding, the MOU does not satisfy the legal standard for being an enforceable contract because the parties failed to reach a "sufficiently definite" agreement on the material terms of the purported settlement. Specifically, UHS identifies four allegedly crucial areas where a definite agreement has allegedly not been reached: (1) the total amount to be paid to all SHPs; (2) how the total amount allocable to the SHPs would be divided among the various SHPs; (3) whether amounts paid to SHPs would first be reduced by legal fees paid to class lawyers who did not represent them; and (4) whether SHPs were releasing claims for amounts spent on behalf of "administrative-services only" customers.

a.     *Total Amount Paid to SHPs*

UHS first contends that the parties failed to reach a definite agreement on how much of the total settlement amount would be paid to all SHPs and how much would be paid to the putative class members. Relying on evidence extrinsic to the MOU, UHS argues that the only number discussed between Mr. Cohen and Mr. Lefkowitz on October 22, 2015 was $125 million, and neither remembers discussing how much would go toward a class settlement subject to court approval. Although the two lawyers negotiated with class counsel for a $77 million "quick pay" for the SHPs, UHS contends that the ultimate amount to be potentially paid to the SHPs

remained uncertain due to the "true-up" formula proposed in the Allocation Agreement between the class plaintiffs and the SHPs that was never finalized or executed. As such, UHS asserts that the parties clearly contemplated that the SHPs might receive more or less than $77 million depending on how many absent class members made claims, making the "true up" and "clawback" of the $77 million dependent on what happened in the settlement of the class case. In turn, UHS asserts that "the 'essential term' of how much the SHPs would be paid—even when examined as a gross amount, without regard to what each group would actually receive—was never 'sufficiently definite.'"

The MOU, however, speaks directly to this issue and expressly indicates that such allocation—while perhaps important to the agreement between the SHPs and the putative class plaintiffs—is not an essential term of the agreement between the plaintiffs as a whole and the Cephalon Parties. Paragraph two provides that, with respect to the SHPs (which include UHS), the Cephalon Parties will, in exchange for a release of claims, request disbursement from the Settlement Fund in the amount of $77 million (the "SHP Settlement Payment"). (MOU ¶ 2.) Paragraph three states that, with respect to the settlement class, the Cephalon Parties will, in exchange for a release of claims, request a disbursement from the Settlement Fund in the amount of $48 million (the "End-Payor Class Settlement Payment"). (Id. ¶ 3.) The MOU then goes on to acknowledge that notwithstanding the fact that these amounts may be subject to other calculations, the total settlement amount of $125 million—the essential term agreed to in the October 22, 2015 telephone conversation—would remain unaffected:

> Collectively, the SHP Settlement Payment and the End-Payor Class Settlement Payment are referred to as the "Settlement Payment." ***Irrespective of the exact amounts of the SHP Settlement Payment and the End-Payor Class Settlement Payment, the total Settlement Payment shall not exceed $125***

> ***million.*** Apart from the Settlement Payment, no other payment or
> monies will be paid or owed by the Cephalon Defendants.

(MOU ¶ 4 (emphasis added).) Finally, the MOU provides that even though the End-Payor Settlement Payment would be subject to court approval, the SHP Settlement Agreement would be final when executed and would not be dependent on Court approval. (MOU ¶ 8.) This language further undermines UHS's position that the MOU set out only negotiations and is not a binding contract.

The existence of a proposed side agreement between SHPs counsel and End-Payor class counsel to share settlement proceeds pursuant to a "true up" formula—an agreement neither referenced in nor incorporated into the MOU—has no impact on the essential terms of the agreement between all plaintiffs and the Cephalon Defendants. The total amount of the settlement—$125 million—is clearly stated. The fact that the specific amount of the payment to be made to the SHPs was not spelled out in the MOU does not create an ambiguity rendering the contract unenforceable.

> b. *How the Total Amount Allocable to SHPS Would Be Divided Among the SHPs*

Second, UHS contends that the parties never reached any agreement either as to the precise amount each SHP would receive or as to a formula that could determine those amounts. UHS further argues that evidence extrinsic to the MOU—specifically, testimony from Mr. Cohen, for the SHPs, and Mr. Macoretta, for the putative class—shows a lack of agreement on how this would be handled. Because the amount each SHP, including UHS, was to receive is "unknowable," UHS asserts that an essential term of the settlement is missing and it would be impossible for the Court to enforce any putative agreement.[8]

---

[8] To fully comprehend UHS's argument, it is necessary to understand that, under federal antitrust laws, only direct purchasers may bring claims for damages even if the direct purchasers

This argument, however, rests on the assumption that the specific amount each SHP would receive constitutes an essential term of the settlement with the Cephalon Parties. The MOU unequivocally rejects any such notion. Paragraph four of the MOU clearly states that "[t]he Cephalon Defendants are not responsible for, and shall bear no liability in any way for, any allocation or division of the Settlement Payment among the Plaintiffs and their counsel." (MOU ¶ 4.) This language clearly reflects that the parties were not bargaining for specific settlement amounts to be paid to any particular SHP. Rather, it demonstrates that the Cephalon Parties wanted to ensure that they obtained a global release of claims from all end-payor plaintiffs in exchange for a set sum of money. Such agreement can be enforced without an allocation determination, and any dispute over allocation could take place solely among the SHPs without any further involvement from the Cephalon Parties.

In short, had UHS wanted determination of the final allocation to constitute a condition of a final settlement, it was free to negotiate such a provision into the MOU. The MOU, however, expressly *excluded* the allocation as an essential term of the settlement between the Plaintiffs and the Cephalon Parties, and left the allocation as a subject for separate agreement among the SHPs.

---

simply passed on the overcharges to end-payors/indirect purchasers. Illinois Brick Co. v. Illinois, 431 U.S. 720 (1977). To avoid this rule, approximately half of the U.S. states have passed "Illinois Brick repealer statutes" which allow indirect purchasers/end-payors to recover. See In re Broiler Chicken Antitrust Litig., No. 16-8637, 2017 WL 5574376, at *25 (N.D. Ill. Nov. 20, 2017).

Here, the SHPs lawyers apparently agreed that the $77 million SHP Settlement Payment would be distributed pro rata based on purchasers. UHS argues that it claims injury in its home state of Minnesota—a state with an Illinois Brick repealer statute—for drugs purchased for UHS customers throughout the country. It goes on to contend that, in assessing the value of any insurance company's Provigil claims, there is a potential issue as to whether UHS may recover for all of its nationwide purchases or only for damages flowing from purchases made in Illinois Brick repealer states.

### c.    Legal Fees

UHS next argues that "[t]he total uncertainty over the essential term of what each SHP would receive is exacerbated by the fact that the class lawyers believed the agreement would allow them to collect a fee out of the $77 million allocated to the SHPs—and therefore would be paid a fee that would reduce whatever uncertain amount might eventually be paid to UHS and other SHPs."

Again, the MOU expressly rejects this point as an essential term of the settlement.  The MOU provides that "[a]ll awards, fees, and costs related to the settlement, including but not limited to . . . any attorney fee award to counsel for Plaintiffs or the class . . . will all come from the Settlement Payment."  (MOU ¶ 4.)  The MOU goes on to state, "[t]he Cephalon Defendants are not responsible for, and shall bear no liability in any way for, any allocation or division of the Settlement Payment among the Plaintiffs **_and their counsel_**."  (MOU ¶ 4 (emphasis added).)  The MOU makes clear that the Settlement Payment encompasses the Cephalon Parties' complete payment for the release of liability and that any further arrangements for allocation of that Settlement Payment falls outside the scope of the MOU's terms.  UHS fails to make any showing that payments to counsel are an essential term of the settlement with the Cephalon Parties.[9]

---

[9]    Defendant cites to <u>Behrend v. Comcast Corp.</u>, No. 03-6604, 2012 WL 4459582, at *6 (E.D. Pa. Sept. 25, 2012) for the proposition that the failure to agree upon the sum to be used for attorneys' fees plus reimbursement of costs and expenses to counsel reflects that no settlement agreement was ever entered.  <u>Behrend</u>, however, involved a motion by class plaintiffs to enforce a settlement.  <u>Id.</u> at *1.  Under Federal Rule of Civil Procedure 23(e), trial judges must approve class settlements to protect absent class members and assure that the settlement represents adequate compensation for the release of the class claims.  <u>In re Food Prods. Liab. Litig.</u>, 629 F.3d 333, 349 (3d Cir. 2010).  In doing so, the court must consider the range of reasonableness of the settlement fund.  <u>Id.</u>
      Here, the SHPs were not part of a putative class, but rather were separately represented by their own counsel.  As such, their settlements were not subject to any review and approval by the Court.  To the extent, the SHPs affirmatively failed to negotiate with the Cephalon Parties regarding allocation of the settlement funds among themselves and their counsel, they may not raise it as a basis to find that the parties did not enter into a binding settlement agreement.

        *d.*     *Whether SHPs Were Releasing Claims for Amounts Spent on Behalf of ASO Customers*

UHS's final challenge to the enforceability of the MOU alleges that the parties failed to reach any agreement as to whether purchases made on behalf of self-insured customers who purchase so-called administrative-services only ("ASO") products are included in the releases.

By way of background, most large health insurance companies, like UHS, sell ASO products to self-insured customers. In such cases, the insurance company administers the health insurance plan the way it administers and adjudicates members' claims in a fully insured plan, but the funding for paying claims comes from the self-insured customer rather than the insurance company. Thus, in self-insured plans, the customer takes on the risk of the medical costs itself and pays the healthcare costs directly, meaning that its ASO premiums are lower than full insurance premiums.

According to UHS, when the MOU was signed, the parties had not reached any agreement as to whether purchases made on behalf of ASO customers were included in the contemplated releases. It avers that although the plain text of the MOU says nothing about ASO customers—and thus would not appear to require any releases from them—the record is replete with conflicting testimony from the Lowey, Crowell, and Hill lawyers as to whether purchases for ASO customers were included in the proposed settlement or not. (See Def.'s Opp'n Summ. J. 24 (citing testimony).) As UHS reasons,

> [I]f there is a claim arising out of an overpayment for any product or service such as pharmaceuticals, the question arises whether the claim to recover for that overcharge is held by the insurance company or by the ASO customer. Resolving that issue may depend partly on what is in the contract between the insurer and the ASO customer, and partly on whether the ASO customer has assigned this claim.

(Def.'s Opp'n Summ. J. 6.)  Thus, UHS contends that the MOU and its accompanying release is unenforceable because a question might arise as to whether UHS "released" claims for ASO purchases.

UHS again relies upon extrinsic evidence to broaden the essential terms of the MOU in order to encompass matters outside the scope of the underlying settlement agreement.  The MOU states that "***Plaintiffs*** will release ***all claims*** against the Cephalon Defendants and covenant not to sue the Cephalon Defendants on any claims relating in any way to the claims asserted in the lawsuit filed by the End-Payor Plaintiffs and related actions."  (MOU ¶ 1 (emphasis added).)  The MOU defines the "Plaintiffs/Claimants" as "(1) the entities listed on the attached Schedules A-D ('Settling Health Plans' or 'SHPs'); (2) Vista Healthplan, Inc. . . ., Pennsylvania Turnpike Commission . . ., Pennsylvania Employees Benefit Trust Fund . . ., District Counsel 37 Health & Security Plan . . ., and Shirley Panebianco . . .; and (3) a settlement class of end-payors as set forth in paragraph 7 below."  (<u>Id.</u> at Intro.)  Although the MOU does not specifically reference ASO customers, UHS, as part of the SHPs, agreed to release "all claims" related "in any way" the End-Payor Provigil action.[10]  (MOU ¶ 1.)  This provision, by its plain language, precludes UHS from bringing any ASO claim it may hold.

---

[10]  The MOU also states that the "release and covenant not to sue will be substantially similar to the release and covenant not to sue in the Settlement Agreement between the Cephalon Defendants and the Direct Purchaser Class that was approved by the Court on October 15, 2015."  The Direct Purchaser Class Release covers

> [A]ny and all manner of claims, rights, debts, obligations, demands, actions, suits, causes of action, damages whenever incurred, liabilities of any nature whatsoever, known or unknown, suspected or unsuspected, fixed or contingent, including costs, expenses, penalties and attorneys' fees . . . that Plaintiffs or any member or members of the Direct Purchaser Class (including their past, present or future officers, directors, insurers, general or limited partners, divisions, stockholders, agents, attorneys, employees, legal representatives, trustees, parents, associates,

To the extent an individual ASO customer subsequently seeks to assert a claim that UHS—or any other health insurer—supposedly "held" and thus released under the MOU, that dispute does not impact the enforceability of the MOU. Rather, as UHS itself notes, such a dispute would have to be resolved between UHS and the ASO, and would depend on both the contract between UHS and the ASO customer and whether the ASO customer assigned this claim. While that dispute might eventually decrease the amount UHS retains under the settlement, in no event would it disrupt the overall settlement between the Plaintiffs and the Cephalon Parties. Therefore, the absence of provision in the MOU addressing this issue does not render the MOU ambiguous and unenforceable.[11]

> ### e. Conclusion – The MOU is Sufficiently Definite

It is well established that "[a] settlement agreement is enforceable if it contains all essential terms, even though it expressly leaves other matters for future negotiation." Endo Pharms. Inc. v. Mylan Pharms Inc., No. 11-717, 2014 WL 2532179, at *9 (D. Del. June 2, 2014)

---

> affiliates, joint ventures, subsidiaries, heirs, executors, administrators, predecessors, successors and assigns, acting in their capacity as such) . . . ever had, now has, or hereafter can, shall or may have . . . arising out of or relating in any way to: any claim that was alleged or could have been alleged in the Direct Purchaser Action prior to the date of this Settlement . . .

(Weidenhammer Decl., Ex. 20, ¶ 14.)

[11] To the extent UHS argues that it did not contemplate claims by ASO customers prior to signing the MOU, its argument is both irrelevant and disingenuous. Primarily, it is well established, under Pennsylvania law, that a unilateral mistake will not void a contract unless the other party knows or has reason to know of the mistake. Harrison v. Fred S. Jones, P.A., Inc., 558 F. Supp. 438, 443 n.3 (E.D. Pa. 1983). There is no evidence that the Cephalon Parties knew or should have known that UHS wanted a provision regarding ASO customers in the MOU. Moreover, the record suggests that UHS did consider ASO claims, but deliberately did not address them in the MOU. The December 9, 2015 memorandum by UHS's outside counsel discussed what UHS's estimated recovery would be under the MOU, and remarked that UHS's claims would represent between 10–15% of the claims, which "assume[d] a certain level of ASO customers [would] submit their own claims." (Dennis Decl., Ex. 5.)

(applying Pennsylvania law). "A contract is enforceable and contains all essential terms when it establishes the heart of the agreement." Parker-Hannifin Corp. v. Schlegal Elec. Materials, Inc., 589 F. Supp. 2d 457, 463 (D. Del. 2008).

Here, the heart of the agreement was plainly set forth in the MOU. The Cephalon Parties negotiated a global settlement with all plaintiffs who were indirect purchasers of Provigil— whether part of a putative class or as an individual health care plan—which provided that all claims by these plaintiffs would be released in exchange for a total payment of $125 million. Although the MOU detailed how the Settlement Payment would be divided between the End-Payor Class and the SHPs, it expressly stated that the Cephalon Parties were not responsible for the allocation. The fact that UHS could not determine its precise share of this payment, how much would go to counsel, and whether some of its ASO customers would attempt to make claims does not change my conclusions. These were details for which UHS could have, but did not insist on further clarification prior to signing the MOU. The absence of these details does not prevent the MOU from being sufficiently definite to be enforced. As such, I find that the MOU constitutes a binding and enforceable contract to which both UHS and the Cephalon Parties were bound.

**B.      Whether the Terms of the MOU are Sufficiently Unambiguous To Permit Judicial Interpretation of the Agreement**

Once an enforceable contract is found to have been formed, the court must inquire whether the terms agreed to by the parties are sufficiently unambiguous to permit judicial interpretation of the contract. Behrend, 2012 WL 4459582, at *6 (E.D. Pa. 2012) (citing Am. Eagle Outfitters v. Lyle & Scott Ltd., 584 F.3d 578, 586 (3d Cir. 2009)). This inquiry "focuses on whether the terms of a contract are sufficiently clear and unambiguous to permit judicial interpretation of the contract as a matter of law." Id. "Thus, a court may find that the parties

intended to be bound and that the terms of the agreement are sufficiently definite so that an enforceable contract was formed as a matter of law, but that 'the language chosen by the parties is ambiguous,' necessitating interpretation of the contract terms by a fact finder." Id.; see also American Eagle, 584 F.3d at 587 (holding that the ambiguity inquiry occurs only after an enforceable contract is found to exist and focuses on whether the terms of a contract are sufficiently clear and unambiguous to permit judicial interpretation of the contract as a matter of law). Id. at 587.

Pennsylvania courts apply the "plain meaning rule" to interpret contracts, which assumes that the intent of the parties to an instrument is "embodied in the writing itself, and when the words are clear and unambiguous the intent is to be discovered only from the express language of the agreement." Cnty. of Dauphin v. Fid. & Deposit Co. of Md., 770 F. Supp. 248, 251 (M.D. Pa.) (quotation omitted), aff'd, 937 F.2d 596 (3d Cir. 1991). Where the words of the contract clearly manifest the parties' intent, a court need not "resort to extrinsic aids or evidence." Am. Eagle, 584 F.3d at 587 (citation and internal quotation marks omitted). The Third Circuit has explained:

> [a contract] will be found ambiguous if, and only if, it is reasonably or fairly susceptible of different constructions and is capable of being understood in more senses than one and is obscure in meaning through indefiniteness of expression or has a double meaning. A contract is not ambiguous if the court can determine its meaning without any guide other than a knowledge of the simple facts on which, from the nature of the language in general, its meaning depends; and a contract is not rendered ambiguous by the mere fact that the parties do not agree on the proper construction.

Bohler–Uddeholm, 247 F.3d 79, 93 (3d Cir. 2001) (quotations omitted). Contracts must be read to avoid ambiguities if possible, and "specific provisions ordinarily control more general

provisions." Great Am. Ins. Co. v. Norwin Sch. Dist., 544 F.3d 229, 247 (3d Cir. 2008) (citations omitted).

In an effort to inject uncertainty into the settlement agreement set forth in the MOU, UHS alleges that at least four material terms of the MOU are ambiguous and incapable of judicial interpretation as a matter of law: (1) the disbursement of money to the SHPs; (2) how much money will be paid to UHS or any other specific SHP; (3) whether the SHP Settlement Agreement is to be executed and implemented if the Court does not approve the End Payor Class Settlement; and (4) whether SHPs or their ASO customers may "opt out" in whole or in part.

> 1.     Disbursement of Money to the SHPs

UHS first challenges the clarity of paragraph 2, which states:

> In exchange for the release described in paragraph 1, the Cephalon Defendants, within eight business days of the later of (i) the execution by all parties of both the final SHP Settlement Agreement and the End-Payor Class Settlement Agreement, and (ii) receipt in writing of all required payment information, shall submit a Disbursement Request to the Federal Trade Commission . . . . The Disbursement Request will request disbursement in the amount of $77 million ("SHP Settlement Payment").

(MOU ¶ 2.) UHS raises a host of alleged ambiguities in this provision, as follows:

- The provision is ambiguous because "the extrinsic evidence demonstrates that at the time the MOU was signed, Lowey and the class lawyers contemplated an Allocation Agreement that would provide for this $77 million to be *increased* or *decreased* pursuant to a 'true up' or 'clawback'." Thus, the $77 million is not the final amount and no mechanism for determining the final amount has been agreed upon.

- The Disbursement Request is dependent on the execution of a future agreement, but does not provide what happens if that future agreement is never finalized.

- The Disbursement Request is not to be made until after "receipt in writing of all required payment information," but gives no hint as to what constitutes "all required payment information," and whether it should include payments for Provigil purchases in all states, as opposed to only Illinois Brick repealer states, or payments for purchases for ASO companies.

32

- Paragraph 2 does not require "payment" of $77 million as the Cephalon Parties claim. Instead, it requires a "Disbursement Request" of the FTC and does not provide for what happens if the FTC declines the request or delays in deciding on that request.

- The MOU does not require the $77 million to be paid out to the SHPs. Instead, it provides that the money shall be paid into an account "designated by Plaintiffs' Counsel," even though the term "Plaintiffs" includes the end-payor class.

As repeatedly set forth above, the Cephalon Parties unambiguously agreed to a total Settlement Payment of $125 million, with $77 million to go to the SHPs and $48 million to go to the End-Payor Class. The Cephalon Parties expressly disclaimed any responsibility for the actual allocations. Thus, the Cephalon Parties were obligated for these amounts regardless of (a) whether the SHPs and End-Payor Class have reached agreement on how the "true up" formula will work; (b) whether the SHPs have decided what purchases will be included when determining what each SHP gets; and (c) when the SHPs Settlement Agreement and End-Payor Settlement Agreement are executed, so long as these groups provide the requisite releases.[12]

Moreover, UHS's claimed ambiguities in the terms "payment information," "disbursement request," and "account designated by Plaintiffs' Counsel" fail to preclude the finding of a binding settlement agreement. As a primary matter, they are not essential terms of the agreement that disrupt the core obligations agreed to by both sides. Moreover, UHS cannot create ambiguity simply by posing multiple hypothetical questions—unmoored from any actual dispute that has arisen in their application—about their precise meaning. Mere speculation that some ambiguity may exist when the parties eventually carry out the settlement—ambiguities not identified by any of the other multiple signatories to the MOU—is not a basis on which to invalidate the entire agreement.

---

[12]   UHS queries what would happen in the event that no SHPs Settlement Agreement is reached, and thus no release is provided to the Cephalon Parties. As with all contracts, the Cephalon Parties could potentially pursue contractual remedies.

I find no ambiguity in this provision that precludes me from providing a legal interpretation of the contract.

                2.        How Much Money Will Be Paid to UHS or Any Other Specific SHP

UHS next re-raises the issue of how the $77 million SHPs Settlement Payment will be distributed among the individual SHPs. This time, it acknowledges paragraph four of the MOU, which states that the Cephalon Parties are not responsible for the allocation, but argues that "[b]y simply stating that Cephalon has no responsibility does not suffice to create a binding contract, or to avoid a fundamental ambiguity." (Def.'s Opp'n Summ. J. 32–33.) It concludes that the absence of a formula to determine how much each SHP gets makes the MOU "literally impossible to enforce." (Id. at 33.)

This argument fares no better the second time around. The MOU, as it stands, is entirely enforceable without further interpretation. It is not within the Cephalon Parties' responsibility or control to determine how these individual companies choose to resolve allocation issues among themselves. By signing a document which expressly stated that the Cephalon Parties had no liability for allocation, UHS affirmatively waived its right to argue that any allocation ambiguity makes the settlement incapable of judicial enforcement.

                3.        Whether the SHP Settlement Agreement is to be Executed and Implemented if the Court Does Not Approve the End Payor Class Settlement

Next, UHS argues that the MOU contemplates the finalization of both a SHPs Settlement Agreement and End Payor Class Settlement Agreement, the latter of which requires court approval. According to UHS, the MOU never addresses what happens if the court refuses to approve the End Payor Class Settlement. It posits that "the most logical reading of the MOU is

that the SHP Settlement Agreement could not become final and enforceable until the End Payor Class Settlement is both executed *and* approved by the Court."

UHS, however, fails to acknowledge paragraph eight of the MOU, which addresses this precise issue. The MOU plainly states that "[i]f the Court denies approval . . . of the End-Payor Class Settlement Agreement . . . then the Cephalon Defendants will have no obligations under this MOU, with respect to the End-Payor Class Settlement Agreement" and "all funds in the qualified settlement escrow account described *in paragraph 3 [dealing with the End-Payor Class Settlement Payment]* . . . will be returned to the Cephalon Defendants. (MOU ¶ 8 (emphasis added).) The MOU then unequivocally provides that, "[t]he SHP Settlement Agreement *will be final when executed and is not dependent on Court approval*." (Id. (emphasis added).) Under the most basic and logical reading of this provision, the MOU dictates that regardless of what happens with court approval of the $48 million End-Payor Class Settlement Payment, the $77 million SHPs Settlement will be final. UHS's speculations and alternative interpretations do not produce any ambiguity.

### 4.     Whether the SHPs or Their ASO Customers May "Opt Out"

UHS identifies one final alleged ambiguity:

> Each entity the MOU describes as an "SHP" is also a member of the putative class represented by the *Vista* plaintiffs. As class members, they have a right to "opt out" of any class settlement. There is nothing in the MOU stating that the SHPs were giving up this right. The extrinsic evidence shows that the lawyers representing UHS believed that SHPS like UHS *did* have the right to opt out . . . This reveals another ambiguity.

(Def.'s Opp'n Summ. J. 35 (citations to the record omitted)[13]

---

[13]   UHS also re-raises the ASO argument as follows:

> Separately, the MOU is silent as to whether the requested release would include purchases made for ASO customers or not. The

The plain language of the MOU undermines UHS's argument. The state antitrust class and state unjust enrichment class are defined, in relevant part, as "[a]ll persons or entities who purchased Provigil and/or its generic equivalent modafinil, intended for consumption by themselves, their families or their members, employees, plan participants, beneficiaries or insureds . . . ." (MOU ¶ 7.) Although the putative class definition does not explicitly exclude SHPs from the class definition, the MOU defines the SHPs (the entities listed on Schedules A–D of the MOU, including UHS) separately from the settlement class of end-payors. Unlike the End-Payor Class Settlement, the SHP Settlement is not subject to court approval, and thus not subject to any opt-out process. UHS's logic—that the SHPs could also be members of the putative class since they fit within the class definition—would render the MOU's definition of the SHPs as a separate group a superfluous provision. See Pacific Employers Ins. Co. v. Global Reinsurance Corp. of Am., 693 F.3d 417, 430 (3d Cir. 2012) (recognizing the "cardinal rule of contractual interpretation that counsels against rendering words or provisions meaningless"). Applying the appropriate rules of contract interpretation, I find no ambiguity on this issue.

## IV. CONCLUSION

Notwithstanding UHS's efforts to inject complexity into the dispute at issue, the resolution remains relatively straightforward. UHS, as part of a group of Settling Health Plans, entered into a settlement agreement, memorialized in the MOU, wherein it would receive a $77

---

> MOU makes no reference to ASOs, and the various attorneys could not agree as to whether ASOs would be included in any settlement. . . . Thus, for this additional reason, the scope of the release (a material term) is ambiguous.

(Def.'s Opp'n Summ. J. 35 (citations to the record omitted).

This issue was already considered, addressed, and rejected above. Although the MOU makes no reference to ASOs, the document is clear that the SHPs will release all Provigil claims against the Cephalon Parties, regardless of whether they are for payments made by the SHPs or ASO claims held by the SHPs.

million disbursement out of a total $125 million payment from the Cephalon Parties in exchange for a full release of all of its Provigil-related claims. Although the MOU contemplated the entry of a later, more detailed agreement covering more of the logistical details, the MOU itself, by its very terms, was a binding contact as to the essential terms regarding the payment and the release. UHS's identification of alleged ambiguities neither deprives the MOU of sufficient definiteness nor creates a genuine issue of material fact as to the appropriate interpretation of the essential terms.

While this finding resolves the interpretation of the MOU, it does not resolve the final issue of whether the MOU can be enforced. UHS's argument on this issue is that its counsel did not have authority to enter into the MOU on its behalf. This raises a dispute which cannot be decided on a motion for summary judgment.

An appropriate Order follows.