**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| TEVA PHARMACEUTICAL | : | |
| INDUSTRIES, LTD., et al., | : | CIVIL ACTION |
| | : | |
| Plaintiffs, | : | |
| | : | |
| v. | : | No. 16-4870 |
| | : | |
| UNITEDHEALTHCARE SERVICES, INC., | : | |
| | : | |
| Defendant. | : | |
| | : | |

Goldberg, J.                                                                                    September 18, 2018

## MEMORANDUM

The question before me is whether a Memorandum of Understanding ("MOU") pertaining to a $125 million antitrust resolution constitutes a binding settlement agreement.

This dispute arises from several antitrust claims, brought pursuant to FTC v. Actavis, Inc., 570 U.S. 136 (2013), involving reverse settlement payments between the brand name manufacturer of the drug Provigil® and various generic drug manufacturers. On June 1, 2015, I denied class certification for the end-payor plaintiffs in the case of Vista Healthplan v. Cephalon, Inc., et al., Civil Action No. 06-1833. Thereafter, the putative class plaintiffs and a separate group of third-party payers—of which Defendant United Healthcare Services, Inc. ("United") was a part—reached a settlement agreement, memorialized in an MOU, with brand manufacturer Cephalon, Inc. and two generic manufacturers Teva Pharmaceutical Industries/Teva Pharmaceuticals USA, Inc. and Barr Pharmaceuticals, Inc. (collectively, the "Cephalon Parties"). United has renounced the settlement, claiming that the terms set out in the MOU did not

constitute a binding and enforceable contract and that its lawyers were not authorized to enter into such an agreement. The Cephalon Parties have sued to enforce the agreement.

In an opinion issued April 20, 2018, I determined that the MOU contained the essential terms of a settlement and constituted a binding, enforceable, and unambiguous contract. Teva Pharm. Indus., Ltd. v. United Healthcare Servs., Inc., No. 16-4870, 2018 WL 1898911 (E.D. Pa. Apr. 20, 2018). Thereafter, from April 23–27, 2018, a bench trial was held on the issues of (a) whether United's attorneys were cloaked with either express or apparent authority to sign the MOU, and (b) whether UHS's actions subsequent to the signing of the MOU constituted a ratification of the MOU. Upon consideration of the evidence presented at trial and additional videotaped depositions and documentary evidence entered into the trial record, I conclude that the settlement is binding upon United.

## I. FINDINGS OF FACT

### A. Pertinent Procedural Background of the Provigil® Litigation

1. Beginning in May 2006, over sixteen lawsuits (including putative class actions) alleging antitrust violations were filed against the Cephalon Parties and other generic drug manufacturers relating to the branded drug Provigil®. (Stipulation of Facts ("SOF") ¶ 1.)

2. Pursuant to an August 8, 2006 case management order, these antitrust lawsuits were collectively captioned In re Modafinil Antitrust Litigation and consolidated in a collective docket in the United States District Court for the Eastern District of Pennsylvania. (SOF ¶ 2.) The actions encompassed by the case management order included:

   a. The direct purchaser class cases, brought by putative classes consisting of companies that directly purchased Provigil® from Cephalon for re-distribution, consolidated into

King Drug Company of Florence, Inc. et al. v. Cephalon, Inc, et al., No. 2:06-cv-1797 (Id. ¶ 3(a));

b. The end-payor class cases brought by putative classes consisting of individuals, insurance companies, and other entities that purchased Provigil® indirectly, consolidated into Vista Healthplan, Inc., et al. v. Cephalon, Inc., et al., No. 2:06-cv-1833; (Id. ¶ 3(b)); and

c. An action brought by the Federal Trade Commission ("FTC"), captioned as Federal Trade Commission v. Cephalon, Inc., No. 2:08-cv-2141. (Id. ¶ 3(c).)

3. In May 2015, Cephalon, Inc. and Teva Pharmaceuticals Ltd. settled the FTC action. (Id. ¶ 4.) The settlement was announced in a press release issued by the FTC on May 28, 2015, and memorialized in a Stipulated Order for Permanent Injunction and Equitable Monetary Relief that this Court entered on June 17, 2015. (Id. ¶ 5.)

4. The FTC settlement required Cephalon, Inc. to deposit $1.2 billion, less amounts already paid out in related case settlements, into an FTC-administered account. The FTC Settlement was to be held in trust to satisfy the amount of any settlement or judgment regarding other Provigil® claims. (No. 2:08-cv-2141, ECF No. 405.)

5. Jay Lefkowitz, Esq. from the law firm of Kirkland & Ellis LLP, represented Cephalon in settlement negotiations relating to the Provigil® antitrust claims. (Notes of Testimony ("N.T.") 4/23/18, 123:18–24.) Greg Skidmore, Esq. from Kirkland & Ellis, also worked on the Provigil matter, including settlement, on behalf of Cephalon. (N.T. 4/24/18 108:18–109:25.)

## B. United's Corporate Structure and Legal Departments

6. UnitedHealth Group ("UHG") is a holding company with two subsidiary business units: (a) United Healthcare Services, Inc. ("United Healthcare"), which provides health insurance services to third parties, and (b) OptumInsight ("Optum"), which provides information and technology-enabled health related services. (N.T. 4/25/18, 34:3–18; N.T. 4/27/18, 33:8–13.)

7. During the relevant time period, Marianne Short, Esq. was general counsel of UHG and the most senior lawyer in the organization. (N.T. 4/27/18, 65:11–15.) Matthew Shors, Esq. was UHG's head of litigation and reported to Short. (N.T. 4/27/18, 33:2–4.) Heather Redmond, Esq. was a deputy general counsel for intellectual property and litigation at UHG and reported to Shors. (Redmond Dep.). 9:21–23; N.T. 4/27/18, 29:22–25.)

8. During the relevant time period, Chris Zaetta, Esq. was head of litigation for United Healthcare. (N.T. 4/27/18, 4:6–11.) Andrea Boado, Esq. was Deputy General Counsel and oversaw a group of lawyers who provided legal support for UHS's commercial pharmacy business. (N.T. 4/26/18, 9:18–25, 47:3–5.) Both Zaetta and Boado reported to Thad Johnson, Esq. who was United Healthcare's General Counsel. (N.T. 4/26/18, 44:24–45:4; 33:17–20.) Jeremy Johnson, Esq. was a senior associate general counsel who reported to Zaetta. (N.T. 4/26/18, 91:1–92:11.) Laurie Wolfe, Esq. was a senior associate general counsel reporting to Boado. (Wolfe Dep. 16:19–21:6.)

9. During the relevant time period, Matthew Klein, Esq. was the head of litigation for Optum. (N.T. 4/25/18, 28:5–7.) Elizabeth (Betsy) Schmiesing, Esq. was a litigation manager tasked with overseeing a team of lawyers. (Klein Dep. 20:5–10.) Klein supervised four lawyers, including Schmiesing. Schmiesing had an additional five lawyers that reported directly to her. (Klein Dep. 19:11–16.)

10. Optum handled "national recovery matters" for the entire UnitedHealth Group. (N.T. 4/25/18, 29:1–4, 38:9–14.) National recovery matters are those that mostly involve claims against medical device manufacturers or pharmaceutical companies to recover some fraction of the costs or the "spend" for the device or drug, and generally take the form of either a mass tort action or an antitrust pricing-type case. (N.T. 4/25/18, 29:5–17.) Schmiesing was the individual at Optum responsible for handling the national recovery cases for UnitedHealth Group. (N.T. 4/25/18, 39:3–7.)

11. The Provigil® matter was one such national recovery case and fell within Schmiesing's responsibilities. (N.T. 4/25/18, 39:8–15.)

12. To summarize, the in-house counsel for United involved with the Provigil matter include the following:

| NAME | UNITED BRANCH | POSITION |
|------|---------------|----------|
| Marianne Short | UHG | General counsel |
| Matthew Shors | UHG | Head of litigation |
| Heather Redmond | UHG | Deputy general counsel for intellectual property & litigation |
| Thad Johnson | United Healthcare | General counsel |
| Andrea Boado | United Healthcare | Deputy general counsel |
| Chris Zaetta | United Healthcare | Head of litigation |
| Jeremy Johnson | United Healthcare | Senior associate general counsel |
| Laurie Wolfe | United Healthcare | Senior associate general counsel |
| Matt Klein | Optum | Head of litigation |
| Betsy Schmiesing | Optum | Litigation manager |

## C. United's Retention of Outside Counsel to Handle Provigil® Matters

13. On April 20, 2012, Schmiesing signed an engagement letter, on behalf of United, retaining Robert Rhoad, Esq. of Crowell & Moring LLP ("Crowell") and Mark Sandmann, Esq. of Gibson & Sharps ("Gibson") "in resolving potential claims United has against Cephalon, Inc.

("Cephalon") in the pending matter captioned as <u>In Re Modafinil Antitrust Litigation</u>, No.

06-CV-01797-RBS (E.D. Pa.) . . . as a result of Cephalon's alleged anticompetitive conduct

in connection with its marketing and sale of Provigil®." (Trial Exhibit ("TX") 2; N.T.

4/25/18, 32:1–18.)

14. The "Scope" provision of the engagement letter stated:

> In conjunction with its representation of United in this Matter,
> Crowell & Moring and Gibson & Sharps will pursue settlement of
> claims on behalf of United against Cephalon based on alleged
> violations of state antitrust/consumer protection statutes and
> common law due to Cephalon's alleged anticompetitive conduct in
> connection with its marketing and sale of Provigil. The
> representation in this Matter will pertain to efforts to obtain
> recovery for United through settlement negotiations with
> Cephalon. It is not anticipated at this time that active litigation
> will be required to achieve recovery on United's claims. If it is
> ultimately determined by Crowell & Moring, Gibson & Sharps or
> United that active litigation (i.e., opting-out of the class and filing a
> complaint on your behalf) is required to adequately address
> United's claims, it is agreed that the parties to this Retention
> Agreement may withdraw (pursuant to the provisions contained
> herein) or negotiate revised terms.

(Trial Exhibit ("TX") 2.) Schmiesing understood this provision to mean that she was

authorizing Crowell and Gibson to conduct settlement negotiations on behalf of United.

(N.T. 4/25/18, 33:23–34:2.) Rhoad likewise understood that he had been retained to

negotiate a settlement on behalf of United in the Provigil matter. (N.T. 4/25/18, 173:12–16.)

15. At the time of the execution of this letter and thereafter, Rhoad understood that Schmiesing

was his main point of contact at United for the Provigil matter. (N.T. 4/24/18, 171:5–172:2.)

From 2012 to March 2016, Schmiesing remained the primary point of contact for the Provigil

matter. (N.T. 4/25/18 41:5–10.)

16. In September 2015, Sandmann left Gibson and joined the Hill Hill Carter firm ("Hill Hill"),

but continued to represent United in the Provigil matter. At that point in time, Pamela Slate,

Esq., another Hill Hill lawyer, began working on the Provigil matter on behalf of United. (Sandmann Dep. 42:7–9, 42:18–43:2, 44:1–5.)

17. This was not the first time Sandmann, Slate, and Rhoad (collectively "outside counsel" or "United outside counsel") had represented United. Rhoad had represented United in approximately ten to twenty cost recovery matters between 1999 and 2015, and had previously worked with Schmiesing. (N.T. 4/24/18, 16:16–169:3, 172:3–10.) Likewise, Sandmann represented United between 2012 and 2015 in at least six settlements related to defective hip implants, and Schmiesing was his primary contact. (Sandmann Dep. 20:10–21:19, 27:5–27:10.) Finally, Slate represented United on approximately a half dozen health care cost recovery matters before September 2015. (Slate Dep. 35:8–35:21.)

**D. The End-Payor Litigation and Coordination of Settlement Talks**

18. A punitive class action was brought by the end-payors of Provigil ("end-payor plaintiffs") in Vista HealthPlan, Inc. et al. v. Cephalon Inc., et al., No. 06-1833. I denied class certification on June 1, 2015.

19. Following the FTC settlement, the end payors were the only group that had not yet settled with the Cephalon Parties. (N.T. 133:15–20.)

20. Members of the putative class continued to be represented by attorney John Macoretta, Esq. for purposes of continuing settlement talks with the Cephalon Parties. (N.T. 4/24/18, 35:24–36:3.)

21. On June 4, 2014, the Cephalon Parties' lead attorney, Jay Lefkowitz, received an email from Richard Cohen, Esq. of the Lowey Dannenberg ("Lowey") firm. Cohen indicated that he represented a number of end payors that did not want to participate in the class settlement—

including "Aetna, Humana, the Blue Cross Association and others"—and inquired whether Lefkowitz would be interested in settling.  (TX 4; N.T. 4/23/18, 128: 16–23.)

22. The two spoke and Lefkowitz explained that he was only interested in settling if he was going to get "global peace" with all of the end payors through a single lump sum payment.  (N.T. 4/23/18, 133:4–134:2.)

23. Cohen provided some insight as to why the individual health plans elected to settle separately from the class.  He explained that class actions are designed for constituents whose claims are not large enough to make sense to litigate individually.  By contrast, the larger health plans have claims that are quite significant, giving them multiple incentives to negotiate, sue, and settle apart from a class.  These incentives include lower attorneys' fees, the ability to get a "quick pay" of settlement funds without seeking court approval, and more independence to negotiate their claims.  (N.T. 4/24/18, 32:10–35:11.)

24. On June 29, 2015, Cohen sent Lefkowitz another email with a spreadsheet showing "clients' respective covered lives."  He indicated that he expected to add to the list "as more health insurers retain us."  (TX 8.)

25. Lefkowitz had no concerns about Cohen negotiating on behalf of a group of health insurers.  In his experience, "[i]t's very commonplace to rely on lead negotiators who are speaking on behalf of a broad group of people, which could include their own clients and others who are similarly aligned . . . it's perfectly normal in my practice to have a negotiation with one person."  (N.T. 4/23/18, 148:1–12.)  Skidmore, Lefkowitz's colleague, confirmed that "it's not uncommon when you have that many different parties that all want to reach a kind of global settlement to appoint a lead negotiator to talk on their behalf."  (N.T. 4/24/18, 113:8–19.)

### E.   United's Decision to Join the Settlement Talks Led by Cohen

26. Shortly after the FTC settlement, Schmiesing reached out to Rhoads and requested an update on Provigil® and how the FTC settlement would impact United.  (TX 18, at p. 3.)

27. Rhoad's co-counsel, Sandmann, emailed back indicating that outside counsel were collectively discussing the possibility of United and other health plans entering into a tolling agreement with Cephalon and that they were working on determining the "proper course of action."  (TX 18, at p. 2.)

28. On July 8, 2015, Rhoad e-mailed Schmiesing to note that things were "progressing rapidly in the Provigil recovery matter" and that immediate action would be necessary.  (TX 12.)

29. Around the same time, Cohen (the lead negotiator for the health plans) reached out to an attorney named Mark Fischer, Esq., knowing that Fischer's firm had a relationship with United.   At Cohen's request, Fischer contacted United regarding representation in the Provigil case and was told, by someone at United, that Sandmann was going to represent United in that matter.   Based on that information, Cohen called Sandmann to explain what Cohen's group was trying to accomplish in terms of settlement and determine whether United would want to be part of that effort.   Sandmann, responding on behalf of United, said that he wanted to be involved.  (N.T. 4/24/18, 40:14–41:19.)

30. According to Gerald Lawrence, Esq., Cohen's partner, Sandmann and Rhoad specifically told him that they had been retained by United to represent United in this matter and that United had authorized them to join the negotiating group headed up by Cohen in order to make global settlement demands of the Cephalon Defendants.  (Lawrence Dep. 34:3–36:1.)

31. Subsequent to this conversation, Cohen wrote to Lefkowitz, stating that "we have brought into our fold the lawyers representing the most of the rest of the major health insurers.  So we

will be able to come to the table with *United Healthcare*, Massachusetts Minnesota and North Carolina Blue Cross, Assurant and several others." (TX 13 (emphasis added).) In Cohen's July 20, 2015 e-mail to Skidmore, he indicated that "we've made peace with the Macoretta class action group, so we expect to be able to negotiate for virtually all endpayers." (TX 14.)

32. It was significant to Lefkowitz that United was part of this group because he knew United was the major end payor. Lefkowitz understood the e-mails to mean that Cohen was going to be able to negotiate on behalf of United and others, not that Cohen was counsel for United. Notably, he remarked that if he thought that United was not involved, he may not have settled. (N.T. 4/23/18, 134:20–137:7, 158:18–159:12.)

33. In the meantime, Cohen and Skidmore began negotiating a tolling agreement to preserve the claims of the end payors pending the settlement discussions. The agreement provided Schedules A, B, and C to capture the majority of U.S. insured covered lives (*i.e.*, the majority of people and their dependents enrolled in a health insurance program) and end payor purchases of Provigil over the relevant period. (TX 14.)

34. The tolling agreement listed United as a Schedule B plaintiff. (TX 17.) On July 21, 2015, Sandmann and Rhoad executed the tolling agreement on behalf of Schedule B plaintiffs. (TX 17.) The agreement included a "Consent and Authority" provision that, "[e]ach person executing this Tolling Agreement in a representative capacity on behalf of either of the Parties expressly represents and warrants that he or she is fully empowered and authorized by such Party to execute the Tolling Agreement on its behalf." (TX 17, ¶ 11 .)

35. Rhoad testified that the tolling agreement was explained to Schmiesing before it was signed and that she gave him authority to execute it. Schmiesing corroborated this statement and

confirmed that she authorized the tolling agreement.  (N.T. 4/25/18, 179:11–180:9; <u>see also</u> N.T. 4/25/18, 53:9–55:10.)

36. On July 22, 2015, Sandmann forwarded the tolling agreement, executed by Sandmann and Rhoad on United's behalf, to Schmiesing.  In the accompanying email, Sandmann informed Schmiesing that,

> We are working with Lowey/Rawlings and are talking to the "class."  The intent is to have a discussion and make a unified demand on Cephalon for payment out of the disgorgement fund. Cephalon has indicated (n[o]t surprisingly) that they need "global peace", meaning something with us, the independently represented plans and a "class" to act as the "clean-up" for any potential remaining parties.  We plan to present a united front to Cephalon (our respective firms and the class).  The next step (mentioned above), and which will occur next week, is to get all the groups together and begin discussing what we would like to collectively present as our demand.

(TX 18.)

37. Schmiesing understood from this e-mail that United was one of the members of the group that would be making a unified demand on the Cephalon Parties to settle Provigil.  (N.T. 4/25/18, 51:21–25.)  In response to this e-mail, Schmiesing never provided Sandmann or Rhoad direction as to a minimum share that United would need to receive as part of this global group.  (N.T. 4/25/18, 52:11–15.)  Nor did Schmiesing ever ask Sandmann for any information about the nature of the coordination with the Lowey firm in connection with the settlement negotiations.  (N.T. 4/25/18, 67:21–25.)

38. Skidmore signed the tolling agreement on behalf of the Cephalon Parties on August 10, 2015. (TX 25.)

## F.  Summary of Counsel Negotiating the MOU

39. The following chart summarizes the attorneys involved with negotiation of the settlement and

    MOU:

| NAME | FIRM/COMPANY | CLIENT |
|------|--------------|--------|
| Jay Lefkowitz | Kirkland & Ellis | Cephalon Parties |
| Greg Skidmore | Kirkland & Ellis | Cephalon Parties |
| John Macoretta | Spector, Roseman, Kodroff & Willis, P.C. | Putative End Payor Class Members |
| Richard Cohen | Lowey Firm | Lead negotiator for Third-Party Payors (later known as "SHPs") |
| Gerald Lawrence | Lowey Firm | Lead negotiator for Third-Party Payors (later known as "SHPs") |
| Robert Rhoad | Crowell & Moring, LLP | United ("outside counsel") |
| Mark Sandmann | Hill, Hill, Carter, Franco, Cole & Black, P.C. | United ("outside counsel") |
| Pamela Slate | Hill, Hill, Carter, Franco, Cole & Black, P.C. | United ("outside counsel") |

## G.  United Provides Confidential Purchase Data for the Settlement Negotiations

40. Upon returning the fully-executed tolling agreement to Cohen, Skidmore asked Cohen's

    partner Lawrence for Provigil purchase data.  (TX 24.)  Skidmore testified that the reason for

    this request was:

> [W]hen you do a settlement in a case like this, the kind of Hatch-Waxman overcharged type case, the damages all stem from the amount of Provigil purchases that are made.  And that is kind of your starting point.  And so to evaluate the demands that they were making and to determine our own side what our risk was, what our exposure was, we needed their purchase data.

    (N.T. 4/24/18, 122:21–123:3.)

41. This type of information is not publicly available and had to be obtained from the health

    plans themselves.  (N.T. 4/23/18, 138:15–21, 153:3-12.)

42. On August 26, 2015, Sandmann e-mailed Schmiesing and Connie Redden, a non-attorney member of United's legal department, requesting United's purchase data for Provigil and its generic from June 1, 2006 to September 30, 2015, because they were "starting negotiations with the Defendants in the Provigil antitrust matter." (TX 27.) Schmiesing understood the purpose of this request was to facilitate settlement negotiations. (N.T. 4/25/18, 61:10–13.) The following day, Redden provided this data to Sandmann. (TX 29.) Sandmann, in turn, forwarded the information to the Lowey firm. (Sandmann Dep. 81:6–16.)

43. On September 17, 2015, Lawrence sent Lefkowitz a chart containing the purchase data for most of the health plans in the global negotiating group, including United. (TX 30; see also TX 34.)

44.  Lefkowitz indicated that receipt of this data confirmed for him that Cohen was, in fact, negotiating on behalf of the whole group of health plans, including United, because he would not have otherwise been able to obtain this confidential data. (N.T. 4/23/18, 138:15–139:15, 154:11–155:3.) Skidmore drew the same conclusion. (N.T. 4/24/18, 114:21–116:8.)

45. United's outside counsel Rhoad and Sandmann then signed an amended tolling agreement, dated September 30, 2015, relating to United's Provigil claims. (TX 32; SOF ¶ 7.) Schmiesing did not dispute that outside counsel were authorized to sign that agreement. (N.T. 4/25/18, 68:8–19.) A second amended tolling agreement was subsequently signed by counsel for the Cephalon Parties and the health plans, extending the tolling period through November 30, 2015. (TX 43; SOF ¶ 8.)

46. The Cephalon Parties' lawyers concluded from the attorney signatures on these tolling agreements that Cohen had been authorized by United's representatives to negotiate on its behalf. (N.T. 4/23/18, 144:12–15; N.T. 4/24/18, 114:21–115:17.)

**H.  Settlement Discussions Leading Up to the October 22, 2015 Phone Call**

47. Over the ensuing weeks, settlement discussions occurred both between Lefkowitz and Cohen, and between Cohen and the various health plans.

48. During the entire period of these negotiations, neither Lefkowitz nor Skidmore had any direct communications with in-house lawyers or outside counsel for United regarding the Provigil matter.  (N.T. 4/23/18, 170:4–9; N.T. 4/24/18, 146:12–25.)  Nonetheless, Cohen explained that he made numerous phone calls to counsel for each of the groups of health plans to keep them apprised of discussions between himself and Lefkowitz.   Cohen stated that he would not have discussed a settlement number with Lefkowitz without all counsel who signed the tolling agreements being consulted and approving that number.  According to Cohen, he and the other counsel on the tolling agreement had "robust discussions, disagreements and ultimately consensus on each number that we communicated to [Lefkowitz] and on the final number to which we agreed."  (N.T. 4/24/18, 59:2–16.)

49. Sandmann, Slate, and Rhoad all extensively participated in these discussions.  (N.T. 4/24/18, 59:17–60:18, 191:13–21.)  None of United's outside counsel ever suggested that they had limited authority to negotiate on United's behalf or indicated that United required a minimum share of any settlement.  (N.T. 4/24/18, 60:24–61:3; Lawrence Dep. 36:3–38:8, 652–25.)  It was Cohen's understanding and impression throughout the Provigil settlement negotiations that outside counsel had full authority to negotiate a settlement for United.  (N.T. 4/24/18 61:4–11.)

50. The Cephalon Parties understood (a) that Cohen had full authority from counsel for the various health plans to make demands on their behalf, and (b) that Cohen was having multiple conversations with the health plans' attorneys and with Macoretta on behalf of the

class.  (N.T. 4/23/18, 148:23–149:16; N.T. 4/24/18, 78:12–17, 113:24–115:8, 118:25–119:21.)

51. Sometime in the first half of October, Lefkowitz signaled to Cohen what number it would take for them to reach an agreement.  (N.T. 4/23/18, 157:12–23.)

52. On October 22, 2015, Lefkowitz and Cohen had a five to six-minute telephone conversation during which they agreed to "global peace" via a settlement for $125 million, which included all of the health plans and the Macoretta group.  (N.T. 4/23/18, 157:12–158:7; N.T. 4/24/18, 63:10–64:5.)  In that conversation, Cohen affirmatively represented that the $125 million would allow for full releases by all of the indirect purchasers, both from the Macoretta group and from the third-party health plans.  (N.T. 4/23/18, 159:13–24.)

53. Cohen believed that the oral agreement reached on October 22, 2015 was a binding settlement agreement.  (N.T. 4/24/18, 64:6–19.)  Cohen further stated that the $125 million settlement he reached with Lefkowitz was approximately $10 million higher than what he and the lawyers for the other health plans had agreed they would be willing to take.  (N.T. 4/24/18, 79:3–12.)

54. Sandmann, Slate, and Rhoad all assented to the settlement terms reached on October 22, 2015.  (N.T. 4/24/18, 192:17–23.)

55. The trial testimony was somewhat inconsistent as to whether United authorized outside counsel to commit to the $125 million settlement.  Rhoad "distinctly recall[ed]" he, Sandmann, and Slate having a conversation with Schmiesing, on or around October 22, 2015, wherein they told Schmiesing that negotiations were at a point where they were about to agree to settlement terms.  According to Rhoad, they outlined those terms for her, and Schmiesing orally committed to the terms and authorized outside counsel to commit to those

terms. (N.T. 4/24/18, 192:24–194:17.) Schmiesing, on the other hand, could not recall having any phone call with Rhoad between August 28, 2015 and December 1, 2015, in which she told him he could approve United's participation in a settlement of Provigil claims. (N.T. 4/25/18, 189:9–190:3.)

56. The day after the Cohen/Lefkowitz phone conversation, Macoretta and Lefkowitz telephoned the Court to advise that the parties had reached a settlement. (N.T. 4/27/18, 95:12–18.)

**I.** **Discussions Among the Parties Between the October 22, 2015 Phone Call and the December 7, 2015 Signing of the MOU**

57. Almost immediately after the October 22, 2015 telephone call, the Cephalon Parties began drafting a Memorandum of Understanding ("MOU") to memorialize the settlement. On October 23, 2015, Lefkowitz sent a draft of the MOU to Cohen and Macoretta. (TX 36.)

58. Two key provisions of the draft remained consistent throughout the drafting process. First, the introduction stated, "[t]his memorandum of understanding (MOU) *memorializes the principal terms of a settlement agreement* reached on October 22, 2015 by and between the following persons and entities (collectively, "The Parties") and to be incorporated into a comprehensive written settlement agreement that will be presented to the Court for approval." (Id. (emphasis added).) Second, paragraph four provided, "[t]he settlement *is binding and enforceable* and, unless otherwise agreed to in writing, the terms, including the Settlement Payment, will not change regardless of any rulings issued by the Court on pending motions, and regardless of any ruling by the United States Court of Appeals for the Third Circuit on the End-Payor Class Plaintiffs' pending petition for leave to appeal under Federal Rule of Civil Procedure 26(f)." (Id. (emphasis added).)

59. After that draft was sent to Cohen, and because there were numerous settling entities, it took the health plans (the "settling health plans" or "SHPs") a couple of weeks to get back to the

Cephalon Parties with their edits.  The parties then negotiated the exact language of the MOU over the ensuing six weeks.  (N.T. 4/24/18, 127:16–129:6.)

60. During that time, the lawyers for the individual SHPs—including the lawyers for United—had ample opportunity to both review and mark up the draft MOUs.  (N.T. 4/24/18, 69:6–70:2; Lawrence Dep. 70:25–71:11; Slate Dep. 371:17–372:2; Sandmann Dep. 182:7–182:20; TX 38; TX 39.)  In fact, Slate was "deeply involved" in the drafting process and exchanged many drafts of the MOU back and forth with the Lowey firm.  (Lawrence Dep. 71:20–72:20.)

61. On December 2, 2015, Lawrence e-mailed Skidmore requesting a third tolling agreement.  (TX 68.)  Skidmore declined to execute the third tolling agreement because the Cephalon Parties did not want any further delay in the signing of the MOU.  (N.T. 4/24/18, 128:7–20.)

**J.  United Outside Counsel Sign the MOU**

62. On December 1, 2015, Schmiesing emailed outside counsel to request an update on the status of Provigil.  (TX 61.)  Sandmann and Slate responded that they were close to a proposed agreement on settlement, which prompted Schmiesing to request a phone conference to discuss specifics because she was "a little uncomfortable with [Slate] stating that we're close to a settlement when [she] [hadn't] heard any numbers."  (TX 61.)

63. Schmiesing also asked whether there had been any discussions about the amount of the settlement because they would "need to get approval of the amount in discussion."  (TX 59.)  Slate responded, "Yes, we will be recommending the settlement with a quick-pay of $77 million for our group out of a total $125 million for our group and the class (which includes both health plans and consumers) combined, and with a true-up process as in a typical SHP deal . . . .  All of this is highly confidential (a term of the draft MOU/agreement), of course."  (TX 59.)

64. Schmiesing testified that, from this email, she learned that there was a draft MOU in the works, the total settlement payment was about $125 million, and the quick-pay, which included United, would be $77 million. (N.T. 4/25/18, 90:13–91:12.) Schmiesing then emailed outside counsel with four questions: (1) "[w]hat would United's pro rata share be?"; (2) "[w]hat % recovery compared to our exposure?"; (3) "[w]hy should we settle rather than litigate?"; and (4) "[h]ow does our recovery compare to others outside the settlement group." (TX 64.) Sandmann said he would get something to her "when we have a final proposal to recommend, but we can certainly get something before the week is over with the caveat that there is the release issue still out there and thus no proposed agreement to recommend." (TX 64.) Schmiesing did not ask for a copy of the draft MOU. (N.T. 4/25/18, 95:10–16.)

65. Slate, Sandmann, and Rhoad testified that on December 8, 2015, prior to signing the MOU, they had a phone call with Schmiesing wherein they walked through what they believed were the essential terms of the settlement. (Slate Dep. 173:8–13; Sandmann Dep. 112:14–113:9.) They explained their view of the MOU and that it did not obligate United to anything at that point. (Slate Dep. 209:23–211:12.) They further indicated that they were about to sign the MOU, but United would still have options in deciding whether to go forward with the ultimate SHP settlement agreement because there was a provision allowing United to "opt-out." (Slate Dep. 212:14–214:11; N.T. 4/24/18, 197:12–198:12.)

66. According to outside counsel, Schmiesing told them it was fine for them to go ahead and sign the MOU. (Slate Dep. 214:12–16; Sandmann Dep. 113:10–15.) Sandmann testified that there was no ambiguity about Schmiesing's grant of authority to sign the MOU. (Sandmann Dep. 113:10–114:3.) Rhoad corroborated Sandmann's testimony and stated that before he signed the MOU on behalf of United and the other Schedule C Plaintiffs, he fully explained

the terms of the MOU to Schmiesing and that she orally provided authority to sign on United's behalf. (N.T. 4/24/18, 195:8–196:25.)

67. Schmiesing contradicted this testimony and categorically denied giving outside counsel authority to execute the MOU on United's behalf. She maintained that she could not recall any conversation at all with outside counsel in December 2015. (N.T. 4/25/18, 175:10–19.) Several facts undermine her position:

    a. First, an email chain from December 7, 2015 reflects that the day before the call in question, Schmiesing and Sandmann arranged a phone conference for the next day. (TX 77.) Documents confirm that that phone call did in fact occur. (TX 79.)

    b. Second, Schmiesing acknowledged that in subsequent conferences with United personnel and outside counsel regarding the enforceability of the MOU, she neither denied giving outside counsel authority to sign the MOU nor expressed any surprise that an MOU had been executed on United's behalf. (N.T. 4/25/18, 171:6–25, 173:15–22; <u>see also</u> N.T. 4/26/18, 34:1–35:9, 101:17–102:5; Slate Dep. 239:11–15.) Had Schmiesing never authorized the signing of the MOU, it is likely that she would have displayed some form of incredulity upon learning that outside counsel had entered into the MOU on United's behalf.

    c. Third, Schmiesing stated that she sometimes forgot what was going on with her individual cases and often relied on outside counsel to remember the details of any particular matter. (N.T. 4/25/18, 58:7–59:11; 106:7–13.) Indeed, Schmiesing could not even recall giving outside counsel authority to sign the tolling agreement, despite her deposition testimony that she orally authorized the signing of the tolling agreement. (N.T. 4/25/18, 53:9–54:16.)

68. Given the foregoing facts, together with consistent testimony from outside counsel regarding the December 7, 2015 phone call, I credit the testimony of Sandmann, Slate, and Rhoad that Schmiesing authorized them to sign the MOU.

69. On December 9, 2015, Cohen sent Lekfowitz and Skidmore "the MOU signed by all plaintiff side counsel." (TX 83.) United was listed as a Schedule C SHP, and outside counsel Rhoad and Sandmann signed on behalf of the Schedule C "Settling Health Plans." (TX 83.) Outside counsel for United represented to Cohen that they had the informed consent from United's in-house lawyers to sign the MOU on United's behalf. (N.T. 4/24/18, 72:23–73:1; Lawrence Dep. 69:2–23.)

70. The following day, December 10, 2015, Skidmore signed the MOU on behalf of the Cephalon parties, made a .pdf copy of the executed document, and emailed it to Cohen under the file name "Provigil MOU Final Executed.pdf." (TX 84; 4/24/18, 131:17–20.)

71. At the time the MOU was executed, Lefkowitz and Skidmore understood that Sandmann and Rhoad were authorized to bind United to the MOU. (N.T. 4/23/18, 162:17–163:2; N.T. 4/24/18, 129:17–130:5.)

72. Similar to the original draft MOU, the introduction to the fully-executed MOU stated:

> This memorandum of understanding ("MOU") memorializes the principal terms of a settlement agreement reached on October 22, 2015 by and between the following persons and entities (collectively, "the Parties") and to be incorporated into a written settlement agreement that will be presented to the Court for approval with respect to the End Payor Plaintiffs and End-Payor Settlement Class ("End-Payor Class Settlement Agreement"), and a separate written settlement agreement with the Settling Health Plans listed on the attached A–D ("SHP Settlement Agreement"), which agreements together will result in a comprehensive settlement between the Cephalon Defendants and Plaintiffs.

(TX 84 at Introduction.)

73. The MOU then provides that "Plaintiffs will release all claims against the Cephalon [Parties] and covenant not to sue the Cephalon [Parties] on any claims relating in any way to the claims asserted in the lawsuit filed by the End-Payor Plaintiffs and related actions."  (Id. ¶ 1.)

74. In exchange for these releases, the Cephalon Parties were to request from the FTC Settlement Fund certain amounts for each group of plaintiffs.  With respect to the SHPs, the Cephalon Parties agreed to request disbursement from the Settlement Fund in the amount of $77 million into "an account designated by Plaintiffs' Counsel."  (Id. ¶ 2.)  With respect to the End-Payor putative class, the Cephalon Parties agreed to request a disbursement in the amount of $48 million, to be paid into a "qualified settlement escrow account established by Plaintiffs' Counsel."  (Id. ¶ 3.)  The collective payments to the SHPs and the End-Payor class would not exceed $125 million.  (Id. ¶ 4.)

75. The MOU then states that "[t]he settlement *is binding and enforceable*, and, unless otherwise agreed to in writing, the terms, including the Settlement Payment, will not change regardless of any rulings issued by the Court on pending motions . . . ."  (Id. ¶ 5 (emphasis added).)

76. Unlike the Tolling Agreement, the MOU did not contain a "Consent and Authority" provision, or any similar provision, warranting that each person executing the MOU in a representative capacity on behalf of a party is fully empowered and authorized by such party to execute the MOU on its behalf.  (TX 84.)

77. On December 22, 2015, Skidmore sent Lawrence initial drafts of the two settlement documents contemplated in the MOU:  the End-Payor Class Settlement Agreement and the SHP Settlement Agreement.  (N.T. 4/24/18, 131:23–132:12; TX 95.)  Both draft documents contained a "WHEREAS" clause indicating that "parties have entered into a binding Memorandum of Understanding that contemplates the entry of this Settlement Agreement

which will remain in force and effect only until this Settlement Agreement becomes effective, at which point the Memorandum of Understanding will be superseded by this Settlement Agreement." (TX 95.) This clause was included in all drafts of the SHP Settlement Agreement, including the latest one circulated on April 4, 2016. (TX 211, TX 215.) Sandmann, Slate, and Rhoad were aware of the inclusion of this clause, but never questioned it. (N.T. 4/24/18, 68:6–69:5; Slate Dep. 297:22–300:8.)

78. Skidmore understood that Cohen and Lawrence forwarded the draft SHP and Class Agreements to the other lawyers in their group. (N.T. 4/24/18, 134:12–135:14.)

## K. United's In-House Inquiry Into Whether It Would Pursue Affirmative Litigation

79. On November 19, 2015, lawyers from two other law firms, Boies Schiller ("Boies") and Zelle—current counsel in this enforcement of settlement dispute—held a meeting with United in-house counsel at United's headquarters in Minnesota. United's attendees at this meeting included Redmond, Schmiesing, Klein, Jeremy Johnson, Boado, and Zaetta. (N.T. 4/25/18, 68:24–69:12.)

80. The point of this meeting was for the Boies and Zelle lawyers to "pitch" United on pursing affirmative, contingency-fee antitrust litigation with respect to Provigil in lieu of pursuing settlement. (N.T. 4/26/18, 93:2–14.)

81. Shortly after this pitch meeting, Zaetta asked Jeremy Johnson to work up a potential affirmative litigation case in connection with Provigil. (N.T. 4/26/18, 93:20–24; TX 58.) Johnson explained that this was a new tact with respect to the Provigil cases since, prior to that time, Schmiesing and Optum had been working on negotiating settlements. (N.T. 4/26/18, 96:24–97:11, 96:10–97:10; N.T. 4/27/18, 5:14–19.)

82. Following the pitch meeting, Schmiesing emailed Johnson, Zaetta, and Klein, on November 18, 2015, stating, "[j]ust want to give you a heads up that we have already retained another firm on Provigil . . . ." She then identified Crowell and Hill Hill as the firms United "regularly use[s]" for the national recovery work. (TX 52.)

83. Outside counsel was not aware at that time that United was working with the Boies and Zelle firms to develop a litigation strategy for Provigil. (Slate Dep. 241:4–13.)

**L.  Under's In-House Discussions Regarding Settlement In December 2015**

84. Following execution of the MOU, outside counsel sent Schmiesing an extensive memorandum, dated December 9, 2015, entitled "Provigil Proposed Settlement." (TX 82.) Outside counsel indicated that "we, along with counsel for the IP Class, began settlement discussions with Teva which, as noted above, had bought Cephalon during the course of the litigation. . . . We have ultimately convinced Teva to pay a total of $125 million to resolve all the claims of our group and the IP Class." (TX 82.)

85. The December 9th memorandum went on to acknowledge an understanding of how the allocation of the settlement amount would work, stating that

> [W]e were able to negotiate with the [indirect purchaser] Class to get an unprecedented 61.6% of the total settlement amount—$77 million—in quick-pay. . . . The agreement with Teva would provide that, upon the execution of both agreements with our group and the IP Class, Teva would have eight days to submit a disbursement request to the FTC requesting the $77 million be paid to our group.

(Id.) The memorandum made clear that the estimate of UHS's pro rata share under the allocation was not exact and that "an exact pro rata allocation based on all purchases during a set period can be calculated when all relevant purchases for our group are compiled

(currently in process). However, we believe the pro rata share for United based on covered live market share will give a good 'back-of-the-napkin' estimation." (Id.)

86. In the memorandum, Slate, Sandmann, and Rhoad recommended that "United accept a settlement containing the essential terms" set forth in the memorandum "subject, of course, to the drafting of an acceptable written agreement." (Id.) The memorandum made no mention of the MOU.

87. On December 18, 2015, Schmiesing forwarded this memorandum to her colleagues at United, including Redmond, Boado, Zaetta, Jeremy Johnson, and Klein, with the subject "Provigil proposed settlement." (TX 88.) Schmiesing indicated that the Cephalon Parties had "agreed to settle the Settling Health Plan group (SHP) and indirect purchaser class (IP Class) claims for a total of $125 million. United is a member of the SHP group." (TX 88.) She went on to note that the SHP group would receive approximately $77 million in a quick pay and there would be a "true-up" payment after the class funds were distributed. She commented that although outside counsel acknowledged that a larger recovery might be achieved through litigation, they were recommending settlement because of the risks associated with litigation. (Id.) At the time Schmiesing wrote this email, she did not yet have a copy of the MOU and was summarizing only the December 9th "Provigil Proposed Settlement" memo. (N.T. 4/25/18, 109:4–9, 110:6–16.)

88. Schmiesing testified that, at this time, the Provigil matter was proceeding on "two tracks" within United. On one track, United was considering affirmative litigation through the Boies and Zelle firms, while, on the other, United was considering settlement through outside counsel. (N.T. 4/25/18, 95:10–23.) Schmiesing was not directly involved in discussions about affirmative litigation. (Id.)

89. On December 21, 2015, Andrea Boado called Schmiesing regarding the Provigil matter. (N.T. 4/26/18, 17:19–18:5; TX 70.) Boado's contemporaneous notes of the call refer to the fact that the "Settling HP [Health Plan] Group" will get the "SHP Quick Pay," and that it "[s]eems we've reached a settlement [agreement]," but could still decide not to settle. (TX 70.) Boado understood that there were proposed settlement terms that were put forth for United to evaluate. (N.T. 4/26/18, 2:5–15.)

90. Boado immediately communicated the substance of her conversation with Schmiesing to Chris Zaetta. (N.T. 4/27/18, 10:7–21.) Zaetta asked whether Schmiesing thought "the settlement negotiations to date were a problem if we [United] want to pull out"?" (TX 92.) Boado responded, "Yes and no. She thought we could walk away from the settlement without recourse. However, she was unsure whether the tolling agreement would protect us if we chose to pursue affirmative litigation." (TX 92.) Boado did not tell Zaetta at that time that she had learned from Schmiesing that there was a settlement agreement. (N.T. 4/27/18, 11:14–21.)

## M. United In-House Counsel Receives the MOU

91. On January 5, 2016, United in-house lawyers Schmiesing, Boado, Jeremy Johnson, and Redmond had a conference call with outside counsel Sandmann, Rhoad, and Slate. (TX 96; TX 97; N.T. 4/26/18, 30:11–31:7.) Zaetta was not on the call. (Id.) Although a primary topic was a discussion of the pros and cons of United's affirmative litigation of the Provigil antitrust claims, (TX 70), another topic discussed was the executed MOU. (N.T. 4/26/18, 101:14–16.) The parties on the call discussed that an MOU had been executed by outside counsel and that, under the MOU, United would be part of the quick pay group receiving $77 million. (TX 70, at 6.) Schmiesing did not raise any surprise, concern, or objection about the

fact that counsel had executed an MOU. Likewise, no other lawyer from United either expressed any surprise or dismay at that fact or requested a copy of the MOU. (N.T. 4/26/18, 34:1–35:9, 101:17–102:5; Slate Dep. 239:11–15.) Sandmann could not recall anyone questioning or commenting in any way on his authority to sign the MOU on United's behalf. (Sandmann Dep. 192:14–193:1.)

92. Sandmann first sent Schmiesing a copy of the executed MOU on January 14, 2016 via an email with the file name "Provigil MOU Final Executed.pdf." (TX 109.) The cover email stated, "[h]ere is the MOU that contains the proposed terms discussed in our memorandum." (TX 109.) Although Schmiesing understood that the principal terms of the settlement were memorialized in this MOU, she did not click on the link to open the MOU and read it. (N.T. 4/25/18, 129:9–22.) In fact, Schmiesing testified that she never read the MOU until sometime after March 25, 2016. (N.T. 129:17–130:11.) At the time she first received the MOU, Schmiesing believed that it was only a proposed settlement which allowed United to walk away from it, but not the Cephalon Parties. (N.T. 4/25/18, 132:21–3.) She thought that when Sandmann and Rhoad signed the MOU on United's behalf, United gained rights and obligations under this MOU to enforce the settlement against the Cephalon Parties. (N.T. 4/25/18, 133:14–134:20.)

93. On January 15, 2016, and without any comment, Schmiesing forwarded the MOU to several of her colleagues inside United, including Boado, Jeremy Johnson, and Redmond. (TX 110; N.T. 4/25/18, 128:18–129:5.)

94. Upon receipt, Johnson read the MOU within a day or two. (N.T. 4/26/18, 104:2–106:13.) He noted that the MOU expressly stated that it "memorializes the principal terms of the settlement agreement reached on October 22nd," that it listed United as a Schedule C Settling

Health Plan, and that it provided that the settlement was "binding and enforceable." (N.T. 4/26/18, 105:1–23.) His understanding of the MOU was consistent with the opinion provided by outside counsel—that United was not bound to a settlement of its Provigil claims. (N.T. 4/26/18, 175:19–176:15.) Johnson admitted, however, that when he read the MOU, he was "not really reviewing [it] to question whether it was binding or not," but rather "was looking at the MOU primarily for the main terms of what [United] would get out of this and seeing what [United] would get out of it versus the upside of pursuing an individual case." (N.T. 4/26/18, 137:14–25.) Johnson further stated that he "read the MOU in the context of two memoranda [from outside counsel] addressing a proposed settlement . . . . I'm relying heavily on my own outside lawyers who have been involved in the process. I'm new to the matter. I read it in that context. I never questioned it. I thought they were reputable lawyers and they knew—they knew more about the MOU than I did." (N.T. 4/26/18, 137:4–13.) In short, Johnson did not question outside counsel's representation that the MOU was not binding. (TX 178.)

95. Boado did not read the MOU upon receipt, but rather reviewed it at a "high level" and relied on what outside counsel had conveyed to her about the MOU. (N.T. 4/26/18, 45:11–46:24, 51:15–53:15.) She did not believe it was her responsibility, as a business lawyer, to thoroughly read the document. (N.T. 4/26/18, 58:19–59:4.)

96. Similarly, Redmond indicated that she opened up the MOU and reviewed it for the framework of the proposed settlement and the financial aspects, but did not review the entire document from start to finish. (Redmond Dep. 44:20–45:25; 93:6–9.) She considered the MOU to be a framework of possible settlement terms that the parties were negotiating, and did not believe it was a binding settlement agreement. (Redmond Dep. 47:6–11, 96:16–18.)

97. On January 22, 2016, Jeremy Johnson, together with Andrea Boado and Laurie Wolfe, prepared a report for United Healthcare General Counsel, Thad Johnson. (TX 111, 112, 113, 114.) This report stated, in part:

> In July 2015, Crowell (at the direction of Optuminsight) began settlement discussions with Teva on UHC claims for Provigil. In late December 2015, Crowell obtained a settlement offer estimated to result in a gross settlement amount of $11 – 16.5 million in a "quick pay" to UHC. The settlement offer also provides for additional "true up" funds after consumer claimants have been paid 100% of their purchases; although Crowell believes those funds would likely be less than the quick pay amount. The quick-pay likely would be paid sometime in 2016, with the true-up calculated and any additional amounts paid by the end of 2016 or early 2017. UHS has not responded to the offer forwarded by Crowell, and is evaluating whether to pursue individual affirmative litigation against the defendants using Zelle, Hofmann and Boies Schiller (Zelle/Hofmann).

(TX 114.) Boado did not tell Thad Johnson that a week earlier she had received an executed MOU. (N.T. 4/26/18, 45:11–24.)

98. On January 28, 2016, Jeremy Johnson emailed Wolfe and Boado in preparation for Boado's meeting with Zaetta and Thad Johnson the following Monday. (N.T. 4/26/18, 107:13–108:18.) Without mentioning the MOU, Jeremy Johnson stated "Crowell negotiated a tentative $125 mm settlement agreement with defendants on behalf of a group of indirect purchasers (including UHC). UHS would likely receive $11 mm-$16.5 mm under that settlement." (TX 117.) Johnson acknowledged that he pulled his summary more from the December 9th memorandum he received from outside counsel than from the MOU. (N.T. 4/26/18, 110:1–9.) Relying on outside counsel, he did not consider the possibility that United's counterparties to this executed MOU might read the "binding and enforceable" language in the MOU to mean that it was a binding agreement. (N.T. 4/26/18, 114:2–115:7.)

**N. United In-House Lawyers and Outside Counsel Discuss "Opting Out" of the Settlement**

99. At the end of January 2016, Schmiesing reached out to Sandmann to inquire whether the tolling agreement between the Cephalon Parties and the end payors had been extended. (TX 119.) Sandmann responded, in part, "need to confirm with Jerry Lawrence at Lowey that the [Defendants] are treating the agreement as still in effect during the sign off period for the MOU . . ." (TX 119.)

100. Thereafter, Slate and Sandmann contacted Lawrence and asked whether "[i]f this [the MOU] all blew up somehow, are we still tolled?" (TX 118.) Lawrence responded that, "if it blew up, we'd [the plaintiffs] be suing to enforce the settlement." (TX 118.) Sandmann then repeated the question regarding whether the claims were still tolled in light of the expiration of the tolling agreement. (TX 118.) Lawrence stated that "the antitrust claims aren't tolled, but we now have claims to enforce the settlement—same if we tried to bring the antitrust claim they could enforce the settlement." (TX 118.) In follow up, Sandmann remarked, "is what I am hearing is that if one of the SHP clients decides not [to] participate and wants to sue (and does), the limitations period has not been tolled since November 30, 2014." (TX 118.) Lawrence simply responded, "yes." (TX 118.)

101. Lawrence explained that he understood these questions to reflect Sandmann and Slate's concern that perhaps the Cephalon parties were trying to back out of the settlement. (Lawrence Dep. 229:6–20.) He testified that this email did not set off any red flags for him because he was "confident that [United] agreed to a settlement on October 22nd." (Lawrence Dep. 229:21–230:1.)

102. Schmiesing then spoke with Sandmann sometime on January 29, 2016, but could not remember the call with any level of specificity. (N.T. 4/25/18, 136:18–138:4.) Thereafter,

she wrote to Jeremy Johnson, Boado, Wolfe, and Redmond stating, "Hi—I spoke with Mark. Even if we decide not to sign off on the MOU, we are OK because there will be an opt out period associated with the approval of the settlement class. Also, the class claims are tolled from the filing of class complaint until the time of denial of certification, so there is still time left on the clock—approximately three years." (TX 120.)

103. Upon reading this email from Schmiesing, Boado sent a separate email to Jeremy Johnson, and Wolfe inquiring, "[i]s she merely addressing the settlement issue or is she confusing/conflating the settlement opt out with our query re the DP opt out . . ." (TX 121.) Johnson responded that,

> Even though the indirect class wasn't certified for purposes of the litigation, a class can be certified for settlement purposes. The Memorandum of Understanding (attached) does in fact contemplate the certification of a class of indirect purchasers for settlement purposes. Any final settlement, including the certification of an IP settlement class, needs to be approved by the judge and all class members (including UHC) need to be given the opportunity to opt-out of the settlement class.

(TX 121.) Johnson understood that the SHP settlement did not require court approval, but did not think that it affected United's opt-out rights. (N.T. 4/26/18, 8–12, 127:10–23.)

104. Johnson also told Boado that "on a related note, settlements often also have 'blow up' provisions where the settlement is voided if a certain number of plaintiffs . . . opt out." (N.T. 4/26/18, 128:11–16.) Johnson was referring to the concept or possibility that if United were to opt out of the settlement, it would blow up. (TX 122; N.T. 4/26/18, 128:17–20.) Boado responded that, "So I'm guessing that this shrinking violet may be tossing an incendiary device into the settlement?" (TX 122.) Johnson noted, "That's right!" (TX 122.)

105. On February 15, 2016, Redmond sent the executed MOU, with the same filename— "Provigil MOU Final Executed.pdf."—to Matthew Shors, the corporate head of litigation for

UnitedHealth Group.  (N.T. 4/27/18, 33:31–4; TX 133.)  At this point, multiple high-level in-house lawyers at United—Matthew Shors, Jeremy Johnson, Elizabeth Schmiesing, Andrea Boado, and Laurie Wolfe—had a copy of the MOU.  From January through late March of 2016, no counsel from United expressed any surprise that there was an executed MOU in the Provigil matter or questioned whether outside counsel had authority to sign the MOU.  (N.T. 4/24/18, 203:16–205:3; N.T. 4/25/18, 173:1–22; N.T. 4/26/18, 106:14–107:3, 138:22–140:3.)

## O.  Chris Zaetta at United Receives the MOU

106.    On March 25, 2016, Chris Zaetta, head of litigation at United Healthcare, was on a conference call when something alerted him to the potential existence of a document involving Provigil.  (N.T. 4/27/18, 17:18–18:9.)  At Zaetta's request, Boado forwarded Jeremy Johnson's January 29, 2016 email referring to the MOU.  (TX 145; N.T. 4/27/18, 18:10–19:23.)  It was at this point that Zaetta first learned that there was an MOU.  (N.T. 4/27/18, 20:1–4.)

107.    After seeing the reference to the MOU, Zaetta wrote to Schmiesing asking if there was "a deadline for opting out?"  (TX 147.)  Schmiesing responded, "I assume you mean a deadline for opting out of the proposed settlement, right?  I'm not aware of one, but I will follow up and let you know."  (TX 147.)  This prompted Zaetta to ask, "Is there a settlement agreement?"  (TX 147.)  Schmiesing then forwarded him Sandmann's email of January 14, 2016, which attached a copy of the executed MOU.  Schmiesing's cover email stated, "Here's the proposed settlement."  (TX 149.)  Zaetta then realized that everyone on his in-house team working on the Provigil matter knew about the executed MOU except him.  (N.T. 4/27/18, 22:4–7.)

108.    As soon as he received the MOU, he read it and concluded that there was a problem. (N.T. 4/27/18, 22:8–15.)  In his view, what he was reading in the MOU was very inconsistent with what he had understood to be the state of affairs, *i.e.* that United could opt out of the settlement.  (N.T. 4/27/18, 23:3–7.)

109.    Zaetta emailed Schmiesing stating, "[i]t's not clear to me that we can actually opt out from the settlement based on this MOU?  What is your view on that?"  (TX 156.)  Schmiesing remarked that there was no final agreement yet.  She went on to state that, "[w]e are definitely not bound to the settlement at this point—we would just need to tell the firm [Hill Hill] that we're not signing on and we would then not be listed as a settling TPA.  If they are not able to get this approved as a class settlement, we would not need to opt out, but if there is a class settlement, it will include an opt out procedure."  (TX 156.)  At this point, Schmiesing had still not read the MOU.  (N.T. 4/25/18, 142:21– 145:16.)

110.    Zaetta responded, "My view is that we're probably going to have a fight on our hands if a settlement class is certified and we decide to opt out."  (TX 156.)  When Zaetta indicated that he did not understand the purpose of the MOU if United was allowed to opt out, Schmiesing explained,

> My understanding is that, if we do not buy into the settlement and therefore are not part of the MOU, we are not bound by it.  Those payers that are not party to the MOU will be in the general pool of payers that can opt in or out of the settlement once it is set forth as a class settlement . . . . I think the purpose of the MOU is to ensure that there is a critical mass among the payers that are participating in the settlement and minimize the potential for direct actions such as the one we're contemplating.

(TX 162.)  In other words, Schmiesing took the position that somehow United had a choice not to be part of the MOU.  (N.T. 4/25/18, 151:2–6.)  Zaetta wrote back and asked, "[d]oesn't the fact that we're a signatory to the MOU make us a party to it."  (TX 165.)  Schmiesing

answered, "It has not yet been finalized.  Crowell and Hill Hill understand that we have not agreed to the settlement."  (TX 165.)  At trial, Schmiesing acknowledged that this email did not deny granting authority to outside counsel to sign the MOU for United.  (N.T. 4/25/18, 152:11–16.)

111.    Zaetta wanted to get outside counsel on the phone so he could have them address his concerns about how the MOU should be read, particularly in light of its "binding and enforceable" language.  (N.T. 4/27/18, 24:22–25:9.)

112.    In preparation for this meeting, Boado forwarded several emails relating to the settlement to Zaetta, including one from Schmiesing to Johnson, Boado, Wolfe, and Redmond describing the opt-out theory.  (TX 155.)  Zaetta responded simply, "I'm not sure I agree with the below."  (TX 155.)

113.    Boado also sent to Thad Johnson and Zaetta a "rough chronology of salient meetings and messages" that she had relating to Provigil.  (TX 160.)  The basic point of this timeline was to show when people became aware of the MOU.  (Wolfe Dep. 37:16–40:14.)

114.    On March 26, 2016, Zaetta emailed Jeremy Johnson asking, "I don't get this.  We signed this mou.  Why aren't we barred from opting out?  (TX 179.)  Johnson replied the next day, "[m]ost importantly, the MOU contemplates final settlement agreements that must be court approved.  The parties need the court to approve a settlement class, provide notification and opt out opportunity to the members of the approved settlement class, which is the typical procedure."  (TX 178.)  When Johnson sent that email, he was aware that the MOU contemplated two separate settlement agreements, only one of which needed court approval, the other of which did not.  Nonetheless, he did not note this in his email.  (N.T. 4/26/18, 132:11–134:12.)

115. On March 28, 2016, Zaetta had a conference call with outside counsel—Sandmann, Slate, and Rhoad—as well as in-house lawyers Boado and Schmiesing. (N.T. 4/27/18, 28:15–17; TX 168.) The call primarily focused on the terms of the MOU, whether United was bound, and outside counsel's explanation as to how United could opt out of the Provigil settlement. (N.T. 4/24/18, 205:25–206:10; N.T. 4/25/18, 153:3–19; Sandmann Dep. 127:7–129:9.) At no point did Schmiesing or anyone else on the call indicate that outside counsel did not have the authority to sign the MOU on United's behalf. (N.T. 4/24/18, 209:13–22; N.T. 4/26/18, 139:16–23; Slate Dep. 271:2–14; Sandmann Dep. 206:2–17.)

116. Zaetta was not satisfied with outside counsel's "opt-out" explanation. (N.T. 4/27/18, 25:18–20.) Following the call, he wrote back to Jeremy Johnson with respect to Johnson's previously-provided opt out theory and said, "I don't agree. This MOU would seem to bind us to a settlement. I spoke with outside counsel this morning and they had no good answers, although they said they are looking for additional e-mail correspondence on the issue." (TX 178.) Johnson replied, "They agreed that it's binding? Or they weren't sure? If they think it's binding that should've been point 1 when we talked to them months ago. That's irritating. I didn't question it either so I'll take the blame on this if it truly is binding. If that is the case I have some thoughts on how to message it internally." (TX 178.) At trial, Johnson indicated that he did not think he did anything blameworthy but was just "offering to fall on the grenade for [his] boss." (N.T. 4/26/18, 138:11–21.)

117. Following the March 28th phone call, Slate, Sandmann, and Rhoad sent an email to Zaetta and Boado apologizing "for not being prepared to address the issue you raised about the MOU this morning on the call" and offered an extensive explanation of the same opt-out theory they had previously given to Schmiesing before they signed the MOU. (TX 174;

Sandmann Dep. 116:22–117:4, 119:11–19.) They reasoned that "there was no principal term under which any SHP agreed that it would ultimately be an SHP for purposes of a final SHP Agreement versus maintaining rights as a member of the class; instead the MOU specifically did not <u>exclude</u> SHPs from the class definitions, and did not require that <u>all</u> SHPs listed in the schedules be a party to the final SHP Agreement." (TX 174.)

118.    Zaetta forwarded outside counsel's email to Boado and stated, "Huh?" (TX 174.) In a later email responding to outside counsel's explanation, Zaetta offered the following:

> I'll confess to not understanding the below analysis. My understanding from the MOU is that:
>
> - UHC is listed as a Settling Health Plan who (per the introductory paragraph) will memorialize a separate settlement known as the SHP Settlement Agreement with the defendants in which the releases contemplated in paragraph 1 will be included.
> - Per paragraph 2, the consideration for the releases is $77 million, which comes from the FTC settlement.
> - Per paragraph 7, once the SHP Settlement Agreement is signed, the End-Payor Plaintiffs (UHC is not defined to be an End-Payor Plaintiff) will move for approval of the End-Payor Class Settlement Agreement.
> - As a signatory to the SHP Settlement Agreement who has released the defendants, I don't see how UHC could be part of the End-Payor Settlement Class with an opportunity to opt out.
>
> The above is based solely on the MOU, so I don't know what you are referring to when you talk about the draft class settlement agreement and plan of allocation. Please send them to us. I think we then need to discuss this further.
>
> (TX 176.)

119.    In yet another attempt to explain the opt-out theory, Slate, Rhoad, and Sandmann sent another email, dated March 29, 2016, to Zaetta and Boado, reasoning that United would only be a SHP if it enters into the separate SHP Settlement Agreement. If it does not, it remains part of the End Payor Class and would have the right to opt out. Because the MOU did not

exclude any SHPs from the class definitions, outside counsel further reasoned that the SHPs in the MOU remain class members unless and until they sign off on the SHP settlement agreement. (TX 180.) Slate testified that the arguments laid out in this email were the best arguments outside counsel could think of for how or why United would not be bound by the MOU to follow through on settlement. (Slate Dep. 280:16–281:6.)

120.    At this point, outside counsel understood very clearly that United wanted the option of getting out of the Provigil settlement. (Slate Dep. 281:7–13.) At no point did outside counsel convey to Zaetta that he did not need to worry about the terms of the MOU because United was not a signatory party to it. (Sandmann Dep. 210:9–210:25.)

121.    Although the analysis set forth in this March 29th email (see ¶ 119 above) was "essentially" the same analysis and explanation Sandmann had given to Schmiesing before he signed the MOU on United's behalf, Zaetta, unlike Schmiesing, had actually read the MOU and was unconvinced by the opt-out argument. (Sandmann Dep. 119:3–19.) He forwarded outside counsel's email to Schmiesing, Redmond, Jeremy Johnson, and Boado, asserting, "I am very frustrated with this. They are not acknowledging that this is a massive issue. I'm not sure whether there's a way out, but I don't feel comfortable having this firm or Crowell who signed the MOU negotiating any further on our behalf." (TX 182.)

122.    In response to Zaetta, Schmiesing suggested another phone call and stated, "[w]e have not agreed to the settlement, and these attorneys know that." (TX 182.) Schmiesing explained that she was not referring to outside counsel's authority to sign the MOU, but rather outside counsel's authority to finally settle the claims. (N.T. 4/25/18, 159:1–4.) On the same day, Schmiesing also forwarded the e-mail chain to Matt Klein—Optum's head of litigation—commenting, "FYI. Not sure what can be done here, but these two groups are

talking past each other.  I'm trying to help bridge the gap, but I'm not in the best position to do so.  Any thoughts?"  (TX 186.)  Klein requested a copy of the MOU.  (TX 186.)  Schmiesing immediately forwarded it to him, which was the first time Klein had seen the MOU.  (Klein Dep. 57:11–13, 59:9–13.)

123.    On the same day—subsequent to Zaetta's phone call with outside counsel and their follow up email to him—Schmiesing wrote to outside counsel: "I'm sorry I didn't adequately prepare you for the call yesterday.  I think Chris wants to understand how we are not bound by the MOU when we are already listed as a SHP, and the document appears to be executed.  Can that be explained?  What action can/will defendants take if United determines not to go through with the settlement?"  (TX 181.)  She did not, at this time, mention anything to outside counsel about the fact that they purportedly signed the MOU without obtaining her authority.  (N.T. 4/25/18, 159:18–160:12.)  Nor did she ever tell Zaetta that she did not give outside counsel authority to sign the MOU.  (N.T. 4/25/18, 171:6–25.)  Nonetheless, Schmiesing testified that at some unspecified point, she confronted outside counsel about their alleged unauthorized signature of the MOU.  (N.T. 4/25/18, 157:6–12, 159:18–25, 170:20–171:4, 248:3–249:9.)

**P.  United's Decision to Contest Its Obligations Under the MOU**

124.    In the late afternoon of March 29, 2016, Sandmann sent to Zaetta all the draft documents that could be relevant to continued discussions.  (TX. 193.)  Zaetta promptly instructed, "[p]lease do not conduct any further negotiation on these documents.  I would like to have a call on Thursday."  (TX 193.)

125.    On March 30, 2016, Schmiesing chimed in on this exchange, stating:

> Chris, please include me on the call tomorrow.  I've taken a look at the MOU and the draft SHP agreement, and I think that while the

> MOU is not clearly drafted, it does not bind any particular SHP as denoted on the list, because it is not specific enough as to the division of the settlement between the class and the SHPs. It also indicates that it encompasses the "principle terms" of the agreement. Also, as you noted, there is no "authorization" provision. I think the actual SHP agreement is the binding settlement.
>
> I think the best plan . . . would be to have the existing firms convey that and then proceed with alternate counsel. I'm concerned that if we flag our concerns about the MOU for defendants by raising the issue with new counsel that defendants may see an opportunity that they may not have been aware of.

(TX 195.) Schmiesing then separately told Zaetta that she did not authorize outside counsel to sign the MOU. (N.T. 4/25/18, 169:3–15, 251:1–15; N.T. 4/27/18, 58:21–59:60:9.)

126. On March 31, 2016, Klein reached out to Schmiesing and asked, "Have we told Crowell/Sandmann that they need to get us out of the settlement?" (TX 202.) Schmiesing replied, "I've told them what the issue is. I don't think there has been a final decision on the litigation yet. They know that we are contemplating it and that we need to be able to exit the agreement, though." (TX 202.) Klein then asked, "Is Crowell/Sandmann telling us that we aren't going to be able to get out?" to which Schmiesing replied, "No. They do not agree that the MOU commits us, and do not see an issue. Chris et al. [readacted] disagree with their analysis." (TX 202.)

127. Zaetta then contacted UHG head of litigation Matt Shors, stating:

> We have a big issue with the Provigil indirect purchase claims we had intended to assert.
>
> As you recall, Betsy told us that there was a proposed settlement that the Hill Hill/Crowell teams had negotiated with the Provigil manufacturers in which we would take anywhere between $11M and $16M [redacted]. We had been told that it was a proposed settlement and we had the ability to opt out. After presenting the numbers to the UHC Office of the CEO and Marianne, they were ok with us opting out, assuming the various Optum and UHC

businesses sign off. Over the past few weeks we have been working to get sign offs from a number of people on both the UHC and Optum sides. Everyone has signed off so far the last person we need to go to is Larry (we haven't yet).

Last Friday, I found out that Hill Hill and Crowell had entered into an MOU on UHCs behalf with the Provigil defendants. The MOU is very straight forward and would appear to bind us to the $11M–$16M settlement. I have no idea how this happened, particularly since the MOU was signed after Betsy, Matthew, Heather and the UHC legal team met with Boise [sic] and Zelle about the opportunity to opt-out.

[Redacted] Betsy told me on a phone call earlier this week that she did not give them the authority, but we may want to double check. I know you're on break, but let's discuss as soon as possible when you get back. We'll likely need to move quickly.

(TX 204.) Without any indication that he had already received a copy of the executed MOU over a month earlier, Mr. Shors cursorily responded, "Yikes." (TX 204.) Zaetta did not know that Shors had previously seen the MOU (see ¶ 105). (N.T. 4/27/18, 39:13–40:19.)

128.    In the meantime, outside counsel and Zaetta arranged another phone call for March 31, 2016. Sandmann, Slate, and Rhoad exchanged multiple emails among themselves in order to present a cohesive position, and Sandmann emphasized that they needed to "exonerate" Schmiesing because she authorized them to sign the MOU. (TX 198, Sandmann Dep. 231:3–8.) Sandmann wanted to make clear to Zaetta that, before they signed the MOU, they had provided Schmiesing with the same analysis of the MOU's terms that they were providing to Zaetta on March 28th and 29th. (Sandmann Dep. 233:17–25.)

129.    The call took place on March 31st with Zaetta, Johnson, Boado, Schmiesing, Rhoad, Sandmann, and Slate on the phone. (TX 144, at p. 5.) At that time, Zaetta told outside counsel that they did not have authority to settle the Provigil case on United's behalf. Slate agreed and said, "You are correct, we did not ask for authority to settle the case, and did not

have it." (Slate Dep. 326:18–329:13; N.T. 4/26/18, 185:16–23.) No one discussed whether Schmiesing had authorized outside counsel to sign the MOU. (N.T. 4/26/18, 139:16–140:13.)

130. On April 5, 2016, Zaetta telephoned the Cephalon Parties' counsel, Skidmore, to let them know that United would not be participating in the settlement. (TX 217.) According, to Zaetta's email to other United counsel of the same date, Skidmore asserted that lawyers "purporting to represent [United] signed a binding MOU on [United's] behalf" and wanted to know how United thought it was not bound. Zaetta responded that "the lawyers did not have authority to bind us." (TX 217.)

131. Skidmore testified that he was "incredulous" because "we had been negotiating this for months and months." (N.T. 4/24/18, 137:6–14.) Skidmore's belief had always been that Sandmann and Rhoad had authority from United to enter into this settlement. (N.T. 4/24/18, 136:11–21.) Skidmore contacted Lefkowitz, who testified that he was "flabbergasted," "shocked," and "incredulous" because he had engaged in months of settlement and "relied on lawyers who signed a legally-binding document that said they were representing one of the parties to the document." (N.T. 4/23/18, 164:12–24.)

132. On June 21, 2016, Skidmore received a letter from United's new counsel, Boies Schiller, stating, in part:

> I have sent a letter with a UnitedHealth settlement offer to you and the other lawyers acting as lead counsel for the different defendants in the ongoing litigation relating to the Provigil conspiracy. I am writing separately to you to confirm that the only lawyers representing UnitedHealth in this matter are Boies, Schiller & Flexner LLP and Zelle LLP.
>
> We understand that there have been settlement discussions between you and counsel seeking to represent the class of indirect purchasers (at Lowey Dannenberg Cohen & Hart), as well with

> other counsel purporting to represent a group of large indirect purchasers (Crowell & Moring). As UnitedHealth has informed you, none of those lawyers ever received authorization to make any offer of settlement, or to agree to any offer of settlement, by or on behalf of UnitedHealth. Thus, any memorandum of understanding or other agreement you may have with those lawyers does not affect UnitedHealth.

(TX 221.)

133.     Shortly thereafter, in July 2016, United sued the Cephalon Parties, Mylan Laboratories, Ranbaxy Pharmaceuticals, Ltd., and Ranbaxy Pharmaceuticals, Inc. <u>United Healthcare Services, Inc. v. Cephalon, Inc., et al.</u> (Stipulation of Facts ¶ 11.) This lawsuit asserted the same antitrust claims that were purportedly settled and released under the MOU.

134.     On August 19, 2016, the Cephalon Parties filed a "Motion to Enforce" the MOU as a settlement agreement. The present litigation was commenced by the Cephalon Parties against United on September 9, 2016, alleging a breach of contract claim and seeking an order compelling United's specific performance under the MOU.

## II.     CHOICE OF LAW

On April 18, 2018, prior to the trial, I informed the parties that Minnesota law would govern the authority issue at trial and advised that I would provide a more detailed legal analysis of any reasoning underlying this ruling in my post-trial opinion. Although the Cephalon Parties and United agree that Pennsylvania law applies to any contract and ratification issues, the parties dispute which law applies to the question of outside counsel had authority to bind United to the MOU. The Cephalon Parties assert that Minnesota law applies to the authority issues, while United contends that Pennsylvania law applies.

When a federal court is sitting in diversity, the choice of law rules of the forum state—in this case, Pennsylvania—apply. <u>See</u> <u>Klaxon Co. v. Stentor Elec. Mfg. Co.</u>, 313 U.S. 487, 496

(1941). Pennsylvania applies a "flexible rule which permits analysis of the policies and interests underlying the particular issue before the court" and directs courts to apply the law of the state with the "most interest in the problem." Hammersmith v. TIG Ins. Co., 480 F.3d 220, 227 (3d Cir. 2007) (quoting Griffith v. United Air Lines, Inc., 203 A.2d 796, 805–06 (Pa. 1964)).

Pennsylvania's choice of law analysis consists of two steps. First, the Court must determine whether an actual conflict exists between the laws of two or more states. Mzamane v. Winfrey, 693 F. Supp. 2d 442, 467–68 (E.D. Pa. 2010). An actual conflict exists if the "application of each state's substantive law produces a contrary result." Id. at 468. However, no actual conflict exists if the laws between the states are the same or "if the same result would ensue under the laws of the forum state and those of the foreign jurisdiction." Id.; see Hammersmith, 480 F.3d at 230. If no conflict exists, the law of the forum state governs, and the court may end its choice of law analysis. Hammersmith, 480 F.3d at 230.

Second, if an actual conflict exists, the court must determine whether the conflict is "true" or "false." See Budget Rent–A–Car Sys., Inc. v. Chappell, 407 F.3d 166, 169–70 (3d Cir. 2005); LeJeune v. Bliss–Salem, Inc., 85 F.3d 1069, 1071 (3d Cir. 1996). A "true" conflict exists when both states have interests that would be impaired if the other state's laws are applied. Taylor v. Mooney Aircraft Corp., 430 F. Supp. 2d 417, 422 (E.D. Pa. 2006). If confronted with a true conflict, the court considers each state's contacts with the contract as set forth in the Restatement (Second) of Conflict of Laws. See Hammersmith, 480 F.3d at 231; Compagnie des Bauxites de Guinee v. Argonaut–Midwest Ins. Co., 880 F.2d 685, 688–89, reh'g denied, (3d Cir. Aug. 22, 1989). It then "weigh[s] the contacts on a qualitative scale according to their relation to the policies and interests underlying the [relevant] issue." Shields v. Consol. Rail Corp., 810

F.2d 397, 400 (3d Cir. 1987); see also Specialty Surfaces Int'l., Inc. v. Continental Cas. Co., 609 F.3d 223, 229–30 (3d Cir. 2010).

A.      **Whether an Actual Conflict Exists**

I must first determine whether an actual conflict exists between the agency laws of Minnesota and Pennsylvania, *i.e.* one in which the application of each state's substantive law produces contrary results. I find that because Minnesota and Pennsylvania law differ on whether an agent may bind a principal in settlement under the doctrine of apparent authority, a conflict does exist.

Under Minnesota law, settlement of a client's claim is not subsumed within the ordinary agency of an attorney for his clients, and as such, an attorney must be specially authorized to settle a claim.[1] Schumann v. Northtown Ins. Agc'y, Inc., 452 N.W.2d 482, 484 (Minn. Ct. App. 1990). As an overarching rule, the authority given an attorney to settle a client's claim must be expressed and may not be implied. Id. Where, however, a client has created the appearance that his attorney has authority to settle a case and the attorney exceeds his authority in some way, Minnesota law recognizes that the client may be estopped to deny his attorney's authority. See Barry v. Barry, 172 F.3d 1011, 1015 (8th Cir. 1999); Bergstrom v. Sears, Roebuck & Co., 532 F. Supp. 923, 933 (D. Minn. 1982); see generally McGee v. Breezy Point Estates, 166 N.W.2d 81, 89 (Minn. 1969) (recognizing apparent authority doctrine). Apparent authority must be based on action or non-action by the client, not just the attorney. See In re Mirapex Prods. Liab. Litig., No. 07-mdl-1846, 2013 WL 140292, at *1 (D. Minn. 2013).

_____

[1] Pursuant to Minn. Stat. § 481.08, a client is bound by the attorney's act once the attorney has made an agreement in writing and signed by such attorney, regardless of any showing of authority. Austin Farm Ctr., Inc. v. Austin Grain Co., 418 N.W.2d 181, 184 (Minn. Ct. App. 1988). This is not to say, however, that an attorney settling a claim in writing need not have authority to settle, but rather only that the attorney need not affirmatively demonstrate the existence of such authority. Schumann v. Northtown Ins. Agency, Inc., 452 N.W.2d 482, 484 (Minn. App. 1990).

By contrast, under Pennsylvania law, it is well-settled that only express authority can bind a client to a settlement agreement.  Reutzel v. Douglas, 870 A.2d 787, 789–90 (Pa. 2005). The rationale for this rule stems from the fact that "parties settling legal disputes forfeit substantial legal rights, and such rights should only be forfeited knowingly."  Id.  "As such, a client's attorney may not settle a case without the client's grant of express authority, and such express authority can only exist where the principal specifically grants the agent the authority to perform a certain task on the principal's behalf."  Id. (quoting  Restatement (Second) of Agency § 7 cmt. c (1958)).  Unlike under Minnesota law, there can be no settlement based on apparent authority.

Given this actual conflict and the fact that both states maintain an interest in protecting their citizens, I must now determine which state law governs.

**B.       Whether Minnesota or Pennsylvania Law Should Govern**

Under Pennsylvania choice-of-law rules, the applicable law is that of the place with the most significant relationship to the parties and the transaction.  Tiernan v. Devoe, 923 F.2d 1024, 1033 (3d Cir. 1991); see also Myers v. Commercial Union Assurance Cos., 485 A.2d 1113, 1116 (Pa. 1984).  This requires "more than a mere counting of contacts."  Pacific Emp'rs Ins. Co. v. Global Reinsurance Corp. of Am., 693 F.3d 417, 436–37 (3d Cir. 2012) (quotations omitted). Instead, "we must weigh the contacts on a qualitative scale according to the policies and interests underlying the particular issue."  Id. (quotation marks omitted).  Pennsylvania choice of law principles focus on the "center of gravity" of the transaction between the parties, *i.e.,* "the state which has the most significant relationships with both the transactions in issue and with the parties, in order to determine which state's law must be applied to a particular dispute."  In re

Fineberg, 202 B.R. 206, 219 (Bankr. E.D. Pa. 1996) (citing In re Merritt Logan, Inc., 901 F.2d 349, 356 (3d Cir. 1990)).

After determining the nexus or focal point of the relevant transaction or relationship, the court must also consider the relative interests and policies of each jurisdiction. Among the factors a court may consider are: (a) "the needs of the interstate and international systems;" (b) "the relevant policies of the forum;" (c) "the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue;" (d) "the protection of justified expectations;" (e) "the basic policies underlying the particular field of law;" (f) "certainty, predictability and uniformity of result;" and (g) "the ease in the determination and application of the law to be applied." Restatement (Second) of Conflicts of Laws § 6(2) (1971); Toll v. Tannenbaum, 596 F. App'x 108, 113–14 (3d Cir. 2014).

United argues that Pennsylvania has the closest relationship, citing several allegedly relevant contacts. First, United notes that the underlying lawsuit (the Provigil antitrust claims) arose from anticompetitive agreements entered into between Pennsylvania-based Cephalon and four different generic companies, two of whom have their principal places of business in Pennsylvania. Second, United points out that Pennsylvania was the "forum state" of the litigation allegedly settled. Third, United notes that the lawyers who negotiated the alleged settlement were (a) the Cephalon lawyers in New York; (b) the End Payor Class lawyers in Pennsylvania; and (c) lawyers from the Lowey firm, one of whom was based in New York and the other in Pennsylvania. Finally, United states that the settlement discussions involving the MOU took place primarily in Pennsylvania, and the MOU was to be performed primarily in Pennsylvania because the funds United was to receive in consideration for the release were to be

paid from a settlement fund overseen in the Eastern District Pennsylvania. According to United, Minnesota bears no connection to the MOU.

United's argument is misplaced because the issues currently before me do not involve any inquiry into the alleged anticompetitive agreements, but rather focus on: (a) whether United's outside counsel had express or apparent authority to settle the case and (b) whether United ratified its attorneys' actions. As noted above, the parties agree that the ratification issue is governed by Pennsylvania law, meaning that I only need to consider contacts relevant to the authority issue.[2] On that point, it is irrelevant where the underlying suit was originally being litigated, where the acts in the underlying litigation occurred, what law governs the alleged anti-competitive contract, whether other SHPs' lawyers were located in Pennsylvania, or whether some of the discussions may have taken place in Pennsylvania.

The authority issue here centers *only* around United's relationship with its outside settlement counsel. Focusing on that relationship, all of the relevant contacts are in Minnesota: the place where United retained outside counsel, the location of in-house counsel Besty Schmeising, the starting point for most of the communications between United and its counsel, actions taken by United in-house attorneys to vest their outside counsel with apparent authority, and the place where decision-making regarding settlement would have occurred. Indeed, there is

_____

[2]     Pennsylvania follows the well-established principle that choice of law is "issue-specific, [meaning] different states' laws may apply to different issues in a single case, a principle known as 'depecage.'" Berg Chilling Sys, Inc. v. Hull Corp., 435 F.3d 455, 462 (3d Cir. 2006). "It follows from the principle of depecage that a court's application of one state's law to one issue in a case does not preclude the court from deciding that another state's law governs another issue in the same case." Zavecz v. Yield Dynamics, Inc., 179 F. App'x 116, 120 (3d Cir. 2006).

no evidence that United's outside counsel ever set foot in Pennsylvania in connection with the Provigil antitrust litigation.[3]

United alternatively contends that Pennsylvania has the strongest interest in this action, asserting that the Pennsylvania Supreme Court has made clear its policy interest in ensuring settlements are not enforced against clients who did not knowingly authorize them or consent to them. It further urges that Pennsylvania has a strong interest in applying its settlement authorization rules to claimed settlement agreements purporting to resolve litigation filed in Pennsylvania and received by Pennsylvania courts. Finally, United suggests that, under the doctrine of apparent authority, a court must consider whether the adversary—in this case, the Cephalon Parties—relied upon United's counsel's representation that they had authority to bind

---

[3] United relies heavily on Tiernan v. Devoe, 923 F.2d 1024 (3d Cir. 1991) for the proposition that Pennsylvania's express authority requirement applies to out-of-state citizens. In Tiernan, the lawsuit arose out of a building collapse. Id. at 1027. Forty-eight plaintiffs, who were limited partners in ownership of the building, entered into an agreement, retained a single attorney to represent their interests, and filed suit. Id. At some point, all the defendant groups believed they had reached agreement with plaintiffs' attorney on the terms of the settlement. Id. The plaintiffs rejected the purported settlements, the defendants moved to enforce, and the district court granted the motion. Id. Plaintiffs appealed on the grounds that their attorney lacked authority to settle. Id. In an extremely short analysis on choice of law, the Third Circuit stated that "[t]his lawsuit arose from the collapse of a building project in Philadelphia. Pennsylvania is the forum state and most of the negotiations leading up to the alleged settlements took place among attorneys located in Philadelphia." Id. at 1033.

Tiernan is distinguishable. In that matter, all forty-eight plaintiffs—located both within and outside Pennsylvania—were challenging settlement. Unlike in this case, the challenge went to the propriety of the entire settlement itself and whether the one appointed lawyer had authority to enter into the settlement with the defendants' lawyers. Here, the other end-payor plaintiffs did not challenge the settlement and, in fact, are intervenors in this case seeking to have the settlement enforced. The sole question is whether United cloaked its outside counsel with the authority to sign off on a settlement communicated to them by Cohen. In other words, the scope of the authority issue in this case is drastically narrower than in Tiernan.

The remaining cases relied upon by United are inapposite. See Dugan v. O'Hara, 125 F. Supp. 3d 527, 531, 536–37 n.5 (E.D. Pa. 2015) (not addressing a choice of law question); Sheppard v. Aereospatiale, Aeritalia, 165 F.R.D. 449, 452 (E.D. Pa. 1996) (using Pennsylvania law for issues of contract law and an attorney's authority to settle his client's action because all parties assumed that Pennsylvania law applies, the parties were all connected to different places, and Pennsylvania was the only place common to the parties; "There seems to be no candidate for the applicable law more likely than Pennsylvania.").

United to the MOU. As the Cephalon Parties are Pennsylvania citizens, United posits that Pennsylvania would have an interest in protecting them and ensuring that their interests are met.

I disagree. Pennsylvania has no interest in regulating the attorney-client relationship of a citizen of another state. Moreover, by explicitly rejecting the doctrine of apparent authority in settlement, Pennsylvania has expressly disclaimed any interest in protecting its citizens who had relied upon an agent's representation of authority. By contrast, Minnesota clearly has an interest in regulating the behavior of its citizens and the representatives its citizens hire. As the relevant attorney-client relationship is in Minnesota, Minnesota's interest in this case outweighs any interest maintained by Pennsylvania.

In short, the "center of gravity" with respect to the agency issues rests squarely in Minnesota. Accordingly, I will apply Minnesota law to the questions of authority.

## III. LEGAL DISCUSSION

Under both Minnesota and Pennsylvania law, "[s]ettlement of disputes without litigation is highly favored, . . . and such settlements will not lightly be set aside by the courts." Johnson v. St. Paul Ins. Co., 305 N.W.2d 571, 573 (Minn. 1981) (internal citations omitted); Rothman v. Fillette, 469 A.2d 543, 546 (Pa. 1983). As such, "[t]he party seeking to avoid a settlement has the burden of showing sufficient grounds for its vacation." Johnson, 305 N.W.2d at 573; see also Skalbeck v. Agristor Leasing, 384 N.W.2d 209, 212 (Minn. App. Ct. 1986); Pennsbury Village Assocs., LLC v. Aaron McIntyre, 11 A.3d 906, 914 (Pa. 2011).

The central question before me is whether United is bound by the MOU and, in turn, to the settlement. United claims that it did not give outside counsel authority to settle and, therefore, it is not bound to any settlement agreement. The Cephalon Parties respond that the MOU is enforceable against United on several bases. First, they contend that United gave its

outside counsel authority to settle, both by (a) expressly granting such authority and (b) cloaking outside counsel with apparent authority. Second, they posit that United ratified outside counsel's signatures on the MOU. I address each argument individually.

## A. <u>Authority</u>

The traditional sources of authority are express actual authority, implied actual authority, and apparent authority. <u>Tullis v. Federated Mut. Ins. Co.</u>, 570 N.W.2d 309, 313 (Minn. 1997). Express actual authority is "created when the principal manifests consent to the agent to act on behalf of the principal." <u>Amdahl v. Stonewall Ins. Co.</u>, 484 N.W.2d 811, 814 (Minn. App. Ct. 1992). Implied actual authority "includes those powers that are essential to carry out duties expressly delegated," or, stated differently, "is actual authority circumstantially proved." <u>Id.</u> Finally, apparent authority "is not actual authority," but rather is authority that arises when the client creates the appearance that his attorney has authority. <u>Tullis</u>, 570 N.W.2d at 313.

Here, the Cephalon Parties contend that United (1) gave express actual authority to its outside counsel to settle and (2) cloaked its attorneys with apparent authority to settle.[4]

---

[4]   The burden of proof on the question of authority appears to be unsettled in the context of an attorney's authority to settle a case on behalf of a client. On one hand, as noted above, Minnesota courts have expressly recognized that a party seeking to avoid a settlement "has the burden of showing sufficient grounds for its vacation." <u>Johnson</u>, 305 N.W.2d at 573. On the other hand, the Minnesota Supreme Court has stated that "the party alleging the existence of [a principal-agent relationship] has the burden of proof." <u>White v. Boucher</u>, 322 N.W.2d 560, 566 (Minn. 1982).

Nonetheless, "[a]llocation of the burden of proof will be significant, in theory at least, only in the rare case when, assuming the evidence is weighed by the preponderance of evidence standard, the conflicting evidence is in equipoise in the mind of the fact finder." <u>United States v. DiGilio</u>, 538 F.2d 988 (3d Cir. 1976). Here, the burden of proof is not outcome determinative because, as detailed below, the evidence on the issues of both express and implied authority clearly indicates the appropriate disposition.

1.    Express Authority

As a general principal, Minnesota Statute § 481.08 (1990) allows "an attorney [to] bind a client, at any stage of an action or proceeding by agreement . . . made in writing and signed by such attorney." This principal, however, does not apply to the settlement of an action. Triple B&G, Inc. v. City of Fairmont, 494 N.W.2d 49, 52 (Minn. Ct. App. 1992). "Under Minnesota law, settlement of a client's claim is not subsumed within the ordinary agency of an attorney for his clients, so an attorney must be specially authorized to settle a claim." Barry v. Barry, 172 F.3d 1011, 1015 (8th Cir. 1999) (citing Schumann v. Northtown Ins. Agency, Inc., 452 N.W.2d 482, 484 (Minn. Ct. App. 1990)). Generally, an attorney does not have actual authority to settle in the absence of his client's knowledge or consent. Schumann, 452 N.W.2d at 484 (citing Aetna Life & Casualty Co. v. Anderson, 310 N.W.2d 91, 95 (Minn. 1981)). Minnesota law recognizes that:

> The rules and principles of the law of principal and agent control the relation of attorney and client . . . , and though the authority of the attorney may in many respects exceed that of an ordinary agent, yet his employment to conduct litigation ought not, as a matter of legal inference, wholly to divest the client of the control of his case. The attorney's authority . . . does not necessarily include the right to compromise the suit, and there is no reason why it should. It is not a usual, necessary, or ordinary step in the action, but rather one of an opposite nature, a surrendering of the right to further proceed with the action; and before this step is taken, the client should not only be consulted, but his express authority received.

Id. (quoting Gibson v. Nelson, 126 N.W. 731, 733–34 (Minn. 1910)).

Consistent with the foregoing principles, any actual authorization to settle a claim must be express, not implied. See Albert v. Edgewater Beach Bldg. Corp., 15 N.W.2d 460, 463 (Minn. 1944) ("[A]n attorney has not by implication the right to compromise his client's cause of action.") (further quotations omitted). "Express authority can be created by written or spoken

words or the conduct of the principal which, reasonably interpreted, causes an agent to believe that the principal desires him [or her] to act in a particular manner on the principal's account." Harris v. Arkansas State Highway and Transp. Dept., 437 F.3d 749, 751–52 (8th Cir. 2006) (quoting Turner v. Burlington N. R.R. Co., 771 F.2d 341, 345 (8th Cir. 1985) (further quotations omitted)). Whether an attorney has been given express authority to settle a claim is a question of fact to be resolved by the trial court. Skalbeck v. Agristor Leasing, 384 N.W.2d 209, 212 (Minn. Ct. App. 1986).

Here, although I credit the testimony of Sandmann, Slate, and Rhoad that Schmiesing explicitly authorized them to *sign the MOU* on United's behalf, such authorization did not amount to express authority to *settle the case*. For the following reasons, I find that the evidence shows that United never granted outside counsel express authority to settle United's Provigil claims.

When outside counsel first told Schmiesing that they were "close" to a proposed agreement on settlement, Schmiesing expressed some reservation because she had not heard any details regarding the settlement numbers. Schmiesing also clearly indicated to outside counsel that they would have to "get approval of the amount in discussion." Sandmann responded that there was still "no proposed agreement to recommend." (Findings of Fact ("FOF") ¶¶ 62, 63.)

Subsequently, on December 8, 2017, when outside counsel had a phone call with Schmiesing regarding the MOU, Slate explained her view that the MOU did not obligate United to anything at that point. Outside counsel went on to reason that even if they signed the MOU on United's behalf, United would still have options in deciding whether to go forward with the ultimate SHP settlement agreement because of the opt-out provision. (FOF ¶ 65.)

Following the execution of the MOU, outside counsel sent Schmiesing the December 9, 2015 memorandum that discussed a "Provigil Proposed Settlement." At the conclusion of their summary of the settlement negotiations, outside counsel recommended that "United accept a settlement containing the essential terms set forth above subject, of course, to the drafting of an acceptable written agreement." (FOF ¶ 84.) Later, when Zaetta confronted outside counsel with the MOU, Slate agreed that outside counsel did not ask for authority to settle the case and did not have it. (FOF ¶ 129.)

Considering this testimony collectively, I conclude that although Schmiesing gave outside counsel authority to enter into the MOU on United's behalf, that authorization was based on a misunderstanding that the MOU was a non-binding settlement agreement. In short, express authority to settle was not provided.

In an effort to counter the evidence that outside counsel had no express authority to settle, the Cephalon Parties offer two arguments, neither of which I find availing.

First, the Cephalon Parties rely on basic principles of contract and agency to urge that "[a]n agent's authorized signature on a contract has the same effect as the principal's own signature." (Pls.' Br., at p. 14 (citing Siebert v. Amateur Athletic Union of U.S., Inc., 422 F. Supp. 2d 1033, 1039 (D. Minn. 2006); Norby v. Bankers Life Co. of Des Moines, Iowa, 231 N.W.2d 665, 668 (Minn. 1975); Mackenzie v. Ryan, 41 N.W.2d 878, 879 (Minn. 1950)). But, as discussed above, this theory of implied authority is not consistent with Minnesota law. Rather, "[u]nder Minnesota law, settlement of a client's claim is not subsumed within the ordinary agency of an attorney for his clients, so an attorney must be specifically authorized to settle a claim." Barry, 172 F.3d at 1015.

Second, the Cephalon Parties posit that it is irrelevant that Schmiesing believed the MOU was "non-binding" and did not effectuate a settlement because, under basic principles of contract law, "[a]bsent fraud or misrepresentation, a person who signs a contract may not avoid it on the ground that he did not read it or thought its terms to be different." (Pls.' Br. 16 (citing Siebert, 422 F. Supp. 2d at 1039 (D. Miss. 2006)). The Cephalon Parties urge that a unilateral mistake of fact concerning the terms or effect of a settlement is not a basis for setting the settlement aside unless there is fraud or misrepresentation. They reason that courts apply this rule rigorously, even against unsophisticated parties who released substantial legal claims unwittingly and, as such, it should certainly apply to a large, sophisticated company like United.

The Cephalon Parties' argument conflates the agency issues in this case with basic contract issues. Had a United executive or in-house counsel personally signed the MOU, his or her misunderstanding about the binding nature of the MOU would likely not be sufficient grounds to avoid a binding settlement. Here, however, outside counsel signed the MOU on behalf of United. Thus, the key issue is whether counsel's failure to obtain express authority voids the settlement. As indicated above, as the fact finder, I conclude that no such express authority was given. Schmiesing testified that outside counsel repeatedly told her that the MOU simply encapsulated proposed settlement terms that were not binding on United. The emails introduced into evidence support this testimony. More tellingly, outside counsel explicitly conceded that they did not have and never expressly received authority from United to settle the case. These circumstances establish the absence of express authority.[5]

---

[5] The cases cited by the Cephalon Parties do not advance their position. They rely significantly on Siebert v. Amateur Athletic Union of U.S., Inc., 422 F. Supp. 2d 1033, 1039 (D. Minn. 2006), for the proposition that absent fraud or misrepresentation, a person who signs a contract may not avoid it on the ground that he did not read it or thought its terms to be different. In that case, the plaintiffs had authorized the head coach of a basketball team to complete applications for membership in the Amateur Athletic Union ("AAU"), which required that all disputes involving

## 2. Apparent Authority

The lack of express authority does not, however, absolve United of its obligations under the MOU. Although Minnesota law requires any *actual* settlement authority to be express, rather than implied, Minnesota Courts have recognized that a party may be bound to settlement under the doctrine of apparent authority. "Apparent or ostensible authority is not actual authority; rather it is authority which the principal holds the agent out as possessing or knowingly permits the agent to assume." Tullis v. Federated Mut. Ins. Co., 570 N.W.2d 309, 313 (Minn. 1997). More precisely, the doctrine of apparent authority provides that:

> [W]here a principal has, by his voluntary act, placed an agent in such a situation that a person of ordinary prudence conversant with business usages and the nature of the particular business is justified in assuming that such agent has authority to perform a particular act and deals with the agent upon that assumption, the principal is estopped as against such third person from denying the agent's authority; he will not be permitted to prove that the agent's authority was, in fact, less extensive than that with which he was apparently clothed. This rule has been based upon the principle that where one of two innocent parties must suffer from the wrongful act of another, the loss should fall upon the one who, by

---

the AAU be resolved through binding arbitration. Id. at 1036. The plaintiffs argued that they never agreed to arbitrate. Id. at 1039. The court held that because plaintiffs admitted that they intended to join the AAU, and that they authorized the coach to apply for AAU membership on their behalf, they agreed to the terms of the AAU's contract, including the arbitration clause of which they were allegedly unaware. Id. at 1040. Siebert did not address the issue here: whether an agent's entry into a settlement agreement without express authority to settle claims is binding.

The same holds true for the other cases cited by the Cephalon Parties. In Goldberger v. Kaplan, Strangis & Kaplan, P.A., 534 N.W.2d 734 (Minn. Ct. App. 1995), the only question was as to the scope of the authority to settle, not as to whether the authority to settle existed. In Sluck v. Rapcz, No. 16-103, 2016 WL 4069284 (Minn. Ct. App. Aug. 1, 2016), the court found that the appellant had given his attorney authority to settle, albeit under different terms, in contrast to this case where both outside counsel and Schmiesing agreed that no authority to settle was ever given. Finally, the courts in both Malecha v. St. Croix Valley Skydiving Club, Inc., 392 N.W.2d 727 (Minn. Ct. App. 1986) and Arce v. U-Pull-It Auto Parts, Inc., No. 06-5593, 2008 WL 375159 (E.D. Pa. Feb. 11, 2008) upheld waivers of responsibility signed by the plaintiffs (one at a skydiving facility, one at self-service junkyard) even though both plaintiffs claimed to have not understood the waivers prior to signing them. Neither case either involved settlement of claims or raised a question of authority.

> his conduct, created the circumstances which enabled the third
> party to perpetrate the wrong and cause the loss.

Bergstrom v. Sears, Roebuck & Co., 532 F. Supp. 923, 933 (D. Minn. 1982) (quoting 3 Am. Jur. 2d Agency § 76 (1962)).

In the settlement context, "where a client has created the appearance that his attorney has authority to settle a case and the attorney exceeds his authority in some way, if the adversary relies on the settlement to its detriment, the client may be estopped to deny his attorney's authority." Barry v. Barry, 172 F.3d 1011, 1015 (8th Cir. 1999); see Buysse v. Baumann-Furrie & Co., 448 N.W.2d 865, 871–72 (Minn. 1989) (recognizing that doctrine of apparent authority can bind a party to a settlement). "An agent's apparent authority results from statements, conduct, lack of ordinary care, or other manifestations of the principal's consent, whereby third persons are justified in believing that the agent is acting within his authority." McGee v. Breezy Point Estates, 166 N.W.2d 81, 89 (Minn. 1970). "Therefore, the scope of apparent authority is determined not only by what the principal knows and acquiesces in, but also by what the principal should, in the exercise of ordinary care and prudence, know his agent is doing." Id. To find apparent authority, (1) "the principal must have held the agent out as having authority, or must have knowingly permitted the agent to act on its behalf," (2) third parties "must have [had] actual knowledge that the agent was held out by the principal as having such authority or had been permitted by the principal to act on its behalf," and (3) "proof of the agent's apparent authority must be found in the conduct of the principal, not the agent." Powell v. MVE Holdings, Inc., 626 N.W.2d 451, 457 (Minn. Ct. App. 2011) (quoting Hockemeyer v. Pooler, 130 N.W.2d 367, 375 (Minn. 1964)). Whether an agent is clothed with apparent authority is a question of fact. Id. at 457.

Repeatedly, federal courts in Minnesota have upheld the enforceability of a settlement agreement where the attorney, although perhaps not expressly authorized to settle, was cloaked with apparent authority. For example, in <u>Bergstrom v. Sears, Roebuck and Co.</u>, 532 F. Supp. 923 (D. Minn. 1982),[6] the court considered whether an attorney's settlement of a case on behalf of his client was binding in the face of the client's allegation that it had not expressly authorized the attorney to settle the case. <u>Id.</u> at 933. The court found that express authority existed, but went on to hold that "[e]ven if this express authority were absent, [the client] would be bound by the agreement because it was made within [the attorney's] apparent authority." <u>Id.</u> The court set out several factors supporting apparent authority: (a) the attorney was retained by the client for the specific purpose of pursuing a settlement of the lawsuit at issue; (b) representatives of the client confirmed to attorneys for the adversary that the attorney had been retained, thereby raising a "strong inference" that the attorney's subsequent acts in pursuit of settlement were authorized; (c) the attorney acted in the same manner as any attorney with authority to settle a lawsuit; (d) the client did nothing to indicate to the adversary that the attorney had less than full authority to settle; and (e) when the client's in-house counsel received the drafts of the settlement letter, he failed to disavow the agreement. <u>Id.</u> The court concluded that "the facts of this case demonstrate that [the attorney] had authority to bind [the client] to an agreement to settle the litigation, and that [the client] indicated acquiescence in [the attorney's] conduct until such time as an intention to renege on the deal had been solidly formulated." <u>Id.</u> at 933–34.

---

[6]   The court in <u>Bergstrom</u> applied federal law to the authority dispute, but relied on generalized principles of apparent authority adopted in Minnesota. <u>Bergstrom</u> has repeatedly been cited by courts applying Minnesota law as recognizing the doctrine of apparent authority. <u>Bergmann v. Lee Data Corp.</u>, No. 93-1526, 1993 WL 527899, at *1 (Minn. Ct. App. 1993); <u>Barry v. Barry</u>, 172 F.3d 1011, 1015 (8th Cir. 1999); <u>Sowada v. Luberts</u>, No. 09-3320, 2011 WL 1869208, at *4 (D. Minn. Mar. 28, 2011).

In <u>Andrews v. Minneapolis Park and Recreation Board</u>, No. 09-2004, 2011 WL 882080 (D. Minn. Feb. 23, 2011), the judge held a settlement conference, which was attended by the parties and their attorneys. <u>Id.</u> at *1. The parties were unable to reach an agreement partly because defense counsel did not have the authority of his client—the Park and Recreation Board—to reach a settlement acceptable to the plaintiff. <u>Id.</u> At the end of the conference, the judge received from plaintiff and his attorneys their two last, best offers, presented in the alternative. <u>Id.</u> The judge conveyed these offers to defense counsel and ordered that they be presented to the Park Board for their decision. <u>Id.</u> Subsequently, when the Park Board met, they voted to accept one of the offers and informed the judge and plaintiff's counsel of the decision. <u>Id.</u> Defense counsel drafted a settlement agreement and sent it to the plaintiff's counsel. <u>Id.</u> After some negotiation of the terms, both sides' counsel presented the agreement to their clients. <u>Id.</u> at *2. The plaintiff, however, refused to sign the agreement, terminated his counsel, and informed the court that counsel had been terminated. <u>Id.</u> The defendants moved to enforce the agreement. <u>Id.</u>

Applying the apparent authority rule in the context of settlement, the court found "significant evidence" supporting a finding of authority to settle prior to the time that the plaintiff discharged his attorneys. <u>Id.</u> at *3. First, the plaintiff was present at the settlement conference and worked with his counsel to formulate the settlement offer. <u>Id.</u> Second, the plaintiff acknowledged that he was copied on all correspondence both to and from his attorneys in the case, thereby making him aware of the Park Board's acceptance of one of his two alternative last best offers and subsequent drafting negotiations, but did not nothing to "thwart his attorneys' settlement authority until after he received the final written document outlining the settlement agreement." Finally, throughout the parties' contacts subsequent to the settlement

conference "Plaintiff's attorneys continued to speak and act as though they had full settlement authority." Id. at *4. Given these facts, the court concluded that settlement authority existed.[7] Id.

Here, I find that the weight of the trial evidence establishes that United took affirmative steps to cloak its outside authority to settle the case:

- When United initially retained outside counsel, the retention agreement expressly stated that the scope of outside counsel's representation would be in "efforts to obtain recovery for United through settlement negotiations with Cephalon." Schmiesing acknowledged that she understood this provision to mean that she was authorizing outside counsel to conduct settlement negotiations on United's behalf, leading to the reasonable conclusion that Schmiesing knew that outside counsel was, in fact, engaging in such efforts. (FOF ¶¶ 13–14.) In fact, all three outside counsel testified that they had previously represented United in a similar capacity on prior occasions. (FOF ¶ 17.)

- Once the negotiations among the SHPs and the Cephalon Parties began in earnest, attorney Mark Fischer (former colleague of Sandmann at the Gibson firm), at the request of Cohen (lead negotiator for the SHPs), reached out to United to ask if it wanted to participate in a settlement. Fischer was told by United that Sandmann was representing United in the Provigil matter. (FOF ¶ 29.) Sandmann and Rhoad (two of United's outside counsel) then told Lawrence (Cohen's partner) that they had been retained by United and United had authorized them to join the negotiating group and make global

---

[7] See also Sowada v. Luberts, No. 09-3320, 2011 WL 1869208, at *4 (D. Minn. Mar. 28, 2011) (enforcing settlement agreement using doctrine of apparent authority), report and recommendation adopted, 2011 WL 1843018 (D. Minn. May 16, 2011); In re Mirapex Prod. Liab. Litig., No. 11-cv-42, 2013 WL 4519348, at *1 (D. Minn. Aug. 26, 2013) (discussing apparent authority in settlement context); Bergmann v. Lee Data Corp., No. 93-1526, 1993 WL 527899, at *1 (Minn. Ct. App. Dec. 21, 1993) (same).

settlement demands of the Cephalon Defendants. (FOF ¶ 30.) These facts create a "strong inference" that "the attorneys' subsequent acts in pursuit of settlement were authorized." <u>Bergstrom</u>, 532 F. Supp. at 933.

- Thereafter, outside counsel—together with counsel for the other SHPs, the class plaintiffs, and the Cephalon Parties—executed a Tolling Agreement to toll the limitations period on the Provigil claims. Schmiesing was fully informed of this agreement and explicitly provided Rhoad authority to execute the agreement, knowing it would be used to advance settlement negotiations. From the Cephalon Parties' vantage point, outside counsel's involvement in the execution of the Tolling Agreement would certainly convey that United had cloaked outside counsel with authority in the settlement process. (FOF ¶¶ 33, 34, 35.)

- Sandmann then forwarded a copy of the executed Tolling Agreement to Schmiesing and, in the accompanying email, explained that outside counsel was working with the Lowey firm and planned on making a "unified demand on Cephalon for payment out of the disgorgement fund." (FOF ¶ 36.) Despite being well aware that outside counsel would be making a demand on behalf of United, Schmiesing never gave outside counsel direction about the minimum share United would need to receive or asked for further information about the negotiations. (FOF ¶ 37.) Nor did Schmiesing take any actions to disavow the reasonable perception that outside counsel had authority to settle. In fact, Schmiesing solidified the apparent authority, authorizing two subsequent amendments to extend the Tolling Agreement. (FOF ¶ 45.)

- As the negotiations proceeded, Skidmore requested, on behalf of the Cephalon Parties, Provigil purchase data from each of the SHPs in order to evaluate the monetary demands

being made and what the Cephalon Parties' exposure was. (FOF ¶ 40.) Because such data is not publicly available and had to be obtained from the health plans themselves, outside counsel emailed Redden and Schmiesing at United for such data, explaining that they were "starting negotiations with the Defendants in the Provigil antitrust matter." (FOF ¶¶ 41, 42.) United provided the purchase data to outside counsel with no caveat on its usage and with full knowledge that outside counsel was affirmatively engaging in settlement discussions on United's behalf. (FOF ¶ 42.) In supplying this information, neither Schmiesing nor anyone else at United attempted to avoid the obvious appearance that outside counsel had authority to speak for United. This is compelling evidence that the Cephalon Parties reasonably believed that United had granted its outside counsel authority to act on its behalf. Indeed, Lefkowitz testified that production of this data confirmed outside counsel's authority to represent United because counsel could have only gotten that information directly from United. (FOF ¶ 44.)

- In the weeks leading up to the October 22, 2015 phone call, lead negotiator Cohen made numerous phone calls to counsel for each of the SHPs, including to United's outside counsel, resulting in vigorous and "robust" discussions regarding the demand that would be presented to Cephalon. At no point did United's outside counsel suggest that they had limited authority to negotiate on United's behalf. (FOF ¶ 48, 49.)

- Around the time the agreement was reached on October 22, 2015, outside counsel had a telephone discussion with Schmiesing indicating they were about to agree to settlement terms. (FOF ¶ 55.)

- Thereafter, outside counsel continued to exhibit settlement authority by actively participating in the drafting of the MOU—an action condoned by United. (FOF ¶ 60.) In

early December, just prior to the signing of the MOU, Schmiesing exchanged emails with outside counsel, wherein she learned that a draft MOU was in the works, that the total settlement payment was about $125 million, and that the quick-pay, of which United was a part, would be $77 million. Although Schmiesing told outside counsel that they would all need to get approval for a final settlement, she did not ask for a copy of the draft MOU at that time. (FOF ¶¶ 62, 63, 64.)

- Subsequently, when outside counsel called Schmiesing to walk her through the essential terms of the MOU and advise her that they were about to sign it, Schmiesing affirmatively told them to go forward and sign the MOU. (FOF ¶¶ 65, 66, 68.) Schmiesing provided this authority without requesting a copy of the draft MOU, claiming that she relied on counsel's erroneous description of the MOU as non-binding.[8]

- The executed MOU, signed in part by outside counsel for United, was presented to counsel for the Cephalon Parties on December 9, 2015. Based on the fact that Sandmann and Rhoad had previously acted on behalf of United—with regard to both signing the tolling agreement and providing the confidential purchase data—Lefkowitz and Skidmore, counsel for the Cephalon Parties, understood that Sandmann and Rhoad were authorized to bind United to the MOU. (FOF ¶¶ 69, 71.) Outside counsel's signature on

---

[8] Any error in outside counsel's legal explanation of the scope of the MOU is irrelevant to whether Schmiesing gave authority for counsel to sign that document. Harris v. Arkansas State Highway and Transp. Dep't, 437 F.3d 749, 752 (8th Cir. 2006) (internal quotation marks omitted) ("arguments addressing the adequacy of [an attorney's] legal representation, regardless of their merit, are irrelevant" to the determination of whether a party gave her attorney authority to enter into a settlement). Moreover, Schmiesing's own erroneous belief that the MOU was non-binding does not alter the fact that she permitted the MOU to be signed. See Barry, 172 F.3d at 1015 ("The parties to a contract are bound by the objective meaning of the words they use; their private, unexpressed thoughts cannot alter the meaning of the words they uttered or actions they took.") (citations omitted).

the MOU is further proof of the Cephalon Parties' well-founded belief that United had authorized outside counsel to act on its behalf.

- Thereafter, on December 9, 2015, outside counsel emailed Schmiesing an extensive memorandum summarizing what they titled the "Provigil Proposed Settlement" and which detailed, at some length, the terms of that proposed settlement. (FOF ¶¶ 84, 85.) At this juncture, Schmiesing knew they had signed an MOU, but still did not ask to see it. Rather—in full reliance on the counsel she had hired to negotiate a settlement—she communicated to other United in-house lawyers only what was told to her in the December 9th email. (FOF ¶ 87.)

- For almost two months after United lawyers received a copy of the MOU, not a single individual at United attempted to disavow United's participation in the MOU. (FOF ¶ 92, 95.) It was not until April 5, 2016, almost four months after execution of the MOU, that United contacted the Cephalon Parties' counsel and claimed that outside counsel did not have authority to bind United to the MOU. (FOF ¶ 130.)

Considered collectively, this evidence leads to the inescapable conclusion that United knowingly and affirmatively cloaked outside counsel with the apparent authority to settle its Provigil claims and that the Cephalon Parties reasonably believed that United had bestowed such authority. United—a major health insurance company with a deep and experienced bench of in-house lawyers—decided to hire outside counsel to conduct all settlement negotiations on its behalf on the Provigil litigation. In doing so, United placed complete authority in outside counsel to act on its behalf in these negotiations without providing outside counsel any parameters. Thereafter, with full knowledge that extensive settlement negotiations were ongoing among the various parties to the Provigil claims, United made repeated outward gestures

suggesting that outside counsel had authority to participate in these negotiations and ultimately settle by execution of the MOU.

As noted above, "the scope of apparent authority is determined not only by what the principal knows and acquiesces in, but also by what the principal should, in the exercise of ordinary care and prudence, know his agent is doing." <u>McGee v. Breezy Point Estates</u>, 166 N.W.2d 81, 89 (Minn. 1970). Cognizant that its agents were engaged in detailed negotiations, making settlement demands, and signing documents as significant as a Memorandum of Understanding, United should have been aware that it was affirmatively cloaking outside counsel with apparent authority to settle on its behalf. As the Cephalon Parties were certainly justified in believing that outside counsel represented United's interests, I conclude that United is bound to the terms of the MOU.

In an attempt to avoid the ramifications of these facts, United posits several arguments. I address each individually.

<u>First</u>, United disputes that apparent authority is available for settlement purposes under Minnesota law. It argues that "[f]or over a century, the Minnesota Supreme Court has repeatedly held that a settlement agreed to by a lawyer is invalid if the lawyer did not have 'express authority' from the client to settle the client's claims." (Pl.'s Br. 6.) United then cites a series of Minnesota Supreme Court and Appellate Court cases, which purportedly hold that a settlement is not binding unless an attorney had express authority from his or her client.

United's argument, however, misstates the relevant jurisprudence. The cases it cites pertain to express authority in relation to implied authority. United posits that the Minnesota Supreme Court has held that a lawyer cannot have "implied authority" to settle a case, but in so

arguing United seems to conflate the distinct doctrines of implied and apparent authority. As explained by the Minnesota Supreme Court:

> Implied authority is actual authority, circumstantially proved, and is to be construed under common law principles of agency . . . . Thus, implied authority includes only such powers directly connected with and essential to carrying out the duties expressly delegated to the agent. . . . *It is crucial to distinguish actual authority from apparent authority.* Apparent or ostensible authority is not actual authority; rather it is authority which the principal holds the agent out as possessing or knowingly permits the agent to assume.

Tullis v. Federated Mut. Ins. Co., 570 N.W.2d 309, 313 (Minn. 1997) (emphasis added).

None of the cases cited by United repudiate the doctrine of apparent authority or state that apparent authority cannot suffice to create a binding settlement. See Nelson v. Nelson, 126 N.W. 731 (Minn. 1910) (no discussion of apparent authority); Matteson v. Blaisdell, 182 N.W. 442, 443 (Minn. 1921) (same); Albert v. Edgewater Beach Bldg. Corp., 15 N.W.2d 460, 463 (Minn. 1944) (same); Aetna Life & Cas. & Sur. Div. v. Anderson, 310 N.W.2d 91, 95 (Minn. 1981) (same); Triple B & G, Inc. v. City of Fairmont, 494 N.W.2d 49, 52–53 (Minn. Ct. App. 1992) (same). To the contrary, the Minnesota Supreme Court has repeatedly suggested that when an attorney is cloaked with apparent authority to settle, a settlement may be binding. See Burner Serv. & Combustion Controls Co., Inc. v. City of Minneapolis, 250 N.W.2d 224, 229 (Minn. 1977) (finding a settlement binding based on apparent authority given to the city attorney by the city itself); Buysse v. Baumann-Furrie & Co., 448 N.W.2d 865, 871–72 (Minn. 1989) (engaging in factual inquiry to determine whether attorney had apparent authority to bind client to a settlement); Messerli & Kramer, P.A. v. Levandoski, No. 96-628, 1996 WL 453605, at *1–2 (Minn. Ct. App. Aug. 13, 1996) (acknowledging that a client may be bound to a settlement if his

attorney had apparent authority to settle the case, but reversing trial court's summary judgment finding that apparent authority existed because there was a genuine dispute of material fact).

Second, United attempts to make a distinction between authority to settle versus authority to negotiate. United contends that all of the cases where the court found apparent authority to settle "involved extraordinary facts where the client itself took actions plainly manifesting to the other side that its lawyer was expressly authorized to settle the client's claims." (Def.'s Br. 9 (citing Barry, 172 F.3d 1011; Sowada, 2011 WL 1869208, at *4; Andrews, 2011 WL 882080, at *1, *3; Mirapex, 2013 WL 4519348, at *1; Bergmann, 1993 WL 527899, at *1.) According to United, in each of these cases, the attorney generally had authority to settle, but simply reached a settlement that did not conform to what the client had authorized. United reasons that the courts in those cases found apparent authority because "the client took actions that clearly manifested to the counterparty that its lawyer had express authority to settle the client's claims, not just to negotiate a settlement." (Def.'s Br. 12.) United concludes that unlike these cases where the clients had put their attorneys in a position to settle, United only authorized its lawyers to engage in settlement negotiations. (Id.)

The evidence of record belies this argument. United created the appearance that its counsel had full authority to settle. This conclusion is strongly supported by the facts that United: permitted outside counsel to sign tolling agreements for purposes of engaging in settlement discussions; explicitly authorized outside counsel to participate in settlement negotiations; authorized outside counsel to make a settlement demand on the Cephalon Parties;[9] provided outside counsel with confidential purchase information to forward to the Cephalon

---

[9] Presumably, Schmiesing would have understood that the Cephalon Parties' acceptance of outside counsel's oral settlement demand would result in a meeting of the minds and, in turn, a settlement contract. See Austin Farm Ctr., Inc. v. Austin Grain Co., 418 N.W.2d 181, 185 (Minn. Ct. App. 1988) (holding that a settlement agreement is binding if formed from an offer and acceptance resulting in a meeting of the parties' minds).

Parties to be used to analyze damages, the proper settlement amount, and the viability of that settlement demand; and authorized outside counsel to sign a Memorandum of Understanding which memorialized these negotiations and which had language stating that "the settlement [was] *binding and enforceable*." Indeed, Schmiesing testified that she understood that the MOU was actually a contractual obligation that bound the Cephalon Parties to the terms of the agreement— thus signifying that she allowed outside counsel to enter into contractual terms.

United identifies no evidence which would have led any reasonable party to understand that outside counsel only had authority to *negotiate* a settlement and not *enter into* a settlement. Indeed, the terms "binding and enforceable" signed onto by United's outside counsel are far more consistent with a binding settlement. The mere fact that outside counsel's express authority may have been less extensive than that with which they were actually cloaked does not change the fact that United created the appearance that outside counsel could enter into, and did in fact bind United to, a full settlement agreement.

<u>Third</u>, United asserts that the Cephalon Parties cannot meet the standard for apparent authority because throughout the entire time period relating to the settlement discussions, the Cephalon Parties never communicated with United or any of the lawyers representing United— rather all communications went through the Lowey firm. According to United, that fact alone makes it impossible for the Cephalon Parties to show apparent authority.

This argument is also meritless and United provides no support for the proposition that there must be direct communication between the third party and either the client or the agent in order for there to be apparent authority. [10] Indeed, Minnesota law only requires that third parties

--------

[10] United cites to multiple cases from outside Minnesota to argue that absent some direct communication from United to the Cephalon Parties, there can be no finding of apparent authority. Aside from the fact that these cases are not binding, I find that that they do not stand for United's proposition. See <u>Edwards v. Born, Inc.</u>, 792 F.2d 387, 389 (3d Cir. 1986) (finding

"must have [had] actual knowledge that the agent *was held out by the principal as having such authority* or had been permitted by the principal to act on its behalf." Powell, 626 N.W.2d at 457 (emphasis added).

The evidence before me reflects that it was a common practice in national recovery matters for United to have a lead negotiator. (FOF ¶ 25.) Lawrence testified that Sandmann and Rhoad specifically told him that United had authorized them to join the negotiating group and make global settlement demands. (FOF ¶ 30.) Schmiesing was well aware of this arrangement, knew that United was one of the members of the group making a unified demand on the Cephalon Parties, and explicitly authorized outside counsel to engage in these settlement negotiations. (FOF ¶ 37.) As all outward appearances reflected that outside counsel had authority to settle on behalf of United, the Cephalon Parties did not need to take extra steps to confirm outside counsel's authority. United's expectation that the Cephalon Parties' lawyers had to actually bypass the outside counsel they had been dealing with and call Schmiesing to confirm authority is unrealistic. Rather, the burden fell on United to reach out to the Cephalon Parties and disabuse them of any notion that outside counsel could in fact enter into a settlement on

---

that "apparent authority may be created as to a third person by written or spoken words *or any other conduct of the principal* which, reasonably interpreted, causes the third person to believe that the principal consents to have the act done on his behalf by the person purporting to act for him.") (emphasis added) (internal quotation marks omitted); Makins v. District of Columbia, 861 A.2d 590, 594 (D.C. Ct. App. 2004) ("The apparent authority of an agent arises when the principal places the agent in such a position as to mislead third persons into believing that the agent is clothed with the authority which in fact he does not possess;" no requirement of direct communications); Auvil v. Grafton Homes, Inc., 92 F.3d 226, 230–31 (4th Cir. 1996) (reversing district court and finding that although client manifested attorney's authority to negotiate settlement, client did not manifest attorney's authority to execute settlement because the district court did not find any facts that the principal acted in any way to suggest to the third-party that there was authority to settle); Fennell v. TLB Kent Co., 865 F.2d 498, 502 (2d Cir. 1989) (finding that apparent authority is created only by the representations of the principal to the third party and rejecting the notion that an agent can create apparent authority by his own actions or representations).

United's behalf. See Mirapex Prods., 2013 WL 140292, at *2 ("If Plaintiffs were aware of the Court's November 7, 2011 Order requiring Plaintiffs' counsel to make a written settlement demand based on the clients' consent, or of the communications between their attorney and defense counsel, but did nothing to disabuse Defendants of the reasonable inference that Thompson had authority to present settlement offers on their behalf, this could contribute to a finding of apparent authority.").

Finally, United contends that the Cephalon Parties cannot invoke "apparent authority" because "they cannot show they detrimentally relied on the alleged settlement." (Def.'s Br. 23.) In support of this argument, United cites to language from the Eighth Circuit in Barry v. Barry that "where a client has created the appearance that his attorney has authority to settle a case and the attorney exceeds his authority in some way, if the adversary relies on the settlement to its detriment, the client may be estopped to deny his attorney's authority." 172 F.3d at 1015; see also Mirapex, 2013 WL 140292, at *1 (citing the language from Barry with approval); Sowada, 2011 WL 1869208, at *4 (same). United contends that no evidence was presented at trial purporting to show that the Cephalon Parties relied to their detriment on the fact that United's outside counsel signed the MOU. (Def.'s Proposed Findings of Fact ¶¶ 136–37.)

This argument fails for two reasons. As a primary matter, the language from Barry stands somewhat at odds with the requirements for apparent authority. The Minnesota Supreme Court has adopted the Restatement (Second) of Agency's definition of apparent authority. Lindstrom v. Minnesota Liquid Fertilizer Co., 119 N.W.2d 855, 681–62 (Minn. 1963). Comment d of the Restatement distinguishes estoppel from apparent authority, noting that the latter means that:

> [W]hen one tells a third person that another is authorized to make a
> contract of a certain sort, and the other, on behalf of the principal,

> enters into such a contract with the third person, the principal
> becomes immediately a contracting party, with both rights and
> liabilities to the third person, irrespective of the fact that he did not
> intend to contract or that he had directed the 'agent' not to
> contract, and *without reference to any change of position by the*
> *third party*.

Restatement (Second) Agency § 8 (emphasis added). Consequently, this language does not support United's position that detrimental reliance is needed.

But even if Minnesota law would deem detrimental reliance an element of apparent authority to settle, the trial evidence clearly establishes the existence of such reliance. The cases discussing reliance have required no more than a minimal showing that the adverse party altered their course in a particular case. See, e.g., Barry, 172 F.3d at 1015 (finding reliance where adverse party discontinued a current trial in reliance on the settlement); In re Mirapex Prods. Liab. Litig., No. 07-mdl-1836, 2013 WL 4519348, at *1 (D. Minn. Aug. 26, 2013) (finding reliance where adverse party accepted the settlement offer and settled an entire group of cases for a negotiated aggregate sum); Sowada, 2011 WL 1869208, at *4 (finding reliance where adverse parties and their attorneys, as well as the magistrate judge, "relied on the Plaintiffs' attorney's authority to settle and undoubtedly altered the preparations for trial on the belief that settlement had been reached."); Andrews, 2011 WL 882080, at *4 (finding reliance where the defendants altered their trial preparation based on belief that settlement had been entered into).

Here, the Cephalon Parties clearly established that they altered their course based upon the belief that settlement had been reached. Lefkowitz explained that, at the outset of settlement negotiations, the Cephalon Parties were only interested in settling if he was going to get "global peace" with all of the end payors through a single lump sum payment. (FOF ¶ 22.) It was particularly significant to Lefkowitz that United was part of this group because United was the

largest end payor. Lefkowitz specifically testified that if he had known that a major player such as United was not involved, he may not have settled. (FOF ¶ 32.)

In the October 22, 2015 phone call, Lefkowitz and Cohen agreed to "global peace" for $125 million, which would allow for full releases by all of the indirect purchasers, including United. (FOF ¶ 52.) The day after that phone conversation, Macoretta and Lefkowitz contacted the Court to advise that the parties had reached a settlement. (FOF ¶ 56.) Following the signing of the MOU, the Cephalon Parties prepared and circulated drafts of the settlement documents contemplated in the MOU and continued to work on those documents for months, up to when United informed the Cephalon Parties, in April 2016, that it was repudiating the settlement. (FOF ¶¶ 77, 78.) When Chris Zaetta of United contacted Skidmore to advise that United did not recognize the settlement, both he and Lefkowitz were "shocked" because they had engaged in months of settlement negotiations and "relied on lawyers who signed a legally-binding document that said they were representing one of the parties to the document." (FOF ¶¶ 130, 131.)

Based on this evidence, it is abundantly clear that the Cephalon Parties "altered their preparations for trial" and spent months under a well-founded belief that they had fully settled all of their Provigil claims with the end-payor group of Plaintiffs. As such, I find that the Cephalon Parties relied, to their detriment, on United's entry into the MOU settlement agreement.

In sum, United knew or should have known that outside counsel was acting on its behalf, that the Cephalon Parties reasonably believed that outside counsel were being permitted by United to act on its behalf, and that United made affirmative gestures to confirm outside counsel's apparent authority to settle the case. While United may now claim that it never intended that outside counsel settle its claims, it remains bound because, under the apparent authority doctrine, "where one of two innocent parties must suffer from the wrongful act of

another, the loss should fall upon the one who, by his conduct, created the circumstances which enabled the third party to perpetrate the wrong and cause the loss." Bergstrom, 532 F. Supp. at 933.  As I find that United was wholly responsible for the circumstances that cloaked outside counsel with apparent authority to settle, United must bear the consequences of its counsel's actions.

### C.     Ratification

Finally, I find that United ratified the MOU by failing to repudiate counsel's authority to settle in a timely fashion.[11]

If there is a dispute regarding an attorney's authority to settle a case, a court may find express authority "where the client delayed in asserting the lack of authority, or where it is clear that the real motive for challenging a settlement involved a change of heart." Transport Int'l Pool, Inc. v. Alternative Transp., Inc., No. 07–2895, 2008 WL 2550598, at *5 (citing Farris v. JC Penney Co., Inc., 176 F.3d 706, 713 (3d Cir. 1999)), reconsideration denied, 2008 WL 11366455 (E.D. Pa. July 30, 2008).  In other words, "a client may ratify counsel's actions when he learned a settlement was reached and took no action to repudiate counsel's authority to settle." Id. (citing Piluso v. Cohen, 764 A.2d 549, 551 (Pa. Super. Ct. 2000)); see Yarnall v. Yorkshire Worsted Mills, 87 A.2d 192, 193 (Pa. 1952) ("A client ratifies his attorney's act if he does not repudiate it promptly upon receiving knowledge that the attorney has exceeded his authority").

"[I]in order to find ratification from failure to repudiate the agent's unauthorized actions, it is necessary that the principal have full knowledge of the material facts and circumstances attending the transaction to be ratified." Ebasco Servs., Inc. v. Pa. Power & Light Co., 460 F. Supp. 163, 203–04 (E.D. Pa. 1978).  Courts have found that a party's failure to promptly repudiate a settlement after receiving clear recitation of its terms constitutes ratification and

---

[11]    The parties agree that Pennsylvania law applies to the issue of ratification.

renders its binding. <u>Dugan v. O'Hara</u>, 125 F. Supp. 3d 527, 537 (E.D. Pa. 2015) (finding that although the attorney may have exceeded his authority by accepting the settlement offer on the plaintiff's behalf, the plaintiff's failure to repudiate the settlement until three weeks after receiving an emailed recitation of the terms constituted ratification); <u>In re Paolino</u>, 85 B.R. 24, 31 (Bankr. E.D. Pa. 1988) (finding, under Pennsylvania law, that even if wife did not give husband express authority to compromise on her behalf, wife ratified the settlement by failing to act to repudiate it until one month after she was informed of the settlement).

Here, even if United was justified in its reliance on outside counsel's description of the MOU as a proposed settlement, the evidence reflects that from at least January 14, 2016, United had full knowledge of the MOU's terms, yet failed to repudiate it until the end of March 2016. Several pieces of evidence support this conclusion.

First, it is undisputed that between mid-January 2016 and the end of March 2016, at least four United in-house lawyers received a copy of the executed, six-page MOU—which unambiguously contained binding material terms. Schmiesing received a copy of the executed MOU on January 14, 2016. The file name of the document was "Provigil MOU Final Executed.pdf," thereby putting Schmiesing on notice that it was some type of final executed agreement. Yet, Schmiesing testified that she never read the MOU between the time that she received it on January 14, 2016 and sometime after March 25, 2016, choosing to simply rely on what outside counsel told her. (FOF ¶ 92.)

On January 15, 2016, Schmiesing forwarded the MOU to her colleagues Boado, Johnson, and Redmond, all of whom are attorneys. (FOF ¶ 93.) Boado testified that she did not read the MOU in any detail. Rather, she simply reviewed it at a "high level," also relying heavily on what outside counsel had conveyed, because she did not believe it was her responsibility to

thoroughly read the document. (FOF ¶ 95.) Similarly, Redmond stated that although she opened up the MOU and reviewed it for the framework of the proposed settlement and financial aspects, she did not review the entire document from start to finish. (FOF ¶ 96.) Finally, Jeremy Johnson testified that he read the MOU, saw the language indicating that it was "binding and enforceable," read the introduction that stated that the MOU memorialized the principal terms of the settlement agreement, and noted that Rhoad and Sandmann had signed the MOU on behalf of United. Yet, at no point did Johnson question outside counsel's authority to execute that document or suggest to any other lawyer at United that the MOU was actually binding and enforceable. Johnson admitted that he relied "heavily" on the "outside lawyers who ha[d] been involved in the process" and that he read the MOU "in that context" believing that "they knew more about the MOU than [he] did." (FOF ¶ 94.)

In short, four of United's in-house lawyers received the MOU in mid-January 2016, but chose either to not read it at all or to rely almost exclusively on outside counsel's interpretation. A sophisticated company ably represented by a team of in-house lawyers cannot remain willfully blind to a contractual obligation and then claim that their ignorance precludes ratification.

The circumstances during the pertinent time period exacerbate United's failure to read the MOU. Simultaneous with the signing of the MOU and the ongoing efforts by the Cephalon Parties and Lowey firm to finalize settlement documents, United was engaged in an active inquiry as to whether it should settle its Provigil claims or pursue affirmative litigation. The United in-house attorneys repeatedly acknowledged that there was a settlement of some sort, but believed that they could walk away from it. Schmiesing testified that she understood that the principal terms of the settlement were memorialized in the MOU and believed that United had rights to enforce the settlement against the Cephalon Parties. (FOF ¶ 92.) Boado acknowledged,

in conversations with Schmiesing and Zaetta, that it "[s]eems we've reached a settlement," but thought they could walk away from "the settlement" without recourse. (FOF ¶ 89.) Thereafter, in subsequent conversations, United in-house lawyers discussed the settlement not as a proposed agreement to which they had yet to sign on, but rather as an actual agreement, albeit one from which they could opt-out of under the "blow up" provisions typically included in class settlements. (FOF ¶ 104.)

I conclude that United ratified the contract by delaying any dispute of outside counsel's authority until after it decided to pursue affirmative litigation. The MOU was a brief, six-page, double-spaced document containing unambiguous language expressly indicating in plain language that the settlement was binding and enforceable. Once United's in-house lawyers had the MOU in hand, United had full knowledge of the material facts and circumstances regarding the transaction to be ratified. United's failure to promptly repudiate the settlement after receiving clear recitation of its terms constitutes a ratification of the MOU and renders it binding.

United offers a series of contrary arguments: (a) it claims that the Cephalon Parties failed to prove United manifested its "assent to be bound" to a settlement; (b) it argues that outside counsel's faulty description of the import of the MOU precluded United's silence from being ratification; (c) it asserts that the Third Circuit's decision in <u>Tiernan v. Devoe</u>, 923 F.2d 1024 (3d Cir. 1991), dictates that I must reject the ratification argument; and (d) it posits that ratification must be the intentional act of those with authority to approve the transaction, not the alleged negligence of those who did not. I will address each argument individually.

1. <u>Failure to Show that United Manifested Its Assent to the Settlement</u>

United first argues that ratification requires evidence of the principal's "consent to be a party to the previous transaction" and it consists of "an externally observable manifestation of

assent to be bound by the prior act of another person." (Def.'s Br. 24–25.) It contends that absent any evidence of United's specific intent and consent to be bound by the MOU, the Cephalon Parties cannot prove ratification.

The Cephalon Parties do not need to prove United's specific intent to consent. An affirmance that results in ratification "may consist of a manifestation of consent to be a party to the previous transaction, *or a manifestation that such consent has been given*." Restatement (Second) of Agency § 83, cmt. b (emphasis added). "Such manifestation is effective when made, although not communicated to the other party or to others, unless the other party changes his position believing that there has been no ratification." Id.

The Restatement further provides that affirmance of a transaction can be *inferred* from a failure to repudiate it:

> Silence under such circumstances that, according to the ordinary experience and habits of men, one would naturally be expected to speak if he did not consent, is evidence from which assent can be inferred. Such inference may be made although the purported principal had no knowledge that the other party would rely upon the supposed authority of the agent; his knowledge of such fact, however, coupled with his silence, would ordinarily justify an inference of assent by him.

Restatement (Second) of Agency § 94, cmt. a (1958).

The Pennsylvania Superior Court rejected an argument similar to United's in Piluso v. Cohen, 764 A.2d 549 (Pa. Super. Ct. 2000), appeal denied, 568 Pa. 633 (2002). There, the plaintiffs brought a medical malpractice action against a hospital and two doctors. Id. at 550. After jury selection, the case was settled in chambers, not in the presence of the plaintiff, and the trial proceeded against only the non-settling doctor. The jury returned a verdict in the amount of $1.5 million with no liability on the non-settling doctor, and all liability against the settling hospital and settling doctors. Id. Plaintiff then argued that she never consented to the release,

never authorized her attorney to make the settlement and never signed the release.  Id.  She further claimed she was unaware of the settlement until the following day when she questioned her attorney as to why the settling defendants were not present in the courtroom.  Although she expressed immediate dissatisfaction with the settlement to her lawyer, her lawyer directed her to refrain from mentioning it to anyone else.  Id.  The court found that because plaintiff was aware of the settlement prior to opening statements and allowed the suit to proceed through five days of trial prior to voicing her disapproval, she had ratified the settlement.  Id. at 551.

Here, outside counsel signed the MOU with the express knowledge of their client.  As of mid-January 2016, at least four in-house lawyers knew that the MOU had been signed on United's behalf.  Yet, not one lawyer for United made any effort to challenge outside counsel's authority to sign that MOU.  Nor did any of these lawyers choose to carefully read the MOU, opting instead to tacitly accept, over a period of several months, its consequences as explained to them by outside counsel.  Under such circumstances, United's silence is not susceptible to any interpretation other than ratification.

> 2.  Whether United's Silence is "Explained" and "Reasonable" Such That It Does Not Constitute Assent to the Settlement

United next contends that silence can create an inference of "assent to be bound" only if the evidence shows that the matter was presented to the principal in a manner calculated to call for dissent.  It urges that the MOU was not presented to United in such a manner because outside counsel repeatedly told United that the MOU merely contained the "proposed terms" of a "proposed settlement."  United goes on to contend that "[g]iven that the outside lawyers were much closer to the settlement discussions, United's in-house lawyers accepted these explanations and focused on whether the 'proposed settlement' was desirable, or whether United should litigate its claims."  (Id.)  United concludes that these facts offer a reasonable explanation for its

silence from the date United received the MOU (January 14, 2016) to the date United called the lawyers for the Cephalon Parties to repudiate the MOU (April 5, 2016).

United's argument disregards fundamental principles of mistake under contract law. "Generally if a mistake is not mutual, but unilateral, and is not due to the fault of the party not mistaken, but to the negligence of the one who acted under the mistake, it affords no basis for relief." McFadden v. Am. Oil. Co., 257 A.2d 283, 288–89 (Pa. 1969); see also Holt v. Dept. of Public Welfare, 678 A.2d 421, 423 (Pa. Commw. Ct. 1996), appeal denied, 547 Pa. 733 (1997). Where a party does not read a release or settlement agreement until after he signs it, his negligence cannot be grounds for invalidating the release. See Holt, 678 A.2d at 423 ("In the absence of fraud, failure to read a contract before signing it is not a defense and cannot justify a nullification of the contract or any of its provisions."); see also Simeone v. Simeone, 581 A.2d 162, 165 (Pa. 1990) ("Contracting parties are normally bound by their agreements, without regard to whether the terms thereof were read and fully understood and irrespective of whether the agreements embodied reasonable or good bargains."); Standard Venetian Blind Co. v. Am. Empire Ins. Co., 469 A.2d 563, 566 (Pa. 1983) (failure to read a contract does not warrant avoidance or nullification of its provisions); Nayak v. Voith Turbo, Inc., No. 14-1053, 2017 WL 9485536, at *8 (M.D. Pa. July 19, 2017) ("Because [plaintiff] is legally bound to know the terms of the Release he executed . . . he cannot now seek invalidation of the Release on the basis of his own misunderstanding.").

The Pennsylvania Supreme Court has specifically addressed the situation at issue here, where the principal's alleged lack of knowledge of facts was based on his or her own negligence or willful disregard. In Currie v. Land Title Bank & Trust Co., 5 A.2d 168 (Pa. 1939), the Court stated:

> It is undoubtedly a general principle of law that a person affirming a transaction, made on his behalf but without his authority, may avoid the effect of his ratification if at the time he was ignorant of material facts[.] . . . But there is an equally well-recognized limitation of this doctrine to the effect that "[a] principal can . . . ratify the unauthorized act of his agent without full knowledge of all material facts connected with it if he intentionally and deliberately does so, knowing that he does not possess such knowledge and does not care to make further inquiry into the matter[.]" . . . It is inferred from a ratification under such circumstances that the principal is willing to assume the risk of facts as to which he knows he is ignorant.

Id. at 170 (internal quotations omitted); see also Hodgson v. Gilmartin, No. 06-1944, 2006 WL 2707397, at *12 (E.D. Pa. Sept. 18, 2006) ("Even if the Offshore Fund and its attorneys never gained actual knowledge of the forum selection clause, however, the Court finds that the Offshore Fund could only have been unaware of the contents of the Customer Agreement because it chose not to inquire into its terms, and such ignorance is no excuse when determining whether ratification occurred.").

I find that United's failure to repudiate the MOU for months reflected their intent to be bound by the MOU. Schmiesing authorized outside counsel to sign the MOU. The knowing and intentional decision to not read the contract in order to fully ascertain the scope of the terms to which United had agreed, and to instead rely almost exclusively on advice from outside counsel regarding the MOU's terms, is a unilateral mistake that does not now allow United to escape the consequences of its decision. To hold otherwise would allow parties to rescind settlement agreements simply by willfully avoiding any understanding of the terms of their agreements.[12]

---

[12] United argues that the Cephalon Parties cited no case where "ratification by negligence" was found in the settlement context. It goes on to reference two cases where negligence by the alleged ratifier was held to be insufficient.

The cases cited by United are distinguishable. In Allen v. Holiday Universal, 249 F.R.D. 166, 174 (E.D. Pa. 2008), the court found that "ratification may not be based upon mere negligence" where the party charged with ratification did not have full knowledge of all material facts. Id. at 174. In that case, the court found that no legally cognizable ratification could have

United's assertion that the MOU was not presented in a manner calculated to call for dissent seems disingenuous. Notwithstanding outside counsel's faulty interpretation, the only information United needed to take to determine it was bound was found within the four corners of a very straightforward MOU. Chris Zaetta's reaction after reading the MOU illustrates this point. When Zaetta first received the executed MOU on March 25, 2016 and read it, he immediately concluded there was a problem, particularly given the plain "binding and enforceable" language of the MOU. Although his in-house colleagues and outside counsel attempted to explain the opt-out theory, Zaetta declined to blindly accept that theory.[13] Indeed, when presented with the *identical facts* that were before attorneys Schmiesing, Boado, Jeremy Johnson, and Redmond back in January 2016, Zaetta quickly understood that United was a signatory to the MOU, was classified as a member of the SHPs, and thus was likely bound to the terms set forth in the MOU without any opportunity to opt-out.

---

occurred because the alleged ratifiers did not yet have all facts available to them to determine whether their contracts were unlawful and legally voidable—an issue that was currently in litigation. Id. Prior to any determination on that issue, there was an "impediment to the conclusion of the agreement" that precluded them from ratifying the contract. Id. By contrast here, United had full knowledge of the operative facts in the form of the written MOU, but simply chose not to avail themselves of those facts.

United also cites to Adams Assoc., LLC v. Frank Pasquale Ltd. P'ship., No. C-34-08, 2011 WL 112665, at *8 (N.J. Super. Ct. Jan. 14, 2011) wherein the court remarked that "[b]ecause it requires knowing and intentional conduct, ratification cannot be based on mere negligence." Id. at *9. In that matter, however, the alleged ratifier took "unambiguous and timely steps" to repudiate the unauthorized acts, but was thwarted by fraudulent conduct by his son. Id. Adams did not undermine the well-established principal under New Jersey law that "[f]ailing to read a contract . . . provides no defense to an agreements binding terms" and "a contract may not be rescinded where a unilateral mistake occurred 'as a result of the mistaken party's own negligence.'" Giaccone v. Canopius U.S. Ins. Co., 133 F. Supp. 3d 668, 674 (D.N.J. June 29, 2015) (quotations omitted).

[13] Notably, during this time period, no one questioned outside counsel's authority to sign the MOU or denied knowing of the MOU's existence.

3.      Whether *Tiernan v. Devoe* Requires a Finding of No Ratification

United's third effort to avoid ratification rests on the theory that the case of <u>Tiernan v. Devoe</u>, 923 F.2d 1024 (3d Cir. 1991), is analogous and compels a rejection of any ratification theory.  United asserts that, under this case, where a party believes the settlement agreement to actually be a proposal and, therefore, does not repudiate its attorney's actions in signing that agreement, there can be no ratification.

<u>Tiernan</u> is not dispositive.  <u>Tiernan</u> involved the Third Circuit reversing and remanding a grant of summary judgment.  Crucial to the Court's decision was the fact that there were clear issues of disputed material facts not appropriate for disposition at the summary judgment stage. <u>Id.</u> at 1037–38.  As the district court had not held an evidentiary hearing to resolve these evidentiary and credibility concerns, the facts had to be read in the light most favorable to the plaintiff and summary judgment could not be entered under Federal Rule of Civil Procedure 56. <u>Id.</u>

Moreover, in reversing the district court's grant of summary judgment, the Third Circuit clearly stated that it "expressed no opinion the ultimate success" of the ratification argument.  <u>Id.</u> at 1038.  Indeed, it noted that "Defendants have offered several possible sources for the plaintiffs' attorney's authority," but given the substantial, material disputes as to the availability of each of those grounds, none of them "indisputably justifie[d] enforcement of the settlement agreements *at this stage of the proceedings*."  <u>Id.</u> (emphasis added).

Here, I am not bound by the same standard.  The parties proceeded through a five-day bench trial during which numerous witnesses and documents were offered into evidence.  As the fact-finder, I am specifically tasked with resolving issues of material fact.  Having done so, I find that although United may have reasonably believed the MOU was only a proposed settlement at

the time it was signed, that belief was unfounded once the in-house lawyers had the MOU in their possession, giving them all the material facts necessary to know there was a settlement that they needed to repudiate.

### 4. Whether Ratification Must Be Done By Someone With Authority to Settle

United's final argument asserts that to be effective, "ratification must be made by persons having the power to perform the act which is the subject of ratification." (Def.'s Br. 30 (quoting Schwartz v. Mahoning Valley Country Club, 114 A.2d 78, 80 (Pa. 1955).) It contends that because the United in-house lawyers who had the MOU, but failed to repudiate it did not have authority within United to approve a settlement of United's Provigil claims, no ratification could have occurred.

United's argument is misplaced on two levels. Primarily, the evidence of United's settlement process and who precisely had authority to approve a settlement was vague at best. Zaetta testified generally that he, Thad Johnson, and Marianne Short would have had to be involved. (N.T. 4/27/18, 62:13–63:10.) Schmiesing also offered some testimony about how a settlement would have to work its way up the chain within UHG and Optum and would need approval "from folks like Mr. Zaetta." (N.T. 4/25/18, 187:15–188:2.) Matthew Klein remarked that that there was "a process for review and approval of third-party liability or national recovery cases" and Provigil never went through that process. (Klein Dep. 32:20–33:3.) Jeremy Johnson testified that the settlement process was "not a decision that could have been made at the level that Betsy—or Ms. Schmiesing and I were at." (N.T. 4/26/18, 159:3–9.) United's trial counsel represented in court that Chris Zaetta and Thad Johnson would have had to approve a settlement. (N.T. 4/23/18, 78:17–79:12.) Absent any clear evidence offered by United of what its settlement

process was, I cannot determine the merit of United's defense that no one with authority ratified the contract. [14]

In any event, I find no substantive merit to United's argument. In <u>Hodgson v. Gilmarton</u>, No. 06-1944, 2006 WL 2707397, at *11 (E.D. Pa. Sept. 18, 2006), the court rejected a claim that ignorance by a person with authority precludes ratification. There, an agent of the principal executed a customer agreement that contained a forum selection clause. The principal disputed the validity of the forum selection clause, arguing that the agent did not have authority to act on the principal's behalf. <u>Id.</u> at *8–9. The court found that, notwithstanding the authority or lack thereof of the agent to sign the agreement, the principal—directors of an Offshore Fund—had ratified the customer agreement. <u>Id.</u> at *10. The directors of the Offshore Fund argued that ratification did not occur because they were unaware of the customer agreement and forum selection clause therein. <u>Id.</u> The court rejected this contention, finding that the Offshore Fund was put on notice of the fact that there was some type of agreement. It concluded that "[w]hether officials at the Offshore Fund chose to make a reasonable investigation of the 'acct opening doc' mentioned in the July 26, 2004 e-mail should not be the determining factor for the Court in deciding whether ratification occurred." <u>Id.</u> at *11. The court went on to note that "[e]ven if the Offshore Fund and its attorneys never gained actual knowledge of the forum selection clause . . . the Offshore Fund could only have been unaware of the contents of the Customer Agreement because it chose not to inquire into its terms, and such ignorance is no excuse when determining whether ratification occurred." <u>Id.</u> at *12.

---

[14] I note that the Cephalon Parties repeatedly lodged objections to this testimony because United had, throughout discovery, precluded the Cephalon Parties from inquiring into United's settlement approval process. (<u>see, e.g.</u>, N.T. 4/25/18, 184:23–186:12, 4/26/18, 159:10–13, 4/27/18, 62:21–23.) As the Cephalon Parties were stymied in their efforts to obtain discovery and address this defense, I find that the burden of proving what the settlement process was fell on United.

Here, even assuming that Schmiesing, Jeremy Johnson, and Boado did not have authority to approve a settlement, and that higher-level attorneys would have to approve a settlement, I find that the failure of these higher-level attorneys to inquire into the relevant facts constituted ratification. The undisputed testimony also reveals that many of the "higher-level" attorneys were aware that some settlement offer existed. On January 22, 2016, Jeremy Johnson, Boado, and Wolfe prepared a report for United Healthcare General Counsel Thad Johnson explaining that outside counsel had in hand a settlement offer from the Cephalon Parties, yet Thad Johnson never inquired further into the status of these settlement talks. (FOF ¶ 97.) On February 15, 2016, Matthew Shors, the corporate head of litigation for the entire UnitedHealth Group, actually received a copy of the executed MOU, yet did not think to raise any questions about its "binding and enforceable" language. (FOF ¶ 105.) Indeed, even when Zaetta raised questions to Shors about the MOU at the end of March 2016, Shors did not even acknowledge having ever received it. (FOF ¶ 127.)

5.    Conclusion as to Ratification

In light of the foregoing, I conclude that by failing to contest the authority of its outside counsel to sign the MOU or otherwise express opposition to the MOU for at least two and half months after it was well aware of the document, United ratified the MOU. The ratification renders the MOU binding on United.

## IV.    CONCLUSION

Having fully considered the trial testimony, exhibits, deposition transcripts, and attorney argument, I conclude that United is bound to the MOU signed on its behalf. Aside from the fact that United clearly cloaked its outside counsel with apparent authority to reach a settlement agreement, it also ratified the MOU by failing to repudiate it despite having all of the relevant

facts in its possession.  Therefore, I will enter judgment in favor of Plaintiffs the Cephalon

Parties and against Defendant United on the entirety of the Complaint.

An appropriate Order follows.